# EXHIBIT A

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ---------------------------------------------X
     GEORGE AIRDAY,
3
                                        PLAINTIFF,
4
                     -against-        Case No:
5                                     14-CV-8065(RWS)

6    THE CITY OF NEW YORK, KEITH SCHWAM and
     DAVID H. FRANKEL,
7
                                        DEFENDANTS.
8    ---------------------------------------------X

9

10                           DATE:  March 29, 2017

11                           TIME:  11:20 A.M

12

13

14            DEPOSITION of the Plaintiff, GEORGE AIRDAY,

15   taken by the Defendants, pursuant to a Notice and to the

16   Federal Rules of Civil Procedure, held at the offices of

17   the New York City Law Department, 100 Church Street, New

18   York, New York 10007, before Joanne Capparelli, a Notary

19   Public of the State of New York.

20

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2

 3    LAW OFFICE OF NATHANIEL B. SMITH
            Attorney for the Plaintiff
 4          GEORGE AIRDAY
            111 Broadway, Room 1305
 5          New York, New York 10006
            BY:  NATHANIEL B. SMITH, ESQ.
 6

 7

 8    ZACHARY W. CARTER, ESQ.
      CORPORATION COUNSEL
 9    NEW YORK CITY LAW DEPARTMENT
            Attorneys for the Defendants
10          THE CITY OF NEW YORK, KEITH SCHWAM
            and DAVID M. FRANKEL
11          100 Church Street
            New York, New York 10007
12          BY:  CHRISTOPHER SEACORD, ESQ.
            File #:  2014-036441
13          Control #:  165164

14

15    ALSO PRESENT:

16          MICHAEL SILLER - Department of Investigation

17

18                      *         *         *

19

20

21

22

23

24

25
```

```
1              F E D E R A L   S T I P U L A T I O N S

2

3

4         IT IS HEREBY STIPULATED AND AGREED by and between

5    the counsel for the respective parties herein that the

6    sealing, filing and certification of the within deposition

7    be waived; that the original of the deposition may be

8    signed and sworn to by the witness before anyone authorized

9    to administer an oath, with the same effect as if signed

10   before a Judge of the Court; that an unsigned copy of the

11   deposition may be used with the same force and effect as if

12   signed by the witness, 30 days after service of the

13   original & 1 copy of same upon counsel for the witness.

14

15        IT IS FURTHER STIPULATED AND AGREED that all

16   objections except as to form, are reserved to the time of

17   trial.

18

19                    *     *     *     *

20

21

22

23

24

25
```

G. AIRDAY

```
1    receive any other compensation from any other source other

2    than employment and Social Security?

3        A.    No.

4        Q.    When did you become a City marshal?

5        A.    1984.

6        Q.    Were you employed prior to becoming a marshal in

7    1984?

8        A.    Yes.

9        Q.    What was your employment prior to becoming a City

10   marshal?

11       A.    Federal probation and parole officer.

12       Q.    Who was your employer?

13       A.    It was at Southern District of New York.

14       Q.    How long were you a Federal probation and parole

15   officer?

16       A.    Approximately one year.

17       Q.    Prior to working as a Federal probation and

18   parole officer, did you have any employment?  Were you

19   employed prior to that?

20       A.    Yes.  I worked as a New York City probation

21   officer.

22       Q.    How long were you a New York City probation

23   officer?

24       A.    About seven years off and on.

25       Q.    Prior to serving as a New York City probation
```

G. AIRDAY

1   officer, did you have any other employment?

2       A.      Yes.  I was a teacher in New York City.

3       Q.      How long were you a teacher for New York City?

4       A.      I lasted seven years.

5       Q.      Who was your employer when you were a teacher in

6   New York City?

7       A.      The New York City Board of Education.

8       Q.      Were you ever disciplined in your prior periods

9   of employment?

10      A.      No.

11      Q.      Were you ever terminated from any prior position

12  of employment?

13      A.      No.

14      Q.      You said you became a City marshal in 1984; is

15  that correct?

16      A.      Yes, correct.

17      Q.      How did you obtain that position?

18      A.      Obtain the position of City marshal?

19      Q.      Yes.  What was the process?

20      A.      I filled out an application and about a

21  year-and-a-half later they called me for an interview.

22      Q.      When did you fill out the application?

23      A.      About two years before I became a City marshal.

24  Probably about 1982. '81/'82.

25      Q.      Who called you for an interview, if you recall?

G. AIRDAY

```
 1        A.      I don't recall.

 2        Q.      They called you for an interview and you came in

 3   and had an interview with whom?

 4        A.      I don't recall.

 5        Q.      Was it more than one interview?

 6        A.      I believe it was one interview and then followed

 7   by other interviews before the Mayor's committee.

 8        Q.      How many interviews with the Mayor's committee?

 9        A.      One.

10        Q.      Other than the two interviews, did you have to do

11   anything else in order to obtain the position as a City

12   marshal?

13        A.      Say that again.

14        Q.      Other than those two interviews, did you have to

15   do anything else in order to obtain the position of the

16   City marshal?

17        A.      In order to obtain?

18        Q.      Did you have background questions to fill out?

19        A.      That was part of the application.

20        Q.      Did you have to attend any training?

21        A.      There was a brief training session.

22        Q.      When you say brief, how long did it last?

23        A.      Possibly two or three days.

24        Q.      Did anybody else go through that training session

25   with you?
```

G. AIRDAY

```
 1      A.      Yea.  There were maybe five or six other people.

 2      Q.      Who lead that training session?

 3      A.      I don't remember.

 4      Q.      Do you recall what position that person held?

 5      A.      You know, I don't recall actually.

 6      Q.      At some point you were informed that you had been

 7  selected for a position as a City marshal; is that correct?

 8      A.      Yes.  That was before the training session.

 9      Q.      How were you informed?

10      A.      I believe I was sent a letter.

11      Q.      Do you recall who sent that letter, who signed

12  the letter?

13      A.      I don't recall.

14      Q.      Was it the Mayor?

15      A.      Well, Mayor sent congratulatory letter but I

16  don't know if there was another letter.

17      Q.      The letter said you had been appointed to a

18  position as a City marshal; is that correct?

19      A.      That's right.

20      Q.      Did it identify what your badge number would be?

21      A.      No.  I don't think so.

22      Q.      Were you ever assigned a badge number?

23      A.      I was, yes.

24      Q.      What badge number was that?

25      A.      Number seven.
```

G. AIRDAY

1     Q.     Is that the only badge number you ever held?

2     A.     That's right.

3     Q.     On being appointed to the position of City

4  marshal you had to file an oath of office; is that correct?

5     A.     I had to do what?

6     Q.     You had to sign an oath of office; is that

7  correct?

8               MR. SMITH:  Objection to the form of the

9               question.  You can answer it.

10    A.     I don't recall.

11    Q.     Did you have to obtain a bond?  Do you know what

12  I'm talking about when I say that?

13    A.     I eventually did get a bond but I don't know the

14  exact timing of it.

15    Q.     Prior to becoming a City marshal had you ever

16  done any work for City marshals?

17    A.     No.

18    Q.     Upon being appointed to a City marshal did you

19  establish an office?

20    A.     Well, I was a subtenant in another marshal's

21  office.

22    Q.     When did you start being a subtenant in another

23  marshal's office?

24    A.     Sometime after I was appointed.

25    Q.     Who was that marshal?

G. AIRDAY

1       A.      That was Jerry Shapiro.

2       Q.      How did you know Jerry Shapiro?

3       A.      I didn't.  Just asked around.

4       Q.      When you became a City marshal you asked -- you

5   were looking to be a subtenant in another marshal's office;

6   correct?

7       A.      I was looking to find a City marshal to help me

8   learn the business and have a place where I could operate.

9       Q.      Where was that office located?

10      A.      He was at 16 Court Street, Brooklyn.

11      Q.      When you were a subtenant in Mr. Shapiro's

12  office, what kind of work did you do?

13      A.      I did whatever extra work that he had; that he

14  needed helped with.  I would log tenants.  Mostly that.

15      Q.      Let me ask you more broadly what does a City

16  marshal do?

17      A.      City marshal enforces the civil law.

18      Q.      How so?

19      A.      When there are judgment issues out of civil

20  court, housing court, City marshal will execute on the

21  order if the parties don't come to an agreement.

22      Q.      I assume someone has to ask you to enforce the

23  order; correct?

24      A.      You have to have an execution signed by either an

25  attorney or a judge.

G. AIRDAY

 1      Q.      Once an execution is signed by an attorney or a

 2    judge can any marshal enforce it?

 3      A.      Yes.

 4              MR. SMITH:  That was okay but let him finish

 5              his whole question because she needs to take down

 6              his whole question before you answer.

 7              THE WITNESS:  I understand.

 8      Q.      You said when you first started working as -- or

 9    when you were a subtenant in Marshal Shapiro's office you

10    were enforcing primarily what type of judgments?

11      A.      Whatever work he had that he needed help with.

12    If he was -- if he was short at the time or he had more

13    work than he could handle.

14      Q.      What type of judgments were you enforcing?

15      A.      I think he had -- Shapiro had landlord/tenant

16    work.

17      Q.      Are there other type of judgments that marshals

18    enforce?

19      A.      Yes.  They have property executions.  They have

20    income executions.  Replevin.  Scofflaw enforcement program

21    which is another type.

22      Q.      Any others that you can think of?

23      A.      That's basically it.  Over time the City issued

24    tax warrants.  That was for a short time.  That was one of

25    the assignments for marshals, to enforce tax warrants.

G. AIRDAY

1     Q.     Did you ever do any property executions?

2     A.     Yes.

3     Q.     What about income executions?

4     A.     Yes.  That too.

5     Q.     What about replevin?

6     A.     Yes.

7     Q.     Scofflaw?

8     A.     Yes.

9     Q.     What about tax warrants?

10    A.     I did a few.

11    Q.     How long were you a subtenant in Marshal

12    Shapiro's office?

13    A.     A few months.

14    Q.     When you were appointed as a City marshal were

15    you appointed for a specified term?

16    A.     It was for a term of five years.

17    Q.     You said you were a subtenant in Marshal

18    Shapiro's office for a few months; right?

19    A.     Yes.

20    Q.     Where did you go after Marshal Shapiro's office?

21    A.     I was renting an office from another marshal.

22    Q.     Who was that marshal?

23    A.     Marchisotto.

24    Q.     How do you spell that?

25    A.     M-A-R-C-H-I-S-O-T-T-O.

G. AIRDAY

```
1      Q.    That's the last name, Marchisotto?

2      A.    Yes.

3      Q.    Where was that office located?

4      A.    I think he was in Brooklyn, 16 Court Street.

5            MR. SMITH:  There's a list of marshals so we

6            get their names right.

7      Q.    How long were you renting an office for Marshal

8  Marchisotto?

9      A.    A few months.  Six months maybe.

10     Q.    After that period of time what did you do next?

11     A.    Moved and rented an office in Manhattan.

12     Q.    Were you renting that from another marshal?

13     A.    No.  This was rented together with another

14  marshal.

15     Q.    Who was that marshal?

16     A.    That was Al Mallah, M-A-L-L-A-H.

17     Q.    How long were you renting that office?

18     A.    Approximately a year.

19     Q.    Did you have any employees at that time?

20     A.    Yes.

21     Q.    How many employees did you have?

22     A.    I had one.

23     Q.    What did that employee do?

24     A.    She answered the phones.  Prepared papers, and

25  helped me with my schedule.
```

G. AIRDAY

1     Q.     What was her name, if you remember?

2     A.     First name was Norma.  I don't recall her last

3     name.

4     Q.     You said you rented that office for approximately

5     one year.  Where did you go after that?

6     A.     I went to 40th Street.

7     Q.     You rented an office on what street?

8     A.     I'm sorry.

9     Q.     You were renting an office on what street?

10    A.     I was a subtenant of a lawyer who was renting an

11    office.

12    Q.     Who was that lawyer?

13    A.     Kostroff.

14    Q.     How do you spell that?

15    A.     K-O-S-T-R-O-F-F.

16    Q.     How long were you a subtenant in that office?

17    A.     A few years.  Maybe four years approximately.

18    Q.     What type of work were you doing when you were a

19    subtenant in that office?

20    A.     I was doing scofflaw enforcement; income

21    executions.  Property executions, and landlord/tenant.

22    Q.     What is scofflaw enforcement?

23    A.     Those people who are getting parking tickets and

24    fail to pay them within a fixed time, usually three months

25    or more.  And once these tickets exceed the threshold, then

G. AIRDAY

1    they become scofflaw based on the Parking Violation

2    Bureau's data base.

3        Q.    Do all marshals have access to the parking

4    violation data base?

5        A.    No.

6                MR. SMITH:  Objection.  You can answer.  The

7                answer was yes.

8                MR. SEACORD:  No.

9        Q.    Who has access to the parking violations data

10   base?  I'm not asking for particular people.

11       A.    Who is in the program for scofflaw enforcement?

12       Q.    Who operates the scofflaw enforcement program?

13                MR. SMITH:  Objection to the form.  You mean

14                -- I mean -- I think you can rephrase that.

15       Q.    The scofflaw enforcement program, is that what it

16   is called first of all?

17       A.    They've changed the name slightly over time so

18   it's -- that's generally the term but the exact term has

19   changed over time.

20       Q.    The scofflaw enforcement program, does that fall

21   within the purview of any New York City agency?

22       A.    That has also changed.  Most recently when I was

23   in the program it was under Department of Finance.

24       Q.    Prior to being under the Department of Finance

25   who was in charge of the scofflaw program?

G. AIRDAY

```
 1      A.      I'm not sure.  I think it was an independent

 2   office.  One point it was working with the sheriff's

 3   office.  I think it was independent.

 4      Q.      You said that only people in the program had

 5   access to the Parking Violations Bureau data base; correct?

 6      A.      No.  I didn't say that.

 7      Q.      What did you say?

 8      A.      Among the marshals.

 9      Q.      Only marshals?

10      A.      Only those marshals who were in the program had

11   access to the data base of the program.

12      Q.      How did a marshal get into the program?

13      A.      He was selected and assigned to the program.

14      Q.      Did a marshal have to apply to get into the

15   program?

16      A.      Yes.  I believe so.

17      Q.      Did you apply?

18      A.      I did apply.

19      Q.      When did you apply to be in the scofflaw program?

20      A.      When I became a marshal.

21      Q.      What did a marshal have to demonstrate in order

22   to get into the program, if anything?

23      A.      I'm not sure what the criteria that they are

24   using but I applied for every program that marshals

25   performed when I first became a marshal.
```

G. AIRDAY

1      Q.     What other programs are there besides the
2    scofflaw program?
3      A.     There's City housing evictions.  That's one
4    program.  And they had Con Edison, Brooklyn Union Gas that
5    did replevins.  They had other programs from the Department
6    of Finance, income executions that were issued to garnish
7    salaries of debtors.  They also had property executions but
8    I didn't get any of those things.  With the exception of
9    landlord/tenant work every City housing, I did get that and
10   I performed it for a while.
11     Q.     You said you at one point you were in the City
12   housing evictions program?
13     A.     Yes.  I was selected to do evictions and serve
14   paperwork at several housing projects.
15     Q.     How long were you in that program?
16     A.     Approximately three years.
17              MR. SMITH:  Did you say three?
18              THE WITNESS:  About three.
19     Q.     Did you have to reapply for the program at
20   certain intervals?
21     A.     No.
22     Q.     You said you were in the program three years?
23     A.     Approximately.
24     Q.     Why were you no longer in the program?
25     A.     You had to devote significant portion of your

G. AIRDAY

1    time as a marshal to do that.  So it became impractical.

2        Q.    You chose not to remain in the program?

3        A.    Basically, yes.

4        Q.    I mean you weren't told that you had to leave the

5    program; were you?

6        A.    No, but we had some discussions about how much

7    time I would devote to these evictions.  It was not

8    practical for me to do both evictions and scofflaw

9    enforcement.

10       Q.    I don't want to put words in your mouth but you

11   essentially chose that you wanted to devote the majority of

12   your time to scofflaw enforcement; is that accurate?

13                 MR. SMITH:  Objection.  You can answer.

14       A.    I decided that I would focus on scofflaw

15   enforcement.

16       Q.    You also mentioned Con Edison replevin program?

17       A.    Yes.

18       Q.    Were you in that program?

19       A.    I was, yes.

20       Q.    For how long?

21       A.    I was off and on probably ten years.

22       Q.    How long were you in the scofflaw enforcement

23   program?

24       A.    Well, over time the scofflaw enforcement program

25   changed.  But I have been doing scofflaw enforcement from

G. AIRDAY

1    about 1984 until there was a scandal in the City and the

2    program was halted for a few years and then it was

3    reconstituted in a different format.  So then I joined the

4    program after a few months.  I was assigned to an area.

5        Q.    You said there was a scandal in the City, what

6    are you referring to?

7        A.    There was a Parking Violations Bureau scandal

8    where all the scofflaw enforcement was basically halted.

9    Donald Manes killed himself.  A big scandal in the papers.

10       Q.    When was that?

11       A.    It was about 1985 until 1989.  That program was

12   essentially halted.

13       Q.    What kind of work were you performing when the

14   scofflaw program was halted?

15       A.    As far as I know that's it.

16       Q.    What were you doing instead of that?

17       A.    I was doing landlord/tenant work.  Property and

18   income executions.  Whatever work I could pick up.

19   Overflow work from other marshals.

20       Q.    You said the program was reconstituted.  How did

21   the program change after that, after that scandal?

22       A.    Well, the marshals were given authority over

23   hiring tow companies and were essentially assigned areas of

24   enforcement.

25       Q.    Certain marshals were assigned to certain areas

G. AIRDAY

1    of enforcement?

2        A.      Correct.

3        Q.      What do you mean by an area of enforcement?

4        A.      For example, somebody was assigned part of

5    Brooklyn or part of Manhattan and they were supposed to

6    work only those areas.

7        Q.      A geographic area?

8        A.      Yea.

9        Q.      Which areas were you assigned?

10       A.      I was assigned upper Manhattan, Harlem,

11   Washington Heights.

12       Q.      Was that throughout your period as a City marshal

13   or did that ever change?

14       A.      Well, this began in 1990 and then subsequently I

15   had followed whatever rules they had.  At one point they

16   allowed marshals who were in Manhattan to work all the

17   precincts according to some sort of a schedule and then

18   they returned marshals to just work in those precincts that

19   they were assigned.  And at some point I was -- I requested

20   transfer to the Bronx from Manhattan to work Bronx

21   precincts.

22       Q.      When did you request transfer to the Bronx?

23       A.      That was about 2007 approximately.  I don't

24   recall exactly.

25       Q.      Why did you request transfer to the Bronx?

G. AIRDAY

```
1      A.      There were -- there were more cars to work and

2   less traffic.  So basically it was more productive.

3      Q.      Who did you make that request to?

4      A.      That was -- I spoke with Louis Jordan and Ken

5   Kelly.

6      Q.      Who is Louis Jordan?

7      A.      Louis Jordan is the director of scofflaw

8   enforcement.

9      Q.      What agency is he with?

10     A.      Department of Finance.

11     Q.      Who is Ken Kelly?

12     A.      Ken Kelly was the director of intergovernmental

13  affairs for the marshal's association.

14     Q.      What is the marshal's association?

15     A.      What is it?

16     Q.      Yes.

17     A.      It's an association of marshals.

18     Q.      I mean is it a union?

19     A.      It's an association.  It's a nonprofit.  It's not

20  a union.

21     Q.      You were a subtenant at 40th Street you said for

22  about four years.  Where did you go after that?

23     A.      I went to Mosholu Avenue and opened an office at

24  5720 Mosholu Avenue.

25     Q.      That's in the Bronx?
```

G. AIRDAY

1    another process involving an auction.

2        Q.    Let's say a car was towed or impounded and then

3    the individual never paid the judgment, did that ever

4    happen?

5        A.    Yes.

6        Q.    In that case or on those occasions do you get

7    compensated in anyway?

8        A.    Depends on whether there was a reason why the car

9    could not be redeemed or auctioned.  There were occasions

10   when the car was reported stolen.  There were occasions

11   when there was some other reason to put a hold on it.  If

12   PVB made a mistake and the judgment was thrown out.

13       Q.    Those occasions were you compensated?

14       A.    In those cases I was not compensated.

15       Q.    Let's say the car was auctioned then how were you

16   compensated?

17       A.    Depending on the price at auction.  If the price

18   was very low then there wasn't enough money left to pay

19   marshal fees.  There's a bid report that had a formula for

20   who gets paid first and then so on.

21       Q.    If a car is auctioned I assume the City gets paid

22   first?

23       A.    No.

24       Q.    Who gets paid first?

25       A.    The expenses are paid first.  The expenses for

G. AIRDAY

```
 1              MR. SEACORD:  Can I have this marked,

 2         please?

 3              (Whereupon, the aforementioned Document was

 4         marked as Defendant's Exhibit A for

 5         identification as of this date by the Reporter.)

 6    Q.    Mr. Airday, I'm handing you what's been marked as

 7  Defendant's Exhibit A. Take a look at that and let me know

 8  if you recognize it. (Handing.)

 9    A.    (Perusing.)

10         Yes.

11    Q.    What do you recognize this to be?

12    A.    This was a letter of reappointment.

13    Q.    That letter is dated January 22, 2009; is that

14  correct?

15    A.    Correct.

16    Q.    Is that the reappointment you were just referring

17  to from Mayor Bloomberg?

18    A.    Yes.

19    Q.    Prior to receiving this letter, did you have to

20  go through any process in order to be reappointed?

21    A.    I was required to submit an updated application.

22    Q.    Did you have to do that the first time you were

23  reappointed as well?

24    A.    Yes.

25    Q.    With respect to the 2009 reappointment when did
```

G. AIRDAY

1    you submit the updated application?

2        A.      You know, I don't know.

3        Q.      Like in terms of the times, but how long before

4    you received this letter did you submit it?

5        A.      Possibly as much as six months or more.

6        Q.      Did somebody contact you and ask you to submit a

7    new updated application?

8        A.      I'm not sure.  I'm not sure.  I think that

9    marshals's association with Ken Kelly's help organized

10   everybody to submit application.

11       Q.      When you say everybody, you mean all the

12   marshals?

13       A.      All the City marshals.

14       Q.      Other than resubmitting an updated application do

15   you have to interview with anybody prior to this

16   reappointment?

17       A.      I don't believe so.

18       Q.      Did you have to meet with the Mayor's committee

19   on City marshals at all?

20       A.      I think yes.

21       Q.      You think yes you met with the Mayor's committee?

22       A.      I believe so, yes.

23       Q.      According to this letter you were reappointed for

24   a five year term expiring on December 31, 2016; is that

25   accurate?

G. AIRDAY

1              MR. SMITH:  Is that your question?

2      Q.     That's what is in the letter.  I'm asking is that

3   your understanding?

4              MR. SMITH:  I have an objection to the form

5              of that question.

6      Q.     What was your understanding of the term of

7   appointment in 2009?

8      A.     I was reading the letter and the letter basically

9   gives the terms.

10     Q.     When you received this letter was it your

11  understanding you were being reappointed to a five year

12  term expiring on December 20, 2013?

13     A.     Well, that's part of it.

14     Q.     What's the other part?

15     A.     That I had letters of this type over the years

16  and this was one step in the process but the marshal's

17  position was something that was a continuous position.  It

18  did not -- it did the not stop at the end of the term of

19  appointment.  It continued into a holdover status on a

20  number of occasions.  We were not reappointed, we just

21  continue.

22     Q.     It was your understanding that although your term

23  expired on December 20, 2013 you would remain as a

24  holdover?

25             MR. SMITH:  Objection to the form.  Answer

G. AIRDAY

1            it.

2    A.    Correct.

3    Q.    Did you say correct?

4    A.    Yes, correct.

5    Q.    We talked about the scofflaw program in which

6    judgments were enforced through towing process.

7            Did that process ever change to a booting

8    program?

9    A.    It had changed, yes.

10   Q.    When did that change?

11   A.    Sometime after I stopped working in the previous

12   program I was suspended from that program.

13   Q.    Wait.  I don't understand.

14   A.    So it became -- sometime in 2012 I believe it

15   became a booting program.

16   Q.    Were you in the program at the time?

17           MR. SMITH:  At that time.

18   Q.    Sometime in 2012?

19   A.    I started working as an associate marshal to --

20   the program was now run by the sheriff's department and it

21   had changed completely.  I was working as an associate

22   marshal for the marshal, for different marshals as well as

23   for the marshal who was given my program.

24   Q.    You were working as an associate marshal?

25   A.    Not a program marshal.

G. AIRDAY

1    Q.    What is the difference?

2    A.    Program marshal is in charge of the -- the

3    program, the assigned areas and associate marshal works at

4    the pleasure of the program marshal when and if he's

5    needed.

6    Q.    When were you working as an associate marshal?

7    A.    When they asked me to cover.

8    Q.    What period of time are we talking?

9    A.    It had changed.  It wasn't a specific schedule

10   but at one point Marshal Rivera was pregnant and she needed

11   somebody to cover for her on at least one day a week.  So I

12   started doing that after the paylock program, after the

13   booting program began.  This was on call.  It was not a

14   regular assignment.

15   Q.    You mentioned the paylock program; what is the

16   paylock program?

17   A.    Paylock program was the booting program run by a

18   company called Paylock out of New Jersey.  Private company.

19   Q.    When did you first learn about the paylock

20   program?

21   A.    Sometime around 2010, 2011.

22   Q.    How did you learn about it?

23   A.    Marshal's association was asked -- well, I

24   learned from the marshal's association president and the

25   executive director, Ken Kelly, of this plan, this pilot

G. AIRDAY

1    program.

2        Q.    You learned from Ken Kelly or you learned from

3    Ken Kelly or somebody else?

4                    MR. SMITH:  Same person.

5        A.    From Ken Kelly and somebody else.

6        Q.    Who is that person?

7        A.    That's the marshal's association.  We had a

8    meeting and it was Ken Kelly who spoke.  The president of

9    the association was also present.

10       Q.    Who is the president of the association?

11       A.    That's Locascio.  His name is Al Locascio.

12                   MR. SMITH:  Let me get the spelling for the

13                   court reporter.

14                   MR. SEACORD:  Okay.

15                   MR. SMITH:  L-O-C-A-S-C-I-O.

16       Q.    Is Al Locascio a marshal?

17       A.    Yes.

18       Q.    Was Ken Kelly a marshal?

19       A.    No.  Ken Kelly is a retired police officer.

20       Q.    You said there was a meeting where the marshals

21   were informed about the paylock program?

22       A.    About the paylock program, yes.

23       Q.    Were all the marshals present at that meeting?

24       A.    I don't believe so, no.

25       Q.    Did anyone voice any concerns at that meeting

G. AIRDAY

1    about the paylock?

2        A.      Yes.

3        Q.      Who?

4        A.      Several of us.  One is no more.

5        Q.      You asked questions at the meeting?

6        A.      Yes.  We asked about the program.

7        Q.      What did you ask?

8        A.      We wanted to know how the program would work; how

9    it would change the existing program.  We didn't know

10   anything about it.

11       Q.      What did you learn about the program at that

12   meeting?

13       A.      We learned that Finance department wanted to have

14   a pilot program.  They wanted some marshals to volunteer.

15       Q.      When you say Finance, you mean the Department of

16   Finance?

17       A.      Department of Finance.

18       Q.      They wanted to have several marshals volunteer

19   for a pilot program; correct?

20       A.      Yes.

21       Q.      Did any marshals volunteer?

22       A.      No.  Not to my knowledge?

23       Q.      Did they go through with the pilot program?

24       A.      Well, subsequently apparently they had started

25   the pilot program with the sheriff's department using

G. AIRDAY

1    deputy sheriffs and then I believe there were some marshals

2    that decided on their own to volunteer.

3        Q.    Which particular marshals volunteered for the

4    pilot program?

5        A.    I understand it was Locascio and what's the other

6    guy.

7                MR. SMITH:    You can look at that.

8        A.    Sergente.   Locascio and another one.

9                MR. SMITH:    With Mr. Seacord's permission,

10               if you want to look at this list.  I'm not trying

11               to pry you but if you want to look at the list

12               which is a list of New York City marshals to

13               refresh your recollection, go ahead.

14       A.    I believe it was Siracusa, the other guy.

15               MR. SMITH:    That is spelled S-I-R-A-C-U-S-A.

16       Q.    How long did that pilot program last, if you

17   know?

18       A.    I think it was probably less than a year.  It was

19   run by the sheriff's department so we're not fully familiar

20   with their arrangement.

21       Q.    After that meeting where you learned about the

22   paylock program, did you discuss the paylock program with

23   any of the other marshals?

24               MR. SMITH:    Objection to the form.  You can

25               answer.

G. AIRDAY

1      A.      Yes.  We talked.

2      Q.      Who did you discuss it with?

3      A.      Other marshals who were involved in the scofflaw

4  program.

5      Q.      How many other marshals were located in the

6  scofflaw program at the time?

7      A.      I believe there were 11 program marshals.

8      Q.      And were you a program marshal at the time?

9      A.      That's right.

10     Q.      Did you have concerns about the paylock program?

11     A.      Yes.

12     Q.      What were your concerns?

13     A.      The paylock program seemed very loosely

14  structured in contrast to the existing scofflaw enforcement

15  program which is very highly structured.

16     Q.      In what way did you think it seemed loosely

17  structured?

18     A.      Well, marshals in the PVB scofflaw enforcement

19  program were required to follow PVB BOB standard operating

20  procedure which detail every step of the process including

21  copying information down, filling out the forms and

22  inventory of the vehicle.  All of those things were missing

23  from this proposal.

24          Also learned that the actual booting process and

25  the execution process was handled by non-marshal staff.  It

G. AIRDAY

1    wasn't handled by the marshal as we understood it to be

2    required under the law.

3         Q.     Who was it that was handling the actual or who

4    would handle the actual booting process under the proposal?

5         A.     Well, initially we didn't have any clear cut

6    answers to any of these questions.  So later on I learned

7    that it was paylock employee that was assigned this role,

8    not the marshal.

9         Q.     How did you come to learn that a paylock employee

10   would be working?

11        A.     When I worked as an associate marshal and I went

12   to the meeting at the sheriff's office and later on I was,

13   I was in the vehicle and I observed how it worked.

14        Q.     Did a marshal accompany the paylock employee when

15   they performed that booting program?

16        A.     Marshal was present at the location.  By the

17   computer operation, the entering of judgment with the key

18   stroke, all of that was done by the paylock employee in

19   violation of what our understanding was.

20        Q.     What was the role of the marshal in that process?

21        A.     That was an open question.  It seemed as if his

22   role was just to be present and to accompany paylock

23   employee.

24        Q.     On the times when you did accompany a paylock

25   employee what did you do, if anything?

G. AIRDAY

1     A.     I verified the license plates based on what the

2  paylock employee said was on his screen.  I looked at the

3  license plate.  And essentially there wasn't much else.

4     Q.     Did you have concerns about the paylock program?

5  Did you voice those concerns to anybody, to either Ken

6  Kelly or --

7     A.     Yes.  I voiced my concerns to a number of people

8  especially Ken Kelly and the other marshals in the program.

9     Q.     What did you say to Ken Kelly?

10    A.     Well, I had reviewed the proposal at the

11 Department of Finance's offices and they wouldn't let me

12 have a copy but I made some notes and I told them that this

13 is a very unstructured poorly designed program that seems

14 to violate the rules.

15    Q.     When did you review the proposal at the DOF's

16 office?

17    A.     Sometime in March of 2012, I think.

18    Q.     When you reviewed the proposal, how did you go

19 about doing that?  Did you show up at the DOF office and

20 ask to look at the proposal?

21    A.     No.  I spoke to the lobbyist, a guy name Skip

22 Piscatelli and he told me when he's going to be available

23 for viewing and I went to the Department of Finance and I

24 asked to see it.

25    Q.     What was the location?

G. AIRDAY

1     A.     It was the DOF's office.  I think it was in the

2     Municipal building.

3     Q.     Did any other marshals go view the proposal?

4     A.     Not to my knowledge.

5     Q.     Did anybody accompany you when you went to view

6     the proposal?

7     A.     No.

8     Q.     After viewing the proposal you said you spoke

9     with Ken Kelly?

10    A.     I spoke with Ken Kelly and I spoke with the other

11    marshals at our next meeting which was held in -- I believe

12    it was held in the association counsel's office.

13    Q.     How frequently did the marshal's association have

14    meetings?

15    A.     As the circumstances warrant; otherwise, it was

16    approximately monthly.  Sometimes they took a break.

17    Sometimes they had a few extra meetings to certain events.

18    Q.     When you spoke at the meeting regarding the

19    paylock proposal, what did you say?

20    A.     Well, I expressed my concerns to the other

21    marshals.  That this did not seem to be in keeping with

22    what we were used to, a very strict guidance on what

23    marshals have to do and what their responsibilities are and

24    where the lines of authority extend from the marshal to

25    supervise the impoundment of these vehicles.

G. AIRDAY

1      Q.     Did any of the other marshals share your

2   concerns?

3      A.     A few of them said that they thought this was not

4   going to be very good thing for us.  That this would create

5   problems on the street and in the courts.  Say it's

6   illegal.

7      Q.     Did any of the marshals think it was a good

8   proposal?

9      A.     Not to my knowledge, no.

10     Q.     Did Ken Kelly say anything in response to you

11  when you voiced these concerns?

12     A.     He told me that I should not be too outspoken.

13     Q.     Did he express why he believed you shouldn't be

14  too outspoken?

15     A.     He said this is going to be implemented with or

16  without our cooperation as far as he knew.

17     Q.     Other than Ken Kelly and the other marshals, did

18  you discuss the paylock proposal with anyone else?

19     A.     You are asking me if they discussed it with other

20  people?

21     Q.     No.  If you discussed it with other people?

22     A.     I'm sorry.

23     Q.     Other than speaking with Ken Kelly and the other

24  marshals, did you discuss the paylock proposal with anyone

25  else?

G. AIRDAY

1       A.      Yes, I did.

2       Q.      With who?

3       A.      Well, I spoke with a few political contacts that

4    I had in my local councilman's office.  I called

5    controller's office and a few other political contacts that

6    I've had with elected officials.

7       Q.      Who was the councilman you spoke with?

8       A.      Keoppel.

9       Q.      How do you spell that?

10      A.      K-E-O-P-P-E-L, Keoppel.

11      Q.      Is that a male or female?

12      A.      That's a male.

13      Q.      What is his first name?

14      A.      I don't remember.

15      Q.      What did you say to him?

16      A.      I told him that it would be a good idea if he and

17   the City Council looked into this proposal that seems to be

18   -- to be a way off the reservation.  He told me he'll look

19   into it.

20      Q.      When did you speak with him?

21      A.      Well, I saw him frequently.  He lived in my

22   district.  He had an office right nearby.  So I spoke to

23   him on a few occasions.  I don't know exactly.  He was --

24   it was sort of a casual thing.  He was not directly

25   involved in deciding things one way or the other.  So I

G. AIRDAY

1   told him and wanted to know if he was interested in looking

2   into it.

3        Q.     Was this before or after you had viewed the

4   proposal?

5        A.     This was probably before and after.

6        Q.     Where were you when you spoke with him?

7        A.     I spoke to him on the street.  I used to see him

8   pretty much every day on Riverdale Avenue right in front of

9   his office.

10       Q.     Both times or maybe it was more than two times on

11   the occasion when you did discuss it with him, you were on

12   the street in front of his office on Riverdale Avenue?

13       A.     Yes.

14       Q.     What did he say in response, if anything?

15       A.     He said that he'll look into it.

16       Q.     You mention that you spoke with someone else but

17   who else did you speak with?

18       A.     John Liu, the comptroller.  I spoke to his

19   office.  I didn't speak to him personally.  L-I-U.

20       Q.     Who in the comptroller's office did you speak to?

21       A.     I'm trying to recall.  Somebody in the contracts

22   department, I think.  The auditing contracts is what I

23   recall.

24       Q.     Was that a telephone conversation?

25       A.     Yes.  It was several telephone conversations.

G. AIRDAY

1       Q.      When were those telephone conversations?

2       A.      I'm sorry.

3       Q.      When were those telephone conversations?

4       A.      This was around the time after I reviewed the

5    proposal, the proposed contract.

6       Q.      What did you say to the person in the

7    comptroller's office you spoke with?

8       A.      I asked them if they had any information about

9    this contract; if they were aware of it.  And that it seems

10   as if there's a problem with this proposed contract.

11      Q.      What problem did you believe there was with the

12   proposed contract?

13      A.      What's that?

14      Q.      You said that you told them it appears there was

15   a problem with the proposed contract.  What was the problem

16   or problems you believed there were?

17      A.      Well, that it was -- it was that proposal that

18   wasn't appropriate to the program.  That there's a

19   likelihood of if future PVB scandals in the City if

20   something like this is approved and I also learned that the

21   comptroller was against several contracts.  I didn't know

22   if he was aware of this one but I asked them if needed more

23   information and that I was willing to discuss what

24   information I had with them.

25                      MR. SMITH:  Can you read that back?

G. AIRDAY

```
 1                (Whereupon, the referred-to answer was read

 2           back by the Reporter.)

 3      Q.    Did the person you spoke with say anything in

 4  response?

 5      A.    That they will get back to me.

 6      Q.    Did they get back to you?

 7      A.    They did not get back with anything else.

 8      Q.    You said after the first call you spoke with

 9  someone again at the comptroller's office; correct?

10      A.    Say it again.

11      Q.    You said there were several calls with the

12  comptroller's office?

13      A.    Yes.  I called up.  I followed them.

14      Q.    When you followed up what did you say?

15      A.    I told them I was waiting for them to contact me

16  and gave them my information and suggested that this is

17  important; that they should look into it further.  And the

18  person there said they will put me on hold and they would

19  -- said they are going to check to see if they have any

20  record of this contract and -- and they didn't find any

21  record so they took down my information and I waited for

22  them to correspond with me about it.

23      Q.    Did you ever speak with them again after that?

24      A.    At some point there was nothing further.  They

25  didn't call me back and I didn't -- I called them a couple
```

G. AIRDAY

1    of times after that but didn't get through to any official

2    within the comptroller's personal office.

3        Q.    Did you ever speak with anyone at DOI about the

4    paylock proposal?

5        A.    DOI?

6        Q.    Department of investigation?

7        A.    I did not, no.

8        Q.    Who oversees the City marshal program?

9              MR. SMITH:  Objection to the form of that.

10             What do you mean the City marshal program?  Do

11             you mean the scofflaw program?

12       Q.    City marshals?

13       A.    City marshals are supervised by the director of

14   marshal bureau.

15       Q.    Between 2009 and 2013 who was the director of

16   marshal's bureau?

17       A.    It was Keith Schwam.

18       Q.    Did you ever speak to Keith Schwam about the

19   paylock proposal?

20       A.    No, I did not.

21       Q.    What about Department of Finance, did you speak

22   to anyone at the Department of Finance regarding the

23   paylock proposal?

24       A.    I spoke about the paylock program.  I think this

25   was some conversation with Louis Jordan.

G. AIRDAY

1    Q.    When did you have a conversation with Louis

2    Jordan?

3    A.    I spoke to him about getting back my own program

4    being assigned but in that conversation I also asked him

5    how this paylock business is going.

6    Q.    This was after the program had already -- paylock

7    program was already in place?

8    A.    It was -- it was in the process of being fully

9    setup.  It had already started.

10   Q.    You said you were speaking to him about getting

11   back your program?

12   A.    Yes.

13   Q.    What do you mean by that?

14   A.    To be assigned to my area to be a program marshal

15   again.

16          MR. SEACORD:  Do you want to break for

17          lunch?

18          MR. SMITH:  Well, how much longer are you

19          going to be?

20          MR. SEACORD:  Enough so that we should

21          probably break for lunch.  This is a good place

22          to stop right now.

23          MR. SMITH:  Let's take a lunch break.

24          (Whereupon, a short recess was taken.)

25   Q.    Welcome back.  I want to switch gears a little

G. AIRDAY

1       Q.      If you remember?

2       A.      I believe at that point I had four guns.

3       Q.      Were those all registered on the license?

4       A.      The guns that I was aware of I registered, the

5    ones on the license.  I also had one gun that I didn't have

6    that was also on the license.  It had been stolen and

7    reported stolen but though -- the Police Department showed

8    that as under my name.

9       Q.      How many guns were actually registered on the

10   license?

11      A.      I think it was five but I've had some

12   transactions in the meantime so I'm not 100 percent

13   certain.  I had sold guns and bought guns.  I had one gun

14   that was stolen.

15      Q.      As far as the Hawes pistol is concerned, was that

16   ever registered?

17      A.      No. Hawes pistol was stuck someplace in the back

18   of my safe and I haven't looked at it and thought about it.

19   I had forgotten it.  Never used it.  Didn't have bullets

20   for it.  Never fired it.

21      Q.      What kind of safe are we talking about?  Is this

22   a gun safe?

23      A.      It's a regular safe.

24              MR. SMITH:  What does regular safe mean?

25              THE WITNESS:  It's a safe.  It's a steel

G. AIRDAY

```
 1              safe for valuables.  It had a couple of shelves.

 2              It had holes at the bottom to attach to the

 3              floor.  It had a key punch locking mechanism.

 4              And I kept valuables.  Jewelry; papers.  Some

 5              things from my father was in there.  Cigarette

 6              case.  A bunch of odds and ends.

 7      Q.    Approximately how big is the safe?

 8      A.    I would say about two foot cube is the

 9  approximate size.

10      Q.    Going back to Exhibit D which is the property

11  clerk invoice when did you receive this?

12              MR. SMITH:  I don't know if he ever said he

13              did.

14      Q.    If at all?

15      A.    I'm not sure when I first saw this.

16      Q.    But did you see it at some time?

17      A.    Well, I saw it at some time when I was looking to

18  get my guns inventoried.

19      Q.    What do you mean that you were looking to get

20  your guns inventoried?

21      A.    Well, it was about a month later there was

22  another -- I was arrested again for not having one of my

23  guns turned in, which I was under the impression was taken

24  along with the other guns.

25      Q.    Was that on January 18, 2012 when you were
```

G. AIRDAY

1    arrested the second time?

2        A.      I believe so, yes.

3        Q.      How did that arrest come about?

4        A.      I got a call from Police Licensing Bureau and I

5    tried -- I was working at that time so when I got that call

6    in my office and first chance I had I called them back but

7    I wasn't able to contact the caller.  I think it was an

8    officer at the Licensing Bureau and then a detective came

9    by my office and insisted that I meet him.  So at that

10    point this question came up as to what happened to that

11    other gun.

12        Q.      Where did you meet the officer?

13        A.      I met him by my office downstairs at 5720 Mosholu

14    Avenue.

15        Q.      What did he say when he met with you?

16        A.      Well, he was -- he was agitated.  I was surprised

17    at how agitated he was.  He demanded that the gun was

18    missing and that he needed to know -- he don't know what

19    happened.  So I told him that I'm more than happy to

20    cooperate and I invited him to come up with me to my

21    apartment and to look inside my safe which is where my guns

22    were.  So he did that and I opened the safe for him and let

23    him look inside and he found in the back under some other

24    things a gun that the first officer overlooked.

25        Q.      This was a different officer?

G. AIRDAY

1     A.     Yes, it was a different officer.  This guy is a

2  detective.

3     Q.     Is that correct Christopher Boerke?

4     A.     I think, yea.  B-O-E-R-K-E.  I don't know how he

5  spells his name but that's the one.

6     Q.     After he found the gun, what happened then?

7     A.     Well, he arrested me.  I voluntarily went with

8  him.  I cooperated and went to the precinct.

9     Q.     How long where you at the precinct?

10    A.     I was there a couple of hours, I think.  A couple

11  of hours.  And I told them that I was -- I told the

12  officer, one of the officers working in the precinct that I

13  was having some chest pains and eventually they called an

14  ambulance and they took me to a hospital nearby.

15    Q.     How long were you at the hospital?

16    A.     Until the next morning.

17    Q.     When you left the hospital did you have to return

18  to the precinct?

19    A.     I was under a guard so I was -- I was basically,

20  you know, still under the control of the police officers so

21  I went with the officer that came to get me.

22    Q.     Were you arraigned?

23    A.     Yea.

24    Q.     Were you released on bail under your own

25  recognizance?

G. AIRDAY

1      A.     I was ROR'd.

2             MR. SMITH:  You were what?

3             THE WITNESS:  Released on my own

4             recognizance, ROR.

5             MR. SEACORD:  Can I have that marked.

6             (Whereupon, the aforementioned Document was

7             marked as Defendant's Exhibit F for

8             identification as of this date by the Reporter.)

9      Q.     I'm handing you what's been marked as Defendant's

10     Exhibit F. Please take a look at that and let me know if

11     you recognize it. (Handing.)

12     A.     (Perusing.)

13            They spelt (sic) my name wrong.  Jorge.  I

14     recognize it.

15            MR. SMITH:  No Hungarian spelling?

16            THE WITNESS:  Not even.  Maybe Spanish.  The

17            gun is also not a Berringer.  It's a Derringer.

18     Q.     Correct.

19     A.     But that's not the name of the gun, it's a type

20     of gun.

21     Q.     Right.  So the type of gun that was found in the

22     safe the second time, what type of gun was that?

23     A.     The model -- the model is a high standard 22

24     Cobra Derringer.  Two shot Derringer.

25     Q.     Was that gun registered?

G. AIRDAY

1      A.      Yes.

2                      MR. SMITH:  Did you say three shot?

3                      THE WITNESS:  Two shot.

4      Q.      Do you recognize that document, Exhibit F?

5      A.      Yea.  I don't know where I saw it but --

6      Q.      It indicates the you were charged with the

7   offense of criminal attempt.  Is that the offense you were

8   charged with?

9      A.      Yes.

10      Q.      Prior to arrest on December 21, 2011 did you

11   carry a gun when you were working as a marshal?

12      A.      Yea, I did.

13      Q.      Which gun did you carry?

14      A.      I usually carried the HK 40 caliber.

15      Q.      That's the Heckler & Koch?

16      A.      Heckler & Koch.

17      Q.      Taking a look again, I think it's Exhibit D.

18                      MR. SMITH:  D.

19      Q.      Of the guns listed on that invoice?

20      A.      Right.

21      Q.      Which ones did you carry when you were a marshal?

22      A.      I just said Heckler & Koch.  That's what I

23   usually carry.

24      Q.      Were there others that you carried when you

25   weren't carrying that one?

G. AIRDAY

1    and Second Judicial Departments."

2            Do you see that?

3    A.      Yes.

4    Q.      Were you suspended from your services as a

5    marshal on or about that time?

6    A.      I was working in the field on this day and two

7    detectives from DOI came by and give me the papers and I

8    gave them my badge and ID card.

9    Q.      What day was that?

10    A.      What day was it?

11    Q.      Yes.

12    A.      I don't know exactly.  At that was most likely --

13    it was the same day, June 11th.  I'm not sure.

14    Q.      After you gave them your badge and ID card, I

15    assume that you stopped working as a marshal?

16    A.      I stopped working as a marshal.  I took the signs

17    down from my office and I closed the gates and sent my

18    staff home.

19    Q.      How many staff did you have at the time?

20    A.      Two or three.  I had family members that were

21    helping out.

22    Q.      Between your arrest on January 18, 2012 and the

23    time that you were served with this order and suspended,

24    what type of work were you performing as a marshal?

25    A.      Well, I was working as an associate in the

G. AIRDAY

1    booting program.  I was doing income and property

2    executions and some landlord/tenant work as well as small

3    claims work.  Other marshals were sending me work that they

4    didn't have time for or didn't want to do.  Most people are

5    calling me up based on my website and prior contacts.

6         Q.    What website are you referring to?

7         A.    I had a City Marshal George Airday.  There was a

8    website.

9         Q.    You said people were calling you up.  Who was

10   calling you?

11        A.    People were calling me based on their internet

12   searches and other sources of referral.

13        Q.    When you say people, are you talking about other

14   marshals?

15        A.    Or respondents.  Plaintiffs.  Attorneys.  Several

16   different categories.

17        Q.    They were calling you for what purpose?

18        A.    They were calling me to do their executions.

19   Other marshals were calling me to execute on their work and

20   plaintiffs called me to collect on judgments.

21        Q.    How did that differ from what you were doing

22   prior to your arrest?

23        A.    The difference was that instead of being a

24   program marshal I was now working as a fill-in marshal for

25   people that used to be my fill-in marshals.  My role

G. AIRDAY

1      A.     No.  I don't think so.

2      Q.     But you believe that there was correspondence

3    between your attorney and DOI's attorney; correct?

4      A.     Yea.  There was correspondence and everybody

5    apparently agreed.  DOI wanted, I don't know, they wanted

6    me to pay some kind of a huge fine like $20,000 and we kind

7    of negotiated it down.  You know, they wanted to get their

8    pound of flesh.  They apparently didn't just want to just

9    lose the case so they wanted to have me agree to plead

10   guilty to some administrative charge, not cooperating with

11   DOI.

12                    MR. SEACORD:  Can we take a break?

13                    MR SMITH:  Okay.

14                    (Whereupon, a short recess was taken.)

15                    MR. SEACORD:  Can I have this marked,

16           please?

17                    (Whereupon, the aforementioned Document was

18           marked as Defendant's Exhibit L for

19           identification as of this date by the Reporter.)

20     Q.     I'm handing you a document that's been marked as

21   Defendant's Exhibit L. It's a three page document Bates

22   numbered D000297 through 299.  Please take a look at that

23   and let me know if you recognize it? (Handing.)

24     A.     (Perusing.)

25                    MR. SMITH:  Off the record.

97

G. AIRDAY

 1                (Whereupon, an off-the-record

 2            discussion was held.)

 3            MR. SMITH:  Are you familiar with this or

 4            better yet, is that your signature on the last

 5            page?

 6            MR. SEACORD:  I'm going to get there.

 7     Q.     Are you familiar with this document?  Have you

 8  seen this?

 9     A.     Yes.

10     Q.     Turning to the last page underneath the date,

11  which is May 20, 2013, there's a signature above the name

12  George Airday; is that your signature?

13     A.     Yes.

14     Q.     You signed this document?

15     A.     I did.

16     Q.     Again for the record, the document is entitled

17  stipulation.  It's got an oath index of 1620/13.  I want

18  you to turn to the second page down towards the bottom.  It

19  says "it is hereby stipulated and agreed by and between DOI

20  and Marshal Airday", paragraph one, "Marshal Airday agrees

21  to fully cooperate with DOI's investigation of his conduct,

22  including giving full and complete testimony under oath."

23            Do you see that?

24     A.     Yes.

25     Q.     Did you subsequently give testimony under oath?

G. AIRDAY

1      A.    I did.

2      Q.    When was that?

3      A.    That was, I think, June 11th I believe sometime.

4  June 11th or June 12th.

5      Q.    Of 2013; correct?

6      A.    Yes.

7      Q.    Where did that occur?

8      A.    DOI's offices.

9      Q.    Who was present?

10     A.    Schwam.  Caroline Alejandro.  Howard Sterinbach,

11  S-T-E-R-I-N-B-A-C-H.

12     Q.    And Howard Sterinbach, that was your attorney at

13  the time?

14     A.    He was one of the attorneys for the law firm that

15  I retained.

16     Q.    Were you asked questions during that time period?

17     A.    Yes.  I was asked basically one question over and

18  over again.

19     Q.    Who asked the question?

20     A.    Schwam.

21     Q.    What was the question that you were asked?

22     A.    What happened to the gun.  Where was the gun.

23  How come I didn't turn it in. And where did I get it from.

24     Q.    How did you respond?

25     A.    I told him where I got the gun from.  I answered

G. AIRDAY

1    his questions.  I answered it each time he asked me I

2    answered his question.

3        Q.    What did you tell him about where you got the

4    gun?

5        A.    I told him who gave me the gun, the gun that was

6    not on the license.

7        Q.    What did you tell him?  You told him what with

8    regard to who gave you the gun?

9        A.    I told him who gave me the gun and I told him

10   where I kept the gun.

11       Q.    Yes.

12       A.    And he asked me why it wasn't registered and I

13   told him it was in the safe and I hadn't seen it or looked

14   at it for all these years and I had forgotten about it.

15       Q.    When you say the gun, which gun are you referring

16   to?

17       A.    The one that is not registered -- the one that

18   wasn't registered.

19                MR. SMITH:  The Hawes 25 caliber.

20                MR. SEACORD:  I can't have you testify.

21                MR. SMITH:  You want to get out the

22            documents.  Here.

23                MR. SEACORD:  Just to make sure.

24                MR. SMITH:  How about that one.

25                MR. SEACORD:  Knock it off.

G. AIRDAY

1           identification as of this date by the Reporter.)

2      Q.    I'm handing you what's been marked as Defendant's

3  Exhibit M. It's a one page document entitled joint

4  administrative order 013-5.

5           Please take a look at that and let me know if you

6  recognize it? (Handing.)

7      A.    (Perusing.)

8           Yes.

9      Q.    What do you recognize that to be?

10     A.    Well, this is the order lifting my suspension and

11  dismissing the charges.

12     Q.    And it's dated June 6, 2013?  Well, June 5, 2013?

13     A.    Right.

14     Q.    After that date did you resume activity as a City

15  marshal?

16     A.    Did I what?

17     Q.    Resume work as a City marshal?

18     A.    No.  I had to, as agreed, to answer the questions

19  that Schwam put to me.

20     Q.    After you answered the questions or testified

21  under oath at DOI, did you resume work as a City marshal?

22     A.    Yea.  Schwam gave Caroline my badge and ID card

23  after the interview with me and at that point I resumed

24  work as a marshal.  To get everybody back to work and

25  contact marshals and possible clients and so on, to start

G. AIRDAY

1    year on March 15th.  It had to be sent to DOI.

2        Q.    What were you required to include in that report?

3        A.    I was required to include copies of bank

4    statements and also assessment fees which was 4.5 percent

5    of my gross income plus $1,500 as I'd say "franchise fee

6    for being a marshal".

7        Q.    Anything else you were required to include in

8    that report?

9        A.    Well, if there was any unclaimed funds we had to

10   write a check for that.  Basically it's a very complex

11   lengthy report.  So it has numerous items that are

12   required.

13       Q.    Your five year term as a marshal expired on

14   December 20, 2013; is that correct?

15       A.    That was the date, yes.

16       Q.    What happened after your term expired?

17       A.    Well, I found an envelope underneath the gates to

18   my office from Schwam telling me that my badge has been

19   reassigned to someone else.

20       Q.    When did you find that?

21       A.    Some time after the date of termination of my

22   appointment, I got a phone call from Marshal Schwam on my

23   cell phone telling me that I should get -- I should go

24   there and go to my office and check underneath the gate

25   because it's an important message for me.

G. AIRDAY

1    looking at it the worse it looked.  There's no basis for

2    doing this sort of thing with paylock.

3        Q.    Did you raise all of these concerns with all of

4    the people you previously identified that you were raising

5    these concerns?

6        A.    I raised most of them.  I wasn't -- some of these

7    details about how the operational part of it was weak was

8    not emphasized with the political people that I contacted

9    because they would not be interested and they would have to

10   learn about the way the program is done.  It's too much

11   detail.  Despicable to that level of interest.

12   CONTINUED EXAMINATION BY

13   MR. SEACORD:

14       Q.    When you say the political people, which concerns

15   did you raise with the political people?

16       A.    Political people were that it was an improper

17   contract.  It was not properly designed and that the

18   program is a mistake and the fact that it was done without

19   open bid by itself is already a red flag in the political

20   realm.

21       Q.    How did you come to learn that it was a no bid

22   contract?

23       A.    Well, I heard this from Piscatelli, Ken Kelly,

24   and then subsequently when I tried to research it online,

25   it came up as a no bid contract.  It was never publicized,

G. AIRDAY

1    so they didn't have hearings and didn't seem like this is

2    such a drastic change from long existing program.  It

3    seemed very improper from my point of view.

4         Q.    Did you ever speak with David Frankel about the

5    paylock program?

6         A.    I never spoke with him, no.

7         Q.    Did you ever speak to him about anything?

8         A.    Never spoke to him about anything.  He was not --

9    he was not available to people on my level so I did not.

10        Q.    At any time did anybody tell you that you would

11   be permitted to holdover or be reappointed upon the

12   expiration of your term December 2013?

13             MR. SMITH:  Objection.  Go ahead.

14        A.    Not explicit.

15        Q.    Did somebody tell you?

16        A.    It was my understanding that once I'm clear of

17   this deal that I would be restored and work as a marshal.

18   And in the past I've always been either reappointed or kept

19   as a holdover.

20             MR. SEACORD:  Can you give me two seconds.

21             (Whereupon, a short recess was taken.)

22        Q.    Is it your belief that you were not reappointed

23   or that you were replaced as a marshal because you raised

24   certain questions about the paylock program?

25        A.    Yes.

G. AIRDAY

1    the hours that he was questioning me before returning my

2    badge he was visually agitated.  His hands were shaking.

3    My attorney was telling me that this is something very

4    bizarre.  He doesn't understand it.  I don't understand it

5    either.  But there was apparently something Schwam felt

6    that I was not humble or submissive sufficiently for his

7    purposes.  So I'm surmising it.

8            I don't know the factual basis except the paylock

9    was the main thing and the fact that I was fighting back

10   against him not cooperating by resigning.  Not going away

11   quitely.  That was something that made him angry and

12   annoyed at me.

13   Q.    Did you ever learn what Schwam's opinion on the

14   paylock program was?

15   A.    He never told me personally and I don't -- I

16   don't have any insight.

17            MR. SEACORD:  That's all I have.  I don't

18            have anything else.  Do you have anything?

19            MR. SMITH:  No.  No.

20            (Whereupon, at 5:45 P.M., the Examination of

21            this Witness was concluded.)

22                    °          °          °          °

23

24

25

G. AIRDAY

1                    C E R T I F I C A T E

2

STATE OF NEW YORK        )
3                                :  SS.:
COUNTY OF RICHMOND       )

4

5

6           I, JOANNE CAPPARELLI, a Notary Public for and

7    within the State of New York, do hereby certify:

8           That the witness whose examination is

9    hereinbefore set forth was duly sworn and that such

10   examination is a true record of the testimony given by that

11   witness.

12          I further certify that I am not related to any

13   of the parties to this action by blood or by marriage and

14   that I am in no way interested in the outcome of this

15   matter.

16          IN WITNESS WHEREOF, I have hereunto set my hand

17   this 19th day of April 2017.

18

19

20   _____

21          JOANNE CAPPARELLI

22

23

24

25

# EXHIBIT B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

GEORGE AIRDAY,

               Plaintiff,

     - against -          14-cv-8065 (RWS)

THE CITY OF NEW YORK, KEITH SCHWAM
and DAVID M. FRANKEL,

               Defendants.

                      **CERTIFIED COPY**

-------------------------------------X

         DEPOSITION OF KEITH SCHWAM, taken by

Plaintiff, pursuant to Notice, at the Law Offices of

Nathaniel B. Smith, on Thursday, March 30, 2017,

commencing at 10:48 a.m., before Chandra D. Brown, a

Registered Professional Reporter and Notary Public

within and for the State of New York.

Job #25835



**EcoScribe Solutions**

www.EcoScribeSolutions.com

888.651.0505

```
 1

 2   A P P E A R A N C E S:

 3

 4              LAW OFFICES OF NATHANIEL B. SMITH

 5              Attorneys for the Plaintiff

 6              80 Broad Street

 7              New York, NY 10004

 8              By: NATHANIEL B. SMITH, ESQ.

 9                  natbsmith@gmail.com

10                  (212) 227-7062

11

12

13              NEW YORK CITY LAW DEPARTMENT

14              Attorneys for the Defendants

15              100 Church Street

16              New York, NY 10007

17              By: CHRISTOPHER SEACORD, ESQ.

18                  cseacord@law.nyc.gov

19                  (212) 356-2444

20

21

22

23

24

25
```

1

2    A P P E A R A N C E S (Continued):

3                        NEW YORK CITY DEPARTMENT OF

4                        INVESTIGATION

5                        Attorneys for the Defendants

6                        80 Maiden Lane

7                        New York, NY 10038

8                        By: MICHAEL B. SILLER, ESQ.

9                            msiller@doi.nyc.gov

10                           (212) 825-0646

11

12   ALSO PRESENT:

13        George Airday

14

15

16

17

18

19

20

21

22

23

24

25

1

2              IT IS HEREBY STIPULATED AND AGREED, by and

3    between the attorneys for the respective parties

4    hereto, that this examination may be sworn to before

5    the notary public.

6

7              IT IS FURTHER STIPULATED AND AGREED that

8    the signing and filing of the said examination shall

9    not be waived.

10

11             IT IS FURTHER STIPULATED AND AGREED that

12   all objections to questions, except as to form,

13   shall be reserved for trial.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              K. Schwam - 3/30/17

 2    background, your work experience background

 3    during the course of that deposition.

 4         I don't know want to plow over that ground

 5    again, unless you think there was something in

 6    the background information that you gave me

 7    last time that was inaccurate.

 8    A    I don't think it was inaccurate.

 9    Q    Okay.

10         So when I left off with you last, you were

11    the Director of the Marshal Bureau for

12    Department of Investigations; is that right?

13    A    Yes.

14    Q    When did you start that position?

15    A    1995.

16    Q    Before that, were you working for the

17    Department of Sanitation?

18    A    I was working as the Department of

19    Sanitation IG for the Department of

20    Investigation.

21    Q    Okay.

22         And so you were the Director of the

23    Marshals Bureau from 1995 until when?

24    A    The end of January 2014.

25    Q    And why did you leave that position?
```

```
 1                    K. Schwam - 3/30/17

 2        call for the production of those e-mails.

 3             MR. SEACORD:  We'll take it under

 4        advisement.

 5    BY MR. SMITH:

 6        Q    Who from the Department of Finance were

 7        you corresponding with?

 8        A    I was speaking with Andrew Salkin, who was

 9        the First Deputy Commissioner at the time.  I

10        may have had correspondence from him or people

11        on his staff.

12        Q    Did you ever speak to Commissioner Frankel

13        about PayLock?

14        A    Yes.

15        Q    Did you speak with Commissioner Frankel

16        about PayLock before the contract was signed?

17        A    Yes.

18        Q    Who else did you speak to about PayLock

19        before the contract was signed?

20        A    You're not limiting that to the Department

21        of Finance?

22        Q    No.  I'm not limiting it at all.

23        A    I spoke with a number of people regarding

24        the PayLock proposal.

25        Q    Okay.  I would like to know who they were.
```

```
 1              K. Schwam - 3/30/17
 2   A    I don't know that I'll remember all of
 3   them.  I'll tell you the ones that come to
 4   mind.
 5        Louis Jordan, Ken Kelly, Andrew Salkin,
 6   colleagues within DOI, Frank Siracusa,
 7   Steve Biegel, Jeffrey Rose very briefly.
 8   Sorry.  Excuse me.  Not Jeffrey Rose.
 9   Q    The other one.
10   A    Gary Rose.
11   Q    Just so you know, I have a list of the
12   marshals.  It was a document that I showed you
13   at your deposition that came out of your
14   office.  It was a list of all the marshals.
15        If you want to look at that to refresh
16   your recollection, let me know and I'll provide
17   it to you.
18        Okay.  So it's Gary Rose briefly.
19        Anybody else?
20   A    Not that I recall at the moment.
21   Q    What do you recall discussing with Andrew
22   Salkin about PayLock?
23   A    Issues about how the program would
24   actually work.  There were revenue issues.
25   There was a period of time when PayLock
```

```
 1                K. Schwam - 3/30/17

 2   greater volume than the company had handled in

 3   other locations in which it was booting

 4   vehicles.

 5   Q    Did Kelly have any other issues or

 6   concerns about the PayLock proposal?

 7   A    I don't know.  He may have.  That's what I

 8   remember his concern being.

 9   Q    Did Kelly object to the PayLock proposal?

10   A    Well, the Marshals objected as a group.

11   Whether Ken Kelly was their spokesperson on

12   that, I don't recall.

13   Q    So while the PayLock proposal was being

14   considered, Ken Kelly raised concerns with you

15   as the Executive Director of the Marshals

16   Association, right?

17   A    In Ken's role, yes, as executive director,

18   yes.

19        I should add, now that we mentioned Ken

20   Kelly, there was also Ken Litwack who was the

21   attorneys for the Marshals Association, and he

22   expressed some of the same concerns that I

23   mentioned previously.

24   Q    How long had you known Ken Kelly?

25   A    I believe Ken Kelly was a staff member
```

```
 1              K. Schwam - 3/30/17
 2    the conclusion that they had to accept the
 3    PayLock structure?
 4         MR. SEACORD:  Objection.
 5    A    I'm going to say approximately 2012 at
 6    some point, maybe 2012, early 2013, around
 7    then.
 8    Q    Do you know if there were any other
 9    marshals who continued to maintain an objection
10    to the PayLock system?
11    A    No.
12    Q    Do you know if George Airday ever
13    maintained his objections to the PayLock
14    system?
15    A    The first time I heard that Mr. Airday had
16    any opinion regarding PayLock was when I
17    received the first complaint that you had
18    served on me.
19    Q    Well, you knew Mr. Airday was a member of
20    the Marshals Association, right?
21    A    I knew he was a marshal.  I didn't know
22    specifically if he was a member of the
23    association.
24    Q    So did you ever discuss with Mr. Kelly
25    Mr. Airday's opinions about the PayLock
```

```
 1                K. Schwam - 3/30/17
 2           MR. SMITH:  I've marked as Exhibit 2 a
 3       rather lengthy document, Bates stamp GA461
 4       through 530.  It's entitled, "Agreement By and
 5       Between the City of New York and IPT, LLC."
 6   BY MR. SMITH:
 7       Q    Can you just tell me whether or not this
 8       is the PayLock contract that we were
 9       testifying -- or you were testifying about
10       previously?
11       A    (Witness views document.)
12           As far as I know, this is the contract
13       between -- just based on looking at it, the
14       contract between the City and the company that
15       operated the PayLock system.
16       Q    As the director of the Marshals Bureau,
17       did you have a role in the negotiation of this
18       contract?
19       A    No.
20       Q    Did you approve the contract?
21       A    No.
22       Q    I have put a little sticky here on the
23       signature page on Page 20 of the contract.
24       There are two names.
25           That's the name of the DOI Assistant
```

```
1              K. Schwam - 3/30/17
2    has ended.
3    Q     Am I correct that Marshal Airday's badge
4    number was reassigned?
5          MR. SEACORD:  Objection.
6    A     That is correct.
7    Q     And am I correct that as of this time
8    under the law there could be as many as 83
9    badges or offices of City marshals?
10   A     Yes.
11   Q     And so why did you give somebody else
12   Marshal Airday's Badge No. 7, as opposed to
13   giving that person one of the available badge
14   numbers?
15   A     My recommendation was that
16   Marshal Airday's successor be appointed to the
17   office that he held, which in effect would
18   replace Marshal Airday as a City marshal in
19   accordance with the New York City Civil Court
20   Act that expressly authorizes that.
21   Q     Have you ever issued a similar kind of
22   letter to another marshal, who either had his
23   term or her term ending or had been hold over?
24   A     What do you mean by a similar kind of
25   letter?
```

```
 1              K. Schwam - 3/30/17
 2   Q    A letter saying your term has ended,
 3   you're not being held over, you're no longer
 4   needed as a marshal?
 5   A    That's not what this letter says.  This
 6   letter says that a successor was appointed to
 7   the office that Marshal Airday held until his
 8   term expired.
 9   Q    Okay.
10        Have you ever sent to another marshal a
11   letter stating that other than this letter?
12   A    No.
13   Q    When you say that it was your
14   recommendation action, what do you mean by
15   that?
16   A    It was my recommendation that a successor
17   be appointed to the office that Marshal held
18   prior to the expiration of his term.
19   Q    And who did you make this recommendation
20   to?
21   A    I made that recommendation to staff
22   members of the mayor.
23   Q    Anybody else?
24   A    No.
25   Q    Who were the staff members?
```

```
 1              K. Schwam - 3/30/17
 2    A    The person I made the direct
 3    recommendation to, his name was John Baxter.
 4    Q    And who is John Baxter?
 5    A    John Baxter was a staff member in the
 6    office of the mayor who was a principal point
 7    of contact for me and members of my staff
 8    regarding the appointment of marshals and the
 9    actual steps that needed to be taken to effect
10    appointments.
11    Q    He was the one who was going to get the
12    mayor's signature on the appointment letter?
13         MR. SEACORD:  Objection.
14         Go ahead.
15    A    Whether he personally was that person, I
16    don't know, but he was my point of contact with
17    regard to letters of appointment.
18    Q    Did you send a copy of this letter, the
19    December 23rd letter to Marshal Airday, to
20    anybody?
21    A    I don't recall.
22    Q    Was it your practice to record CCs or BCCs
23    at the time?
24    A    If I was sending a copy contemporaneously,
25    yes.
```

```
 1                K. Schwam - 3/30/17
 2    Q    How was this letter sent to Marshal
 3    Airday?
 4    A    I remember it was hand delivered to his
 5    office.  It may also have been mailed.  It
 6    probably was.
 7    Q    Did you obtain anybody's approval before
 8    sending this letter?
 9    A    No.
10    Q    Did you have any discussions with
11    Mr. Baxter about this letter before sending it?
12    A    No.
13    Q    Why did you send this letter to Marshal
14    Airday?
15    A    To inform him that a successor had been
16    appointed to his term -- excuse me, to the
17    office that he previously held, and that his
18    service as a marshal had ended, and that,
19    accordingly, he needed to surrender his badge
20    and identification card, and to ask him to
21    contact our office for additional information
22    regarding the wind-down procedure or
23    termination of office procedure.
24    Q    And why did you make this recommendation
25    or decision to have a successor appointed for
```

```
 1              K. Schwam - 3/30/17
 2   his office?
 3   A      Well, first of all, that was a -- the
 4   appointment of a successor was expressly
 5   authorized by the law.
 6          My reasons for recommending that that be
 7   done had to do with Marshal Airday's conduct
 8   and judgment that was exposed in the aftermath
 9   of his two arrests in December 2011 and
10   January 2012.
11   Q      And what was that conduct that led you to
12   make this recommendation?
13   A      It involved several elements.  One, the
14   marshal was in possession unlawfully of two
15   firearms.  Two, that fact became known after
16   the marshal was arrested on a domestic violence
17   charge, and was under an obligation to
18   surrender all of his firearms.
19          The fact that he was arrested within four
20   weeks of the domestic violence arrest with
21   facts that indicated that he had not
22   surrendered all his firearms as directed by the
23   court, and that he had been in possession for
24   some period of time before his domestic
           violence arrest of an unregistered firearm were
```

```
 1              K. Schwam - 3/30/17
 2    the principal acts that caused me to make the
 3    recommendation.
 4         Those acts, in turn, to me reflected
 5    judgment that fell far short of the standard
 6    that I believe was warranted for someone who
 7    is, Number 1, mayoral appointee; and Number 2,
 8    holding the position that involves the
 9    scrupulous attention to rules, court orders,
10    and adherence to the law in situations that
11    involve actions that -- the position involves
12    actions taken against members of the public.
13         So the position involves a mayoral
14    appointment, a delegation of very serious
15    authority to take away people's property, to
16    remove people's vehicles, to remove people from
17    their homes, to remove money from people's bank
18    accounts.  Those are very serious
19    responsibilities that call for uncompromised
20    integrity, mature judgment, adherence,
21    scrupulous adherence to rules, laws and court
22    orders and basic seriousness in how the person
23    goes about conducting their affairs, both
24    personal and official.
25         The conduct that I described and the fact
```

```
 1              K. Schwam - 3/30/17
 2    that the marshal having been arrested once
 3    failed to do the things that were required of
 4    him to stay well clear of being arrested again,
 5    and that he had not done those things and that,
 6    in fact, done the opposite, said to me that we
 7    need to replace Marshal Airday.
 8    Q    Are there any other reasons for why you
 9    made the recommendation to replace Marshal
10    Airday?
11    A    No.
12    Q    You mentioned that Marshal Airday was
13    arrested for a domestic violence incident; is
14    that correct?
15    A    Correct.
16    Q    When did you first learn about
17    Marshal Airday's arrest for a domestic violence
18    incident?
19    A    I believe it was shortly after the arrest.
20    Q    How were you informed?
21    A    That may have been the one that
22    Ken Litwack called me about.  We are
23    notified -- my office is notified when marshals
24    are arrested through several mechanisms.  So I
25    believe I had more than one report regarding
```

```
1                 K. Schwam - 3/30/17

2    the marshal's arrest, and I believe that was

3    the one that Ken Kelly called me about.

4         Excuse me.  Not Ken Kelly.  Ken Litwack.

5    Q    Ken Litwack.

6         You believe Ken Litwack called you up

7    about the domestic violence arrest?

8    A    I believe so.

9    Q    And you also were notified by the New York

10   State Criminal Justice Department, weren't you?

11   A    Correct.

12   Q    That's an automatic system that lets you

13   know that?

14   A    Yes.

15   Q    And you had been notified of other

16   marshals being arrested through that same

17   system, hadn't you?

18   A    From time to time.

19   Q    Who?

20   A    I can't remember specific means of

21   notification.  If your question goes to --

22   Q    Well, my question is:  Who else do you

23   remember getting notified, one way or the

24   other, that they were arrested who was a City

25   marshal who was under your supervision?
```

1                  K. Schwam - 3/30/17

2     resigns, we would be compelled -- was the word

3     I used -- to seek his suspension at the

4     Appellate Division.

5          So this letter in effect is a placeholder

6     that tells him, "You should resign.  If you

7     don't, we're going to proceed to obtain your

8     suspension."  It may have also mentioned

9     removal.  I see that it does.

10         So I was telling the marshal that if he

11    did not resign, that's how we would proceed.

12    And in the meantime I'm giving him a temporary

13    order to stop official acts other than those

14    mentioned in the letter.

15         So he could continue to collect money.  He

16    could continue to release vehicles.  He could

17    continue to perform the functions that involved

18    accounting for the money and remitting it as

19    part of his responsibilities.

20         What he could not do was to go out and tow

21    additional vehicles for the City of New York

22    while this matter was in this particular

23    status.

24    Q    Before telling Marshal Airday that he

25    could no longer temporarily, based on your

```
 1              K. Schwam - 3/30/17
 2    Airday to resign, and that he should cease
 3    acting as a marshal, right?
 4    A     No.
 5          MR. SEACORD:  Objection.
 6    Q     How is that incorrect?
 7    A     You said that my instruction to the
 8    marshal -- in your question you said that that
 9    was based on some allegations in a police
10    report, suggesting in the way you phrased the
11    question that that was the sum total of the
12    information at my disposal, and I mentioned a
13    number of other steps that we took at about
14    this time.
15    Q     What other information did you have?
16          MR. SEACORD:  Don't cut him off.
17    Q     Sorry.
18          What other information did you have other
19    than the documents that you obtained from the
20    police?
21          MR. SEACORD:  Well, that's different than
22    what you said.
23    Q     Okay.
24          Well, what else did you have?  I mean --
25    what else did you have?
```

```
 1              K. Schwam - 3/30/17

 2         MR. SEACORD:  Objection.

 3         You can repeat.

 4    A    We had the records of the guns that were

 5    recovered from Marshal Airday's premises on two

 6    occasions, which came from the police.  My

 7    recollection is that there were conversations

 8    between detectives or investigators at DOI and

 9    detectives, police officers at the police

10    department.

11         We also had records at DOI that in effect

12    listed all the guns that we knew about that

13    Marshal Airday had.  I also at some point had a

14    discussion with Ken Litwack, who made certain

15    representations about what had occurred.

16         I don't recall if anyone else called me on

17    Marshal's behalf, but I do recall speaking with

18    Ken who, I believe, was speaking for the

19    marshal.  So we had more facts than just a mere

20    allegation and a police report.

21    Q    But based on those things, you sent this

22    letter, right?

23    A    Correct.

24    Q    All --

25    A    All the things I mentioned.
```

```
 1              K. Schwam - 3/30/17

 2         MR. SEACORD:  Objection.

 3         You can answer.

 4    A    My understanding is that while the case

 5    was pending at OATH during a calendar call

 6    there was a conference, and that involved

 7    Marshal Airday's attorneys, the attorneys for

 8    DOI.

 9         The outcome of that conference was that

10    Marshal Airday consented to an open-ended

11    period of suspension pending the resolution of

12    what was then two criminal cases that were

13    pending against him, and that the disciplinary

14    proceeding was adjourned in the interim.

15    Q    So the administrative disciplinary process

16    was put on hold pending the criminal charges,

17    right?

18    A    Correct.

19    Q    I'm going to show you what I'm going to

20    mark as Exhibit 10, two e-mails from

21    Dylan Gordon to you, Bates number 476 to 480.

22         MR. SEACORD:  You're marking them both as

23    10?

24         MR. SMITH:  Yes.

25         (Whereupon, the aforementioned document
```

```
 1              K. Schwam - 3/30/17
 2   memorandum, no.
 3   Q    When you say "not specifically," did you
 4   inform them indirectly?
 5   A    There had been a period of time in which
 6   Mr. London's law firm was representing
 7   Marshal Airday.  During that period of time, I
 8   told Mr. London, in sum and substance, that
 9   when the marshal's term expired, he certainly
10   wasn't going to be reappointed.
11        Whether I specifically said that he would
12   definitely be replaced, I don't recall.  But
13   that eventuality, I think, was covered as a
14   possibility, and certainly my intention that
15   Marshal Airday would not be reappointed.  I
16   know I told Mr. London at various times.
17   Q    When did you tell Mr. London that for the
18   first time?
19   A    It was probably early on.
20   Q    I don't know what that means.
21   A    Well, he began representing Marshal Airday
22   at some point in or around February, January,
23   February 2012.  We had a number of
24   conversations.  We exchanged a number of items
25   of correspondence.  I was speaking with him
```

```
 1                  K. Schwam - 3/30/17
 2    several times during that period of time.
 3    Q    Did you ever tell London or anybody else
 4    associated with Mr. Airday, after the criminal
 5    charges had been dismissed, that Marshal Airday
 6    was not going to be reappointed or held over?
 7    A    I don't recall saying that specifically.
 8    I think in the negotiation of the stipulation
 9    it was referred to.  I'm not -- I don't recall
10    exactly what was said, but the fact that he
11    would not be reappointed I am pretty sure, was
12    conveyed in substance.
13    Q    Are you saying that the fact that
14    Marshal Airday was not going to be reappointed
15    was conveyed in substance while there was a
16    negotiation over the stipulation, which is
17    attached as Exhibit 11?
18    A    That's my recollection and interpretation.
19    Q    And is there something in the stipulation
20    that reflects the fact that Marshal Airday was
21    not going to be reappointed or held over?
22    A    Not directly and expressly.
23    Q    What about indirectly; is there anything
24    in this stipulation that suggests that?
25    A    There is a statement that the stipulation
```

```
 1              K. Schwam - 3/30/17
 2   would be considered -- will be considered for
 3   all purposes as part of Marshal Airday's
 4   official record.
 5   Q      Anything else?
 6   A      No.
 7   Q      Who was involved in drafting the
 8   stipulation?
 9   A      I was, and our counsel's office.
10   Q      And who was that?
11   A      The person I remember most specifically
12   was Benet Kearney.
13   Q      Benet Kearney is a lawyer in your office?
14   A      At that time, she was at the Division of
15   Investigation General Counsel's Office.
16   Q      What about Marjorie Landa; did she have
17   any role in drafting the stipulation?
18   A      I'm sure that she reviewed it at some
19   point.  Drafting, I don't think so.
20   Q      All right.
21          The stipulation reflects that there was
22   one pending charge against Airday, right, for
23   not cooperating in the DOI investigation,
24   right?
25   A      Yes.
```

```
 1              K. Schwam - 3/30/17

 2    Q    Did you tell him he was no longer going to

 3    be a marshal?

 4    A    I told him he was no longer a marshal.

 5    Q    Was he surprised?

 6    A    Yes.

 7    Q    Were you surprised that he was surprised?

 8    A    No.

 9    Q    Do you think he had a reasonable

10    expectation that his office as a City Marshal

11    was going to continue, given the fact that he

12    had been either reappointed or held over since

13    1984?

14    A    His office did continue.  What didn't

15    continue was his occupancy of it.

16    Q    Do you think that he had a reasonable

17    expectation as of December 2013 that he was

18    going to continue in that office, given the

19    fact that he had been in that position or that

20    office since 1984, and had been held over or

21    reappointed consecutively for those 30 years?

22         MR. SEACORD:  Objection.

23         Go ahead.

24    A    No.

25    Q    Why not?
```

```
 1                K. Schwam - 3/30/17

 2   A     Because the law is very clear that upon

 3   the expiration of a marshal's term, his

 4   successor shall be appointed, and that upon

 5   expiration of the term, the marshal's office is

 6   considered vacant for purposes of choosing his

 7   successor.

 8        To me, that should put anyone who

 9   understands anything about the business of

10   being a marshal on notice that what you get is

11   a five-year term.  At the end of that five-year

12   term, the presumption is you are going to be

13   replaced.

14        In light of Marshal Airday's conduct and

15   the lack of judgment that was exposed by his

16   two arrests and the facts that were developed

17   as a result of them, Marshal Airday should have

18   been well aware that his future as a marshal

19   was in grave jeopardy.

20   Q     How many days after you sent

21   Marshal Airday your December 23, 2013 letter

22   did you remain as the Director of the Marshal's

23   Bureau?

24   A     How many days?

25   Q     Yes.  How many days?
```

```
1                    K. Schwam - 3/30/17

2              (Whereupon, a short recess was taken.)

3              MR. SMITH:  I don't have any more

4         questions at this time.

5              MR. SEACORD:  We just request an

6         opportunity to review the transcript and make

7         any necessary corrections.

8              MR. SMITH:  Okay.

9              (Whereupon, at 5:26 p.m., the Examination

10        of this Witness was concluded.)

11

12                    _____

13                    KEITH SCHWAM

14

15   Subscribed and sworn to before me

16   this _____ day of _____, 2017.

17

18   _____

19      NOTARY PUBLIC

20

21

22

23

24

25
```

# EXHIBIT C

**Condensed Transcript**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -x

GEORGE AIRDAY,

                 Plaintiff,

      -against-

THE CITY OF NEW YORK, KEITH SCHWAM and
DAVID M. FRANKEL,

               Defendants.

- - - - - - - - - - - - - - - - - - - -x

           80 Broad Street
           New York, New York

           August 8, 2017
           11:00 a.m.


     DEPOSITION of LOUIS JORDAN, a witness on

behalf of THE CITY OF NEW YORK, one of the

Defendants herein, held at the above time and

place, taken before Karen Zammit, a Shorthand

Reporter and Notary Public of the State of New

York, pursuant to Rule 26 et seq. of the Federal

Rules of Civil Procedure and stipulations between

Counsel.

Job #26496

          *      *      *



**EcoScribe Solutions**
www.EcoScribeSolutions.com
888.651.0505

GEORGE AIRDAY -against- CITY OF NEW YORK
Louis Jordan

Job 26496
Pages 2..5

**Page 2**

```
 1
 2   APPEARANCES:
 3
 4     LAW OFFICES OF NATHANIEL B. SMITH, ESQ.
           Attorneys for Plaintiff
 5         80 Broad Street
           New York, New York 10004
 6     BY:  NATHANIEL B. SMITH, ESQ.
 7     Nathsmith@gmail.com
       212-227-7062
 8
 9
10     NEW YORK CITY LAW DEPARTMENT
           Attorney for Defendants
11         100 Church Street
           New York, New York 10007
12
       BY:  MICHAEL NACCHIO, ESQ.
13
       Mnacchio@law.nyc.gov
14     212-356-0839
15
16     ALSO PRESENT:
17       George Airday
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2                    STIPULATIONS
 3        IT IS HEREBY STIPULATED AND AGREED, by and
 4     among counsel for the respective parties hereto,
 5     that the filing, sealing and certification of the
 6     within deposition shall be and the same are
 7     hereby waived;
 8        IT IS FURTHER STIPULATED AND AGREED that all
 9     objections, except as to form of the question,
10     shall be reserved to the time of the trial;
11        IT IS FURTHER STIPULATED AND AGREED that the
12     within deposition may be signed before any Notary
13     Public with the same force and effect as if
14     signed and sworn to before the Court.
15        IT IS FURTHER STIPULATED AND AGREED that
16     counsel shall furnish counsel for the witness
17     with a copy of the within deposition without
18     charge.
19                *       *       *
20
21
22
23
24
25
```

**Page 4**

```
 1
 2   L O U I S  J O R D A N, the witness herein,
 3   having first been duly sworn by the Notary
 4   Public, was examined and testified as follows:
 5   EXAMINATION BY
 6   MR. SMITH:
 7      Q     What is your name?
 8      A     Louis Jordan.
 9      Q     What is your business address?
10      A     210 Joralemon Street, Brooklyn, New
11   York 11201.
12      Q     Good morning, Mr. Jordan.
13      A     Good morning.
14      Q     Have you ever been deposed before?
15      A     No, sir.
16      Q     There are some basic ground rules
17   that your counsel may have gone through with you.
18   I just want to go through them with you again.
19   You understand you are under oath?
20      A     Yes, sir.
21      Q     Do you understand it is very
22   important that you understand my questions?
23      A     Yes, sir.
24      Q     Would you agree that if I ask you a
25   question and you don't understand it you will let
```

**Page 5**

```
 1                    L. Jordan
 2   me know?
 3      A     Yes, sir.
 4      Q     You understand that everything that
 5   you say and everything that I say gets out taken
 6   down word for word?
 7      A     Yes.
 8      Q     It is very important that you
 9   understand my questions so you will let me know
10   if I am not being very clear?
11      A     Yes.
12      Q     What did you do to prepare for
13   today's deposition?
14      A     There was really nothing to prepare
15   for.
16      Q     Did you review any documents?
17      A     I have looked over stuff pertaining
18   to that that I could locate, yes.
19      Q     Could you tell me a little more
20   about the materials that you have looked at to
21   prepare for the deposition or just to refresh
22   your recollection?
23      A     Yes, I looked over a memo, memos
24   that were sent, and conversations with DIO and
25   with recommendations to my former sheriff.
```

GEORGE AIRDAY -against- CITY OF NEW YORK
Louis Jordan

Job 26496
Pages 10..13

**Page 10**

**L. Jordan**

1
2   Q   Can you show me which documents in
3   this set of Plaintiff's Exhibit 21 relate to
4   recommendations to the former sheriff?
5   A   946.
6   Q   Anything else?
7   A   I believe that's it as far as the
8   documents that are here.
9   Q   Am I correct that the first two
10  pages of this document, 945 and 946, these are a
11  string of E-mails that you obtained about six
12  months ago from your E-mails?
13  A   No, that's not correct.
14  Q   How did you get these two pages?
15  A   Because I had saved them. I have a
16  folder on these in my computer. These were
17  documents that go back to February of 2012, also
18  February 9, 2012.
19  Q   When you obtained these documents
20  you obtained them from a folder?
21  A   No, these were E-mails that were
22  sent to me. They were saved E-mails to a file.
23  Q   They were saved E-mails to what
24  file?
25  A   A file that I keep.

**Page 11**

**L. Jordan**

1
2   Q   What is that called?
3   A   In this case it would probably be a
4   file on Marshal Airday.
5   Q   What else is in that file?
6       MR. NACCHIO: Objection to form.
7   You can answer it.
8   A   I can't answer that, I don't know.
9   Q   Do you have any idea what other
10  documents were in that file?
11  A   That would be relating to Marshal
12  Airday's activity.
13  Q   Can you give me a sense of the
14  number of documents in that file?
15  A   No.
16  Q   Is that because it is too many to
17  remember?
18  A   No, it is just that I don't
19  remember what can be in there because each
20  marshal has a file. It can vary from anything.
21  It could be a complaint, anything, I don't know.
22  Q   In your role as the director of the
23  scofflaw program at the Department of Finance you
24  maintain a file on Marshal Airday?
25  A   No, on all marshals in the program.

**Page 12**

**L. Jordan**

1
2   Q   You maintain files on all marshals
3   in the program?
4   A   Yes.
5   Q   You had a file on Marshal Airday?
6   A   Yes.
7       MR. SMITH: I will call for the
8   production of the file that the witness has
9   just identified.
10      MR. NACCHIO: Please follow up in
11  writing.
12      MR. SMITH: Off the record.
13      [Whereupon, a discussion was held
14  off the record.]
15  Q   Where are you currently working?
16  A   Department of Finance.
17  Q   What is your title?
18  A   Director of our marshal program,
19  back office staff.
20  Q   How long have you been in that
21  position?
22  A   I have been in this position for
23  close to 28 years, close to that.
24      MR. SMITH: Off the record I
25  mentioned that rather than ask you for your

**Page 13**

L. Jordan

1
2   home address in case I need to serve any
3   process I wanted counsel to agree that he
4   would or the Law Department would accept
5   service of any trial subpoenas in the event
6   that I need to call you as a witness at
7   trial.
8       Is that acceptable, counsel, that
9   you will accept service of any process on
10  behalf of Mr. Jordan so I don't have to ask
11  for his home address?
12      MR. NACCHIO: We will accept
13  service. If he is no longer employed and
14  is retired or has otherwise left service we
15  will make efforts to reach him and only if
16  we can't reach him or he doesn't cooperate
17  will we provide you with his address at
18  that time.
19      MR. SMITH: Thank you very much.
20  Q   Are you planning on retiring soon?
21  A   I have an 11-year-old and a
22  14-year-old.
23  Q   So the answer is no?
24  A   Right.
25  Q   What is your highest level of

GEORGE AIRDAY -against- CITY OF NEW YORK                    Job 26496
Louis Jordan                                               Pages 14..17

Page 14

L. Jordan

1
2    education?
3    A       College.
4    Q       When and where?
5    A       I went to the Borough of Manhattan
6    in 1986.
7    Q       Did you receive a degree?
8    A       Yes, business administration.
9    Q       After graduating you joined the
10   Department of Finance?
11   A       Yes. It was actually the
12   Department of Transportation at that time,
13   Parking Violations Bureau.
14   Q       How long were you with the Parking
15   Violations Bureau?
16   A       Under former Mayor Guliani they
17   merged the Parking Violations Bureau into
18   financing. That was somewhere around 1994, I
19   believe.
20   Q       Before you were given the title of
21   director what was your position at DOT or DOF?
22   A       Deputy director.
23   Q       As the director of what?
24   A       The marshals program.
25   Q       Could you describe your duties?

Page 15

L. Jordan

1
2    A       Basically it is really about
3    revenue. At that time it was the towing program.
4    The Department of Transportation with the Parking
5    Violations Bureau, which is now the Department of
6    Finance, we define ways to collect outstanding
7    judgment debt that is owed to the City. They
8    came up with a towing program.
9            Part of it I did was help put the
10   towing program together with Elizabeth
11   Brickfield, the former director at that time, so
12   it is a revenue generating program, and I have a
13   staff, and we mainly report and monitor
14   inventory, we monitor marshals in the field, how
15   much revenue comes in, how many vehicles are
16   towed, what the trends are, what the targets are.
17   We supervise the marshals in that sense.
18   Q       How many marshals are in the towing
19   program?
20   A       There are currently 12. It is
21   booting now.
22   Q       No towing, just booting?
23   A       It is both. When Marshal Airday
24   was in the program it was just towing. Now it is
25   booting and possibly towing.

Page 16

L. Jordan

1
2    Q       For how long have there been 12
3    marshals in the program?
4    A       I think about a year and-a-half in
5    2013 when the marshal expired, deceased.
6    Q       Who was that?
7    A       Marshal Edward Guida.
8    Q       When did he pass away?
9    A       About two years ago.
10   Q       Am I correct that in 2015 there
11   were about 13 marshals in the towing program?
12   A       Yes, before Guida was deceased.
13   Q       For how long were there 13 marshals
14   in the towing program?
15   A       I don't remember. Numbers changed.
16   We had started out with two and went to 20 over
17   the years. As the marshals became more efficient
18   in what they were doing less and less were
19   needed. I can't answer exactly the numbers.
20   Q       The incidents that relate to this
21   case occurred starting in around 2010 or 2011 or
22   2012 or 2013. Are you familiar generally with
23   the nature of the claims in this case?
24   A       Against Marshal Airday?
25   Q       Marshal Airday has brought claims

Page 17

L. Jordan

1
2    against various parties because he feels that he
3    was not treated properly in his removal as a
4    marshal --
5    A       No, I am not familiar with that.
6    Q       You have never read any of the
7    legal documents in this case, is that fair to
8    say?
9    A       As far as --
10           MR. NACCHIO: Objection to form.
11   You can answer it.
12           MR. SMITH: He is just telling me
13   that my question is poorly phrased. I'll
14   rephrase it.
15   Q       Have you ever read George Airday's
16   Complaint?
17   A       I don't believe so.
18   Q       Have you ever read his Amended
19   Complaint?
20   A       No.
21   Q       By way of background, Mr. Airday
22   alleges that in 2010, 2011, 2012 and 2013 certain
23   individuals at DOF and DIO denied him certain
24   rights and as a result of being denied those
25   rights he lost income and lost his right to

GEORGE AIRDAY -against- CITY OF NEW YORK
Louis Jordan

Job 26496
Pages 30..33

Page 30

1          L. Jordan
2   and a computer.
3          The marshal comes upon a vehicle
4   that is a hit, which is a scofflaw, he gets out
5   of the vehicle and check the dashboard for the
6   proper VIN number. If it is a New York plate you
7   match the sticker. If it is out of state you
8   have to give us the correct VIN number. There is
9   a booter inside the van. He gets out and places
10  the boot on the vehicle.
11         Q      The marshals have to be present at
12  the time of the booting?
13         A      Yes.
14         Q      Has that been the system in place
15  since the booting program began in 2013?
16         A      No.
17         Q      When did it change?
18         A      It didn't change. That system has
19  been in place since the inception of the program.
20         Q      Since the inception of the towing
21  program?
22         A      Both programs. A marshal must be
23  at the scene and levy on that vehicle.
24         Q      Is the PayLock contract going to be
25  renewed?

Page 31

1          L. Jordan
2          A      I couldn't answer that.
3          Q      Are you aware of any discussions
4   within the Department of Finance about its
5   renewal?
6          A      No, I have not been a part of any
7   discussions.
8          Q      My understanding is that the
9   contract was entered into formally in 2012 and it
10  had a five-year term and it was scheduled to
11  expire this year. Do you have any knowledge
12  about that at all?
13         A      I know they are scheduled to
14  expire, but that's not handled on my level.
15  That's above me.
16         Q      Getting back to the preparation for
17  your deposition, other than looking at the file
18  that you have maintained at your office did you
19  do any searching for any E-mail communications of
20  any kind?
21         A      Absolutely not.
22         Q      I will show you what was previously
23  marked as Plaintiff's Exhibit 2. I will
24  represent to you that it has been previously
25  identified as the PayLock contract, the one that

Page 32

1          L. Jordan
2   I was just referring to.
3          A      Okay.
4          MR. NACCHIO: Off the record.
5          [Whereupon, a discussion was held
6   off the record.]
7          A      Yes, I am familiar with this
8   contract, an RFP, I think I have seen this
9   before.
10         Q      Was there an RFP?
11         A      I didn't mean to say that. There
12  was a contract of some sort and that looks like
13  that is what it was.
14         Q      Were you familiar with the
15  negotiations with PayLock back in 2012 when there
16  were discussions about it coming on board?
17         A      Not really. When we had Frankel,
18  everything was closed door.
19         Q      Frankel was the one who was doing
20  the negotiating?
21         A      Yes, it would have fell under
22  Commissioner Frankel.
23         Q      What do you mean by that?
24         A      Things were done a lot differently.
25  I was not a part of it.

Page 33

1          L. Jordan
2          Q      If you were on the outside of the
3   closed door who was on the inside?
4          A      I can't tell you that. It would
5   probably be some of his cabinet that was on the
6   inside who actually negotiated that.
7          Q      Was Andrew Salkin involved?
8          A      Yes, he is one of the deputy
9   Commissioners. I think he is the one that,
10  quarterback, I will use that term.
11         Q      Do you know whether or not other
12  potential booting companies were investigated?
13         MR. NACCHIO: Objection to form.
14         A      No, I don't know.
15         Q      As far as you know sitting here
16  today were there any other booting companies
17  involved?
18         MR. NACCHIO: Objection.
19         A      I don't know.
20         Q      Is it fair to say that the only
21  booting company that you ever heard of as
22  potentially having a role in the scofflaws
23  program at DOF was PayLock?
24         MR. NACCHIO: Objection.
25         A      That's the only program that I know

**Page 38**

1          L. Jordan
2  **off by key, where this one you are given a code**
3  **and you can punch in the code and take the boot**
4  **off and return the boot to the location.**
5          Q          Did you have any other objections
6  or concerns about the booting program back in
7  2011, 2012?
8  **A          No.  That was one.**
9          Q          Do you remember any other
10 objections or concerns that you had?
11 **A          No.**
12         Q          I will show you what was previously
13 marked as Plaintiff's Exhibit 20.  This is a
14 memorandum by Keith Schwam.  I will show it to
15 your counsel as well.  Have you had a chance to
16 review Exhibit 20?
17 **A          I scanned it.**
18         Q          Keith Schwam is the author of this
19 memorandum.  Who was Keith Schwam?
20 **A          He was the director of the**
21 **Marshal's Bureau.**
22         Q          Is it fair to say that both you and
23 he had some sort of oversight over the same
24 marshals who were in the towing program?
25 **A          Two different types of oversight.**

**Page 39**

1          L. Jordan
2  **DIO oversees the marshals.  I was basically**
3  **supervising the program that utilizes marshal**
4  **services.**
5          Q          Did you work regularly with Keith
6  Schwam with regard to the marshals that were in
7  the program?
8  **A          I had to, yes.**
9          Q          Is there anything in this memo that
10 you noticed was in correct?
11 **A          No, I can't say that with**
12 **certainty.**
13         Q          There is a reference on the first
14 page in the second paragraph from the bottom.
15 Please read that sentence to yourself.
16 **A          Okay (complying).**
17         Q          The next sentence which says,
18 "Marshal Airday's towing activity ended on
19 January 18, 2012 and never resumed," do you see
20 that?
21 **A          Yes.**
22         Q          Is that a correct statement?
23         MR. NACCHIO:  Objection to form.
24 **A          I can't speak to why he put that,**
25 never resumed, unless he was speaking up to that

**Page 40**

1          L. Jordan
2  date.
3          Q          Am I correct that Marshal Airday's
4  towing activity for the Department of Finance
5  ended on January 18, 2012?
6  **A          No, you are correct.  Because I was**
7  **not notified by the marshal, DOF -- I was not**
8  **notified until February 7th when I was seeking**
9  **inventory.**
10         Q          You didn't find out what?
11 **A          That the marshal been arrested for**
12 **anything or suspended from DIO.  I didn't find**
13 **out until we were seeking inventory and I was**
14 **told by staff that we have not received nothing**
15 **from Marshal Airday in quite a while.  After**
16 **that, around February 7, 2012, is when I found**
17 **out.**
18         Q          February 7, 2012 you found out that
19 Marshal Airday was no longer towing for the
20 Department of Finance?
21 **A          That he had not been towing.  We**
22 **had not told him anything, we didn't know.**
23         Q          On February 7, 2012 you learned
24 what from whom?
25 **A          From Marshal Airday that he had not**

**Page 41**

1          L. Jordan
2  been towing.
3          Q          Marshal Airday himself told you
4  that?
5  **A          Yes.**
6          Q          On February 7, 2012?
7  **A          Yes, somewhere around there.**
8          Q          I will show you what was previously
9  marked as Plaintiff's Exhibit 4.  This is a
10 letter from Keith Schwam to Marshal Airday.
11 Please take a look at that.
12 **A          Okay (complying).**
13         Q          Have you had a chance to review
14 Plaintiff's Exhibit 4?
15 **A          Yes.**
16         Q          Have you ever seen this document
17 before?
18 **A          Not then.**
19         Q          Before me showing you this document
20 have you ever seen this before?
21 **A          Yes, I may have.**
22         Q          Do you know when?
23 **A          No, I don't know.**
24         Q          It looks familiar?
25 **A          It sounds familiar.  I think it**

GEORGE AIRDAY -against- CITY OF NEW YORK                              Job 26496
Louis Jordan                                                        Pages 38..41

Page 38

1                L. Jordan
2    off by key, where this one you are given a code
3    and you can punch in the code and take the boot
4    off and return the boot to the location.
5         Q      Did you have any other objections
6    or concerns about the booting program back in
7    2011, 2012?
8         A     No. That was one.
9         Q      Do you remember any other
10   objections or concerns that you had?
11        A     No.
12        Q      I will show you what was previously
13   marked as Plaintiff's Exhibit 20. This is a
14   memorandum by Keith Schwam. I will show it to
15   your counsel as well. Have you had a chance to
16   review Exhibit 20?
17        A     I scanned it.
18        Q      Keith Schwam is the author of this
19   memorandum. Who was Keith Schwam?
20        A     He was the director of the
21   Marshal's Bureau.
22        Q      Is it fair to say that both you and
23   he had some sort of oversight over the same
24   marshals who were in the towing program?
25        A     Two different types of oversight.

Page 39

1                L. Jordan
2    DIO oversees the marshals. I was basically
3    supervising the program that utilizes marshal
4    services.
5         Q      Did you work regularly with Keith
6    Schwam with regard to the marshals that were in
7    the program?
8         A     I had to, yes.
9         Q      Is there anything in this memo that
10   you noticed was in correct?
11        A     No, I can't say that with
12   certainty.
13        Q      There is a reference on the first
14   page in the second paragraph from the bottom.
15   Please read that sentence to yourself.
16        A     Okay (complying).
17        Q      The next sentence which says,
18   "Marshal Airday's towing activity ended on
19   January 18, 2012 and never resumed," do you see
20   that?
21        A     Yes.
22        Q      Is that a correct statement?
23             MR. NACCHIO: Objection to form.
24        A     I can't speak to why he put that,
25   never resumed, unless he was speaking up to that

Page 40

1                L. Jordan
2    date.
3         Q      Am I correct that Marshal Airday's
4    towing activity for the Department of Finance
5    ended on January 18, 2012?
6         A     No, you are correct. Because I was
7    not notified by the marshal, DOF -- I was not
8    notified until February 7th when I was seeking
9    inventory.
10        Q      You didn't find out what?
11        A     That the marshal been arrested for
12   anything or suspended from DIO. I didn't find
13   out until we were seeking inventory and I was
14   told by staff that we have not received nothing
15   from Marshal Airday in quite a while. After
16   that, around February 7, 2012, is when I found
17   out.
18        Q      February 7, 2012 you found out that
19   Marshal Airday was no longer towing for the
20   Department of Finance?
21        A     That he had not been towing. We
22   had not told him anything, we didn't know.
23        Q      On February 7, 2012 you learned
24   what from whom?
25        A     From Marshal Airday that he had not

Page 41

1                L. Jordan
2    been towing.
3         Q      Marshal Airday himself told you
4    that?
5         A     Yes.
6         Q      On February 7, 2012?
7         A     Yes, somewhere around there.
8         Q      I will show you what was previously
9    marked as Plaintiff's Exhibit 4. This is a
10   letter from Keith Schwam to Marshal Airday.
11   Please take a look at that.
12        Q      Okay (complying).
13        Q      Have you had a chance to review
14   Plaintiff's Exhibit 4?
15        A     Yes.
16        Q      Have you ever seen this document
17   before?
18        A     Not then.
19        Q      Before me showing you this document
20   have you ever seen this before?
21        A     Yes, I may have.
22        Q      Do you know when?
23        A     No, I don't know.
24        Q      It looks familiar?
25        A     It sounds familiar. I think it

GEORGE AIRDAY -against- CITY OF NEW YORK
Louis Jordan

Job 26496
Pages 42..45

Page 42

1    L. Jordan
2 might have been part of something that Keith
3 Schwam sent me as well that I thought was here,
4 but I am not sure.
5    Q    You think maybe Keith Schwam sent
6 you this letter?
7    A    No, I don't recall seeing this
8 letter. I see it is copied to Kenneth Litwack.
9    Q    What about this is familiar to you,
10 what about Plaintiff's Exhibit 4 is familiar to
11 you?
12    A    At this date I didn't know, so
13 nothing about the body of this letter is for me.
14 I didn't know at this date.
15    Q    I understand that you didn't know
16 that Marshal Airday wasn't towing until February
17 7, 2012?
18    A    Around there.
19    Q    This letter is dated January 19,
20 2012, so it is approximately two or three weeks
21 prior to that, so I understand that you didn't
22 know about any issues with Marshal Airday until
23 February 7, 2012; is that correct?
24    A    Basically, yes.
25    Q    At some point did you become

Page 43

1    L. Jordan
2 familiar with the issues that are set forth in
3 this letter?
4    A    Yes. The issues, yes.
5    Q    Did Keith Schwam at any time in
6 January or February inform the Department of
7 Finance that he had told Marshal Airday to cease
8 towing?
9    A    Not to my recollection, but he
10 supercedes the Department of Finance. The
11 department investigation supercedes us as far as
12 suspending the marshal and what they can and
13 cannot do.
14    Q    Your understanding is that Keith
15 Schwam had the authority to go ahead and suspend
16 Marshal Airday without seeking the Department of
17 Finance's approval or permission; is that
18 correct?
19    A    I believe so.
20    Q    When did you learn for the first
21 time that Keith Schwam had directed George Airday
22 to cease towing for the Department of Finance?
23    A    I think it still has to be
24 somewhere in February.
25    Q    How did you learn that Keith Schwam

Page 44

1    L. Jordan
2 had directed George Airday to cease towing?
3    A    I can't say with certainty. I
4 don't know if it was Marshal Airday's attorney or
5 Marshal Airday that when questioned about the
6 inventory, they found out that he was not towing
7 at that time.
8    I can't remember if it came from
9 him or whatever. I was told that his attorney
10 talked with Keith Schwam or DIO and Keith Schwam
11 authorized him to continue towing. I can't tell
12 you when or where.
13    Q    After February 7, 2012 what steps
14 did you take with respect to Marshal Airday?
15    A    Once I found out then I had to also
16 alert the sheriff because that's my superior, as
17 to what was going on, what I was finding out,
18 sending him whatever I had there, what happened,
19 why we were not notified, and basically he said
20 to send him a recommendation.
21    MR. SMITH: Please mark this as
22 Plaintiff's Exhibit 22.
23    [Whereupon, the document was
24 hereby marked as Plaintiff's Exhibit 22 for
25 identification, as of this date, by the

Page 45

1    L. Jordan
2 reporter.]
3    Q    Plaintiff's Exhibit 22 is Bates
4 945 through 946, which is just the first two
5 pages of Plaintiff's Exhibit 21. This is just
6 the two-page E-mail communication that was part
7 of Plaintiff's Exhibit 21.
8    Turning to Page 946, the bottom is
9 an E-mail from you that you sent to Domenech and
10 Sammarco?
11    A    Yes.
12    Q    Is Domenech the sheriff?
13    A    Yes.
14    Q    Why were you sending him this
15 E-mail?
16    A    Because that's what I was directed
17 to do by the sheriff.
18    Q    Who is Sammarco?
19    A    That's my immediate supervisor that
20 I report to.
21    Q    What is his title?
22    A    He is chief of staff.
23    Q    Is this an E-mail that you sent to
24 the sheriff and to your boss?
25    A    Yes.

GEORGE AIRDAY -against- CITY OF NEW YORK
Louis Jordan

Job 26496
Pages 46..49

Page 46

1           L. Jordan
2       Q       It says in the first sentence,
3   "Received a call from Marshal Airday asking to be
4   reinstated into the scofflaws program while this
5   process is being adjudicated." Do you see that?
6       A       Yes.
7       Q       Is that accurate that you received
8   a call from Marshal Airday asking to be
9   reinstated?
10      A       Yes.
11      Q       When was his status removed?
12      A       The status was removed once the DIO
13  had suspended him. As far as the program itself,
14  the towing program, once we found out that he had
15  these arrests and there was domestic violence
16  involved.
17      Q       When was Marshal Airday removed
18  initially from the scofflaws program?
19      A       When Keith Schwam notified him,
20  however it happened, that he was suspended as a
21  marshal.
22      Q       That happened sometime in the month
23  previous?
24      A       Before my notification, yes.
25      Q       Am I correct that as of the time

Page 47

1           L. Jordan
2   you sent this E-mail to Domenech and Sammarco you
3   knew that the DIO had suspended Marshal Airday?
4       A       I am not sure if I was told by him
5   or DIO at that time. I know that I received -- I
6   had to have known about it by February 9, 2012,
7   when he is responding to a question of mine
8   (indicating).
9       Q       Who at the Department of Finance
10  made the decision to remove Marshal Airday from
11  the scofflaws and the towing program?
12      A       Sheriff Domenech.
13      Q       Based on what authority did he make
14  that decision?
15      A       The Department of Finance
16  Commissioner, his or her designee, has the right
17  to not issue executions to any marshal that they
18  choose not to issue them to.
19      Q       Is Sheriff Domenech a Department of
20  Finance employee?
21      A       Yes, he was. He is no longer the
22  sheriff.
23      Q       At the time?
24      A       Yes, at the time.
25      Q       The Department of Finance sheriff

Page 48

1           L. Jordan
2   made the decision to pull Marshal Airday from the
3   towing program; is that correct?
4       A       Yes, sir.
5       Q       When did he make that decision?
6       A       I would have to say he made that
7   decision on February 9, 2012. I can't say 100
8   percent if he told me verbally something on the
9   8th. I can't recall that. I will go by what he
10  says here.
11      Q       Your E-mail to Domenech and your
12  boss suggest that Marshal Airday is calling
13  asking to be reinstated to the scofflaws program.
14          He must have been already removed,
15  at least temporarily, from the scofflaws program;
16  is that correct?
17      A       Yes, but the part that you are
18  leaving out is DIO suspended him. As a marshal
19  you can receive executions from us. If DIO
20  suspends a marshal he or she can no longer
21  receive executions, period.
22      Q       Are you telling me that DIO
23  effectively made the decision to pull Marshal
24  Airday from the scofflaws program because he was
25  pulled completely from being a marshal?

Page 49

1           L. Jordan
2       A       That's automatic.
3       Q       The answer to my question is yes,
4   it is automatic, once DIO makes that decision to
5   suspend Marshal Airday then automatically he is
6   out of the scofflaws program; is that correct?
7       A       That is correct.
8           MR. SMITH:  Let's take a quick
9       break.
10          MR. NACCHIO:  Sure.
11          [Whereupon, after a short recess
12      was taken, the following was had:]
13  CONTINUED EXAMINATION
14  BY MR. SMITH:
15      Q       You have in front of you still
16  Plaintiff's Exhibit 22?
17      A       Yes.
18      Q       I was asking you questions about
19  your E-mail to Domenech and Sammarco?
20      A       Yes.
21      Q       The second page, there is also a
22  reference in the E-mail to, "I spoke with Keith
23  and he felt that Marshal Airday should not be
24  reinstated to the program as well." Do you see
25  that?

GEORGE AIRDAY -against- CITY OF NEW YORK
Louis Jordan

Job 26496
Pages 50..53

Page 50

1           L. Jordan
2      A    Yes.
3      Q    That's a reference to Keith Schwam;
4  is that correct?
5      A    Yes, that is correct.
6      Q    When did you speak to Keith Schwam
7  as referred to in this E-mail?
8      A    Probably that day, just guessing.
9           MR. SMITH: Guessing is not what I
10  am looking for. If you have a faint
11  recollection of the timeframe I would like
12  that, but if it is just sheer speculation
13  on your part then I don't think that's what
14  you or your lawyer want you to do.
15         I would just remind you that since
16  you are under oath your obligation is to
17  try the best you can to tell me what you
18  remember. It could be vague or very
19  concrete, but to just guess is not
20  consistent with what you are expected to do
21  here today.
22         THE WITNESS: Sure.
23         MR. NACCHIO: Note my objection to
24  counsel testifying or offering his opinion,
25  next question.

Page 51

1           L. Jordan
2      Q    Do you remember what Keith Schwam
3  told you about why he thought that Marshal Airday
4  should not be reinstated?
5      A    No, I can't remember.
6      Q    The next sentence in that exchange
7  or that E-mail that you sent is, "My feeling is
8  that the case(S) are still going on and nothing
9  has happened that I know of that cleared him of
10  the charges." Do you see that?
11     A    Yes.
12     Q    When you say the cases are still
13  going on are you referring to the criminal
14  charges against Marshal Airday?
15     A    Yes.
16     Q    When you wrote this E-mail you
17  understand there were charges of domestic
18  violence against Marshal Airday?
19     A    I knew there were arrests. Did I
20  know that there was domestic violence?
21         MR. SMITH: I'll rephrase it.
22     Q    What understanding did you have
23  about these cases at the time that you sent this
24  E-mail?
25     A    Again, I believe that he was

Page 52

1           L. Jordan
2  arrested, I was aware that there was a firearm
3  involved. I may have been aware of the domestic.
4      Q    Are you saying in this E-mail that
5  you believe that Marshal Airday should not be
6  reinstated because the cases are still pending?
7      A    Yes.
8      Q    As far as the status of the case,
9  he has not been cleared; is that correct?
10     A    Yes.
11     Q    Because he has not been cleared of
12  the charges you believe it was appropriate to
13  maintain his suspension from the scofflaws
14  program; is that correct?
15     A    I was in agreement.
16     Q    You agreed that so long as these
17  charges were pending against him that he should
18  remain suspended from the scofflaws program; is
19  that correct?
20     A    That is correct, in agreement.
21     Q    Were there any other reasons other
22  than the fact that there were these cases, these
23  criminal charges against Marshal Airday which you
24  believed which justified, for him being suspended
25  from the scofflaws program?

Page 53

1           L. Jordan
2      A    No, no other cases, but that wasn't
3  the only reason why.
4      Q    Other than these cases what other
5  reasons were there for why you believed that it
6  was appropriate to maintain Marshal Airday's
7  suspended status, if any?
8      A    Based on the fact that we were
9  never notified. We were not notified of any
10  arrest or that any of these things took place.
11  We were not even notified why he was not towing
12  by him.
13     Q    Isn't the reason why he was not
14  towing because Keith Schwam told him to stop
15  towing?
16     A    I was finding that out later. He
17  is a part of our program as far as the towing.
18  He never notified us of his suspension.
19     Q    You believe that his failure to
20  notify you of Keith Schwam's decision to suspend
21  him was a reason for why Marshal Airday should
22  not be resumed as a member of the scofflaws
23  program?
24     A    That was in addition to Keith
25  Schwam's recommendation, yes, of not identifying

Page 54

**L. Jordan**

1             **L. Jordan**
2 **us that he would not be towing and that he had an**
3 **arrest.**
4        **We deemed the arrest very serious**
5 **when we found out about the domestic dispute and**
6 **there was a firearm involved and we have to deal**
7 **with the public.**
8      Q    Were the charges, the criminal
9 charges against Marshal Airday, were those the
10 principal reasons for why you thought the
11 suspension should be maintained or did you
12 independent to that also believe that Marshal
13 Airday was properly suspended because he didn't
14 notify you that Keith Schwam had suspended him as
15 marshal?
16      **A    Two separate things. Keith**
17 **Schwam's suspension is based on him being a**
18 **marshal, period. If we had known that he was**
19 **suspended he would have automatically been**
20 **suspended from the program.**
21      Q    Was the fact that Marshal Airday
22 didn't tell you on January 19, 2012 that Keith
23 Schwam had told him that he should no longer act
24 as a marshal, was the fact that he failed to give
25 you that notification the kind of failure that

Page 55

1             L. Jordan
2 would justify you concluding in your opinion that
3 Marshal Airday should not be a marshal in a
4 scofflaws program?
5      **A    One of the reasons.**
6      Q    If the charges were resolved in
7 favor of Marshal Airday you still believe that it
8 would be appropriate to keep Marshal Airday off
9 of the scofflaws program?
10      MR. NACCHIO: Objection.
11      **A    That it would be appropriate to**
12 **keep him off the program?**
13      Q    Yes.
14      **A    Yes.**
15      Q    Permanently?
16      **A    Yes, during that time you can ask**
17 **for reinstatement, but yes. At that time, yes.**
18      Q    At what time?
19      **A    That the recommendation was to**
20 **terminate him from the program.**
21      Q    Are you aware that there were
22 criminal cases against Marshal Airday?
23      **A    Yes.**
24      Q    Were you aware that at some point
25 later he was completely vindicated of those

Page 56

1             L. Jordan
2 criminal charges?
3      **A    I didn't track his case or anything**
4 **like that.**
5      Q    Did you ever become aware that he
6 was vindicated?
7      **A    I found out later on.**
8      Q    When did you find out?
9      **A    I don't know when I found out.**
10      Q    After he was vindicated and all of
11 the criminal charges were dropped did you think
12 it was still appropriate to keep him off of the
13 scofflaws program?
14      **A    Yes, I would have thought so.**
15      Q    Why?
16      **A    Because we were never notified. We**
17 **should have been notified, according to the stuff**
18 **I read here, that the first arrest took place in**
19 **December. I think the second was in January.**
20 **We were not notified of the -- we**
21 **got no notification. That would have been**
22 **enough, you understand, to also recommend that he**
23 **be terminated from the program.**
24      Q    Have any marshals ever been part of
25 the scofflaws program and been suspended from the

Page 57

1             L. Jordan
2 scofflaws program for failure to provide
3 notification of an arrest?
4      **A    I don't know, but not to my**
5 **knowledge.**
6      Q    Have any marshals that were part of
7 the scofflaws program during the 28 years that
8 you were involved ever been arrested?
9      **A    I don't know. Not to my**
10 **recollection, no.**
11      Q    Were any of the marshals that you
12 identified as part of the scofflaws program ever
13 suspended by the Department of Finance from the
14 scofflaws program for any reason?
15      **A    There have been marshals that were**
16 **suspended for something that may have been**
17 **inappropriate that was done like in the street or**
18 **something to that effect, yes.**
19      Q    Who was suspended?
20      MR. NACCHIO: Let's mark it
21 confidential.
22      **A    I don't have that information.**
23      Q    You don't know?
24      **A    No, not offhand.**
25      MR. NACCHIO: No longer

GEORGE AIRDAY -against- CITY OF NEW YORK
Louis Jordan

Job 26496
Pages 62..65

**Page 62**

1      L. Jordan
2  Standard Operating Procedures?
3      A      Based on working in the program,
4  period, being a part of the program.
5      Q      Is the underlying document that
6  supports your decision to withdraw somebody or
7  suspend somebody or maintain a suspension because
8  they didn't notify you, is that protocol set
9  forth in the SOP or is it set forth someplace
10  else or if it is not set in place anywhere I
11  would like to know that?
12      A      It is part of the SOP, but also at
13  the discretion of the Commissioner or his
14  designee.
15      Q      Where does it say it is at the
16  discretion of the Commissioner?
17      A      An SOP also speaks to inappropriate
18  behavior or actions as well.
19      Q      Other than the SOP is there any
20  piece of paper anywhere in the world that you are
21  aware of that says if a marshal is arrested he
22  has to notify the Department of Finance?
23      A      No, I am not aware of anything
24  else, no.
25      Q      The only writing that you are aware

**Page 63**

1      L. Jordan
2  of is this Standard Operating Procedure?
3      A      Yes.
4      Q      Looking at Plaintiff's Exhibit 21,
5  looking at 947, am I correct that 947, 948 and
6  949 are three pages from the SOP that was
7  relevant to George Airday at the time?
8      A      Yes.
9      MR. NACCHIO: Off the record.
10      [Whereupon, a discussion was held
11  off the record.]
12      MR. SMITH:  Please mark this as
13  Plaintiff's Exhibit 23.
14      [Whereupon, the document was
15  hereby marked as Plaintiff's Exhibit 23 for
16  identification, as of this date, by the
17  reporter.]
18      Q      You have in front of you
19  Plaintiff's Exhibit 23?
20      A      Yes.
21      Q      Are these excerpts from the
22  Standard Operating Procedure?
23      A      Yes, at that time.
24      Q      This is one of the documents that
25  was in the file that you maintain at your office

**Page 64**

1      L. Jordan
2  on Marshal Airday?
3      A      Yes.
4      Q      Is the entire SOP in the file or
5  just these pages?
6      A      This is not kept in the file of
7  Marshal Airday.  This is a file, a separate file
8  of its own.  There is a complete SOP.  It tells
9  you how the towing program works on the street.
10  This is part of it.
11      Q      You refer to this SOP in the E-mail
12  exchange that you had with Keith Schwam and the
13  sheriff, right?
14      A      Yes.
15      Q      Where in the SOP does it say that
16  the marshal has the obligation to provide
17  notification?
18      A      It doesn't say if he or she is
19  arrested.
20      Q      It doesn't talk about that
21  obligation in the SOP?
22      A      Not about the arrest, no.
23      Q      What does it talk about?
24      A      We refer to letter H.
25      Q      Do you believe that Marshal Airday

**Page 65**

1      L. Jordan
2  violated letter H?
3      A      Yes.
4      Q      How?
5      A      I think that through his improper
6  behavior.
7      Q      Improper behavior is a violation
8  of H?
9      A      That we deem serious, yes.
10      Q      Any improper behavior that the
11  Department of Finance deems serious is a
12  sufficient basis to suspend a marshal from the
13  scofflaws program?
14      A      Not only to suspend them, they can
15  be deemed even to stop issuing executions.
16      Q      From your perspective you can do it
17  for any reason at all?
18      MR. NACCHIO: Objection.
19      A      Yes.  The Commissioner can or his
20  designee, yes.
21      Q      The last sentence of this paragraph
22  says, "Upon due and timely disclosure of
23  information the Department of Finance will review
24  pertinent facts and circumstances to determine
25  whether the Department believes there is a

GEORGE AIRDAY -against- CITY OF NEW YORK
Louis Jordan

Job 26496
Pages 102..105

Page 102

```
1              L. Jordan
2  CONTINUED EXAMINATION
3  BY MR. SMITH:
4     Q    Have you understood each of my
5  questions today?
6     A    Yes.
7     Q    Do you want to change any of your
8  answers?
9     A    No.
10    Q    Do you want to clarify any of your
11 answers?
12    A    No.
13    Q    Is there anything that you want to
14 add to your testimony today?
15    A    No, sir.
16    Q    Is there anything else that you
17 want to say for this deposition?
18    A    No, sir.
19         MR. SMITH: Okay. Thank you Mr.
20 Jordan. I have no further questions at
21 this time.
22         I am going to reserve the right
23 potentially to call him back because of the
24 open question that we discussed about
25 E-mails and maybe there hasn't been a
```

Page 103

```
1
2  thorough search.
3         I am not trying to enter into a
4  verbal war, but if something comes up I
5  might have to ask you for you to come back
6  because I am not sure that I have gotten
7  all of the pieces of paper that I wanted to
8  get. Thank you very much for coming down.
9         MR. NACCHIO:  I note your position
10 and my client will review and sign.
11         MR. SMITH:  Yes.
12         [Whereupon, the examination of the
13 witness was concluded at 2:30 p.m.]
14
15
           _____
16           LOUIS JORDAN
17
   Subscribed and sworn to
18 before me this _____ day
   of _____, 2017.
19
           _____
20   Notary Public
21
22
23
24
25
```

Page 104

```
1
2                I N D E X
3  WITNESS      EXAMINATION BY      PAGE
4  L. Jordan    Mr. Smith            5
5
6              E X H I B I T S
7  PLAINTIFF'S  DESCRIPTION         PAGE
8
   21          Bates 945-952         6
9
   22          Bates 945 and 946    44
10
   23          excerpts from SOP    63
11
   24          Bates 950            68
12
   25          Bates 951            71
13
   26          Bates 952            72
14
   27          Daily News article   85
15
16   [Exhibits retained by attorney.]
17
18            REQUESTS
19        Page      Line
20         12         7
           58        18
21
22
23          *      *      *
24
25
```

Page 105

```
1
2              CERTIFICATION
3  STATE OF NEW YORK )
                      : SS.:
4  COUNTY OF NASSAU  )
5     I,  KAREN ZAMMIT, a Notary Public for and
6  within the State of New York, do hereby certify:
7     That the witness(es) whose testimony as
8  herein set forth, was duly sworn by me; and that
9  the within transcript is a true record of the
10 testimony given by said witness(es).
11    I further certify that I am not related to
12 any of the parties to this action by blood or
13 marriage, and that I am in no way interested in
14 the outcome of this matter.
15    IN WITNESS WHEREOF, I have hereunto set my
16 hand this 10th day of August, 2017.
17
18
           Karen Zammit
19           KAREN ZAMMIT
20
21          *      *      *
22
23
24
25
```

*EcoScribe Solutions    888.651.0505*

# EXHIBIT D

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - -x

GEORGE AIRDAY,

                    Plaintiff,

     -against-

THE CITY OF NEW YORK, KEITH SCHWAM and
DAVID M. FRANKEL,

                  Defendants.

                 **CERTIFIED COPY**

- - - - - - - - - - - - - - - - - - - - - - - -x

                100 Church Street
                New York, New York

                August 17, 2017
                11:20 a.m.


    DEPOSITION of CAROLINE TANG—ALEJANDRO, a

witness on behalf of THE CITY OF NEW YORK, one of

the Defendants herein, held at the above time and

place, taken before Karen Zammit, a Shorthand

Reporter and Notary Public of the State of New

York, pursuant to Rule 26 et seq. of the Federal

Rules of Civil Procedure and stipulations between

Counsel.

Job #26510

          *     *     *

**EcoScribe Solutions**

www.EcoScribeSolutions.com

888.651.0505



```
 1

 2   APPEARANCES:

 3

     LAW OFFICES OF NATHANIEL B. SMITH, ESQ.
 4        Attorneys for Plaintiff
          80 Broad Street
 5        New York, New York 10004

 6   BY:  NATHANIEL B. SMITH, ESQ.

 7   Nathsmith@gmail.com
     212-227-7062
 8

 9

10   NEW YORK CITY LAW DEPARTMENT
          Attorney for Defendants
11        100 Church Street
          New York, New York 10007
12
     BY:  MICHAEL NACCHIO, ESQ.
13
     Mnacchio@law.nyc.gov
14   212-356-0839

15

16
     NYC DEPARTMENT OF INVESTIGATION
17        80 Maiden Lane
          New York, New York 10038
18
     BY:  MICHAEL SILLER, ESQ.
19
     Msiller@doi.nyc.gov
20

21

22   ALSO PRESENT:

23   George Airday

24

25            *        *        *
```

1

2                    **STIPULATIONS**

3        IT IS HEREBY STIPULATED AND AGREED, by and

4    among counsel for the respective parties hereto,

5    that the filing, sealing and certification of the

6    within deposition shall be and the same are

7    hereby waived;

8        IT IS FURTHER STIPULATED AND AGREED that all

9    objections, except as to form of the question,

10   shall be reserved to the time of the trial;

11       IT IS FURTHER STIPULATED AND AGREED that the

12   within deposition may be signed before any Notary

13   Public with the same force and effect as if

14   signed and sworn to before the Court.

15       IT IS FURTHER STIPULATED AND AGREED that

16   counsel shall furnish counsel for the witness

17   with a copy of the within deposition without

18   charge.

19                        *        *        *

20

21

22

23

24

25

```
1                    C. Tang-Alejandro
2         Q         For this first page, this 2005
3    chart, it lists 38 City marshals, right?
4         A         Yes.
5         Q         Can you identify which of the 38
6    marshals here are marshals who were part of the
7    scofflaw program?
8         A         I don't know if I can identify all
9    of them.
10        Q         Can you justify the ones that you
11   know were members of the scofflaw program?
12        A         Okay.  Mr. Airday, Burco,
13   Giachetta, Guida, Hammer, Locascio, Jeffrey Rose,
14   Schain, Siracusa, Sollmine, Swift.  That's it.
15        Q         What was the scofflaw program?
16        A         The scofflaw program is part of the
17   Department of Finance and the Department of
18   Finance Parking Violations Bureau.
19                  If a respondent has gotten more
20   than a certain amount of money in tickets they
21   become scofflaw and the Department of Finance
22   contracts or has a program and contracts the
23   marshals to actually go and tow vehicles that
24   were scofflaw at that time.
25        Q         Did there come a time when the
```

```
 1                      DOI

 2   cooperating with an investigation, so I didn't

 3   have anything to relate it to.

 4        Q        You didn't think it seemed like a

 5   harsh consequence?

 6                 MR. NACCHIO:  Objection.  Asked and

 7        answered.

 8        A        I just took it as -- no, I didn't

 9   judge it as harsh or not harsh enough.  It is

10   just something that occurred because he is

11   expected, and it is in the handbook, that he

12   cooperate with any DOI investigation.

13                 It was not up to me to decide and I

14   was not privy to any conversations.  I don't know

15   the specific determining factors.  It is just

16   this abstract -- he didn't cooperate with an

17   investigation and this was the final outcome.

18        Q        You remember going to the interview

19   that may have been tape recorded, right?

20        A        I remember going to the interview.

21        Q        Do you remember it lasted a few

22   hours and Mr. Schwam asked Mr. Airday questions,

23   right?

24        A        Yes.

25        Q        Mr. Airday had an attorney with him
```

```
 1                          DOI

 2    at the time, Mr. Sternbach; is that correct?

 3          A        I don't remember the person's name.

 4          Q        There was somebody else there?

 5          A        Yes.

 6          Q        Who was Mr. Airday's lawyer?

 7          A        Yes.

 8          Q        You were there, right?

 9          A        Yes.

10          Q        Mr. Schwam was there?

11          A        Yes.

12          Q        Was anyone else there?

13          A        I don't think so.  I don't

14    remember.

15          Q        Do you recall any discussions with

16    Mr. Schwam either before or after that

17    examination?

18                   MR. NACCHIO:  Objection to form.

19          You can answer it.

20          A        No, I don't.

21                   MR. SMITH:  I'll rephrase it.

22          Q        Do you remember any discussions

23    that you had with Mr. Schwam about the interview

24    before it took place?

25          A        No, I don't remember.
```

```
 1                          DOI
 2         Q        Do you recall any discussions that
 3   you had with Mr. Schwam about the interview after
 4   the interview took place?
 5         A        I don't recall.
 6         Q        Did Mr. Schwam tell you after the
 7   interview that Mr. Airday was going to be
 8   reinstated as a marshal?
 9         A        I don't recall that.
10         Q        Did you have an understanding one
11   way or the other at the time of the interview
12   whether or not Mr. Airday was going to be
13   reinstated as a marshal?
14         A        Not that I can remember.
15         Q        Looking at the last three pages of
16   Plaintiff's Exhibit 11, which is the stipulation,
17   see if that refreshes your recollection.
18         A        I don't remember much about the
19   interview.  I do remember the suspension.
20         Q        Looking at the second page of the
21   stipulation, paragraph number one says, "Marshal
22   Airday agrees to fully cooperate with the DOI
23   investigation of his conduct including giving
24   full and complete testimony under oath."  Do you
25   see that?
```

```
 1                          DOI
 2         A        Yes.
 3         Q        Do you know whether or not the
 4   interview that you attended where Mr. Schwam
 5   questioned Mr. Airday was the event that was
 6   designed to comply with this provision that I
 7   just read to you?
 8         A        No, I don't.
 9         Q        As a result of or following the
10   interview that you participated in with Mr.
11   Schwam did you have any understanding that DOI
12   was going to then take steps to reinstate Marshal
13   Airday?
14         A        I do not recall.  I don't remember
15   the dates relative to the interview, no, I don't.
16         Q        Do you have any recollection about
17   what it was that Marshal Airday didn't cooperate
18   with DOI in doing?
19         A        I recall -- this is not discussion,
20   it is just information floating in the head, that
21   I believe DOI requested documents and those
22   documents were not submitted by Mr. Airday.
23                  I believe in questioning Mr. Airday
24   with regard to a gun, I don't know the make or
25   the model of the gun, at one point Mr. Airday
```

```
 1                        DOI

 2    said that it belonged to his deceased father and

 3    that he just put it in the safe and forgot that

 4    he had it.

 5                 Again, time, I don't know the

 6    timeframe, but I believe after that he said he

 7    had purchased the gun from someone.  It just

 8    didn't seem -- I don't know the specifics, but it

 9    didn't seem that he was cooperating with Mr.

10    Schwam's investigation.

11         Q      Do you know what documents it was

12    that Mr. Airday was supposed to provide that he

13    didn't provide that formed the basis for this

14    charge against Mr. Airday for not cooperating

15    with the DOI?

16         A      No, I don't know.

17         Q      You have read the stipulation that

18    is part of Plaintiff's Exhibit 11, correct?

19         A      Yes.

20         Q      It says that there were two sets of

21    criminal charges that were made against Marshal

22    Airday, right?

23         A      Yes.

24         Q      One was for assault, right?

25         A      Yes.
```

```
 1                          DOI

 2   marshal at the end of his or her term to expect

 3   to be able to continue as a marshal?

 4                    MR. NACCHIO:  Objection.  You may

 5          answer it.

 6                    THE WITNESS:  Please repeat that.

 7                    [Whereupon, the requested portion

 8          of the record was hereby read by the

 9          reporter.]

10                    MR. NACCHIO:  Objection.

11       A        That's a difficult question to

12   answer.  They should know that their badge term

13   while they are on holdover status is considered

14   and deemed vacant.  If not, that's why they

15   reapply, because it is not -- nothing is owed or

16   given to them.  They reapply.  They are re-vetted

17   and may or not be re-interviewed and they may or

18   may not be reappointed.

19       Q        You don't think it is reasonable

20   for a marshal to expect to be able to continue

21   acting as a marshal after their five-year term

22   expires?

23                    MR. NACCHIO:  Objection.  You can

24          answer it.

25       A        My opinion is that I would not take
```

```
1                        DOI
2    it for granted.
3         Q         It is true that the marshals have
4    to open up an office in order to be a City
5    marshal; is that correct?
6         A         They can choose to open up an
7    office.  Some marshals choose to share an office
8    with an existing marshal.
9         Q         It is certainly required that they
10   maintain office hours, right?
11        A         Yes.
12        Q         That's because if a member of the
13   public needs to reach them because they are the
14   ones involved in the execution on the judgment
15   there are rules that the DOI establishes that say
16   you must maintain regular business hours so that
17   members of the public can reach you, right?
18        A         Yes.
19                  MR. NACCHIO:  Objection.
20        Q         It is also true that marshals,
21   either on their own or in association with other
22   marshals, have staff to deal with paperwork and
23   to deal with other inquiries from the public; is
24   that correct?
25        A         Yes.
```

1

2                    MR. NACCHIO:   Okay.

3                    [Whereupon, after a short recess

4          was taken, the following was had:]

5                    MR. SMITH:   Thank you very much.   I

6          have nothing further at this time.

7                    If I need to ask you to come back

8          it is going to be because there is some

9          squabbling over documents that I have not

10         yet reviewed, but subject to that I don't

11         think I will need to bring you back.   Thank

12         you very much.

13                   MR. NACCHIO:   Okay.   Miss

14         Tang-Alejandro will review and sign.

15                   MR. SMITH:   Okay.   Thank you.

16                   [Whereupon, the examination of the

17         witness was concluded at 2:45 p.m.]

18

19         _____

20                   CAROLINE TANG-ALEJANDRO

21

22    Subscribed and sworn to
      before me this _____ day
23    of _____, 2017.

24    _____
              Notary Public

25

# EXHIBIT E

1

2

3              UNITED STATES DISTRICT COURT

4              SOUTHERN DISTRICT OF NEW YORK

5
   ------------------------------------
6  GEORGE AIRDAY,

7                      Plaintiff,

8              vs.                    Index No.
                                      14-CV-8065
9  THE CITY OF NEW YORK, KEITH
   SCHWAM and DAVID M. FRANKEL,
10
                       Defendants.
11 ------------------------------------

12

13

14          DEPOSITION OF ANDREW SALKIN

15              New York, New York

16          Tuesday, November 21, 2017

17

18

19

20

21

22 Reported by:
   Jeremy Frank, MPM
23 JOB NO. 27084

24

25

1

2                           November 21, 2017

3                             11:41 a.m.

4

5        Deposition of ANDREW SALKIN, held at the

6   Law Offices of Nathaniel B. Smith, 80 Broad

7   Street, New York, New York, pursuant to

8   Subpoena, before Jeremy Frank, a Notary Public

9   of the State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2    A P P E A R A N C E S:

 3

 4         LAW OFFICES OF NATHANIEL B. SMITH

 5         Attorneys for Plaintiff

 6              80 Broad Street, 19th Floor

 7              New York, NY 10004

 8    BY:   NATHANIEL B. SMITH, ESQ.

 9              NatHSmith@gmail.com

10              (212) 227-7062

11

12    NEW YORK CITY LAW DEPARTMENT

13    Attorneys for Defendants

14              100 Church Street

15              New York, NY 10007

16    BY:   GARRETT S. KAMEN, ESQ.

17              GKamen@law.nyc.gov

18              (212) 356-2479

19

20

21

22

23

24

25
```

1                          Salkin

2           A.      Yes.

3           Q.      What is PayLock?

4           A.      PayLock is a company that when I

5    worked for the City, the City partnered with

6    to provide a turnkey booting payment scofflaw

7    finding services.

8           Q.      And so I take it when you

9    searched, you did your search, your searched

10   for any e-mails referring to Airday and you

11   searched and you found nothing, right?

12          A.      Yes.

13          Q.      Then you did a search for any

14   documents or e-mails reflecting objections or

15   concerns about PayLock.  And I understand you

16   say that you found nothing about that also?

17          A.      I followed your directions here

18   and I didn't find anything.

19          Q.      I see.

20                  So maybe the request is ambiguous.

21   So what I was hoping you would do is search

22   for any e-mails or documents that related to

23   Airday as one category.

24          A.      Right.

25          Q.      And then as a separate category,

1                          Salkin

2       that led to this contract creation, if that's

3       what you mean by negotiations.

4              Q.    Let me ask you this way.

5                    Who at the Department of Finance

6       was involved in negotiations over the PayLock

7       contract?

8              A.    So again, I guess negotiations for

9       the contract are the terms that are in the

10      contract, is that what you mean?

11             Q.    No, just sort of generally there

12      was, I'm trying to understand your role and

13      other people's roles in the development of a

14      proposal by PayLock to start a booting program

15      at the Department of Finance.

16             A.    So your questions I hear you, it

17      is not exactly clear, I'm not trying to be a

18      pain.  You're saying proposal that PayLock

19      created, this document was in response to a

20      procurement that the City did.

21             Q.    What was that procurement?

22             A.    It was a procurement for services

23      to create a self, I can't remember the exact

24      details but it was if I remember to the best

25      of my memory it was a contract asking for

```
 1                    Salkin

 2  someone to provide a self-removing booting

 3  system with supporting turnkey technology that

 4  included the payment process and vehicle

 5  finding systems.

 6        Q.    Who was the one that set that

 7  procurement process in motion?

 8        A.    Me.

 9        Q.    Who else was involved in setting

10  the procurement process in motion?

11        A.    Meaning?

12        Q.    At the time at the Department of

13  Finance?

14        A.    Like the ACCO, the Agency Chief

15  Contracting Officer?

16        Q.    You tell me, I don't really know

17  what your process was.

18        A.    Well, it is not what my process

19  was, it is the City's process for contracting.

20  So you create a document, you put it out for

21  response, you evaluate the responses, and then

22  you decide if anyone won an award.  The

23  process for doing that is you create a bid

24  document and you publicize that through the

25  City's process, I don't do that, there is a
```

1                      Salkin

2    whole City infrastructure to do that work.

3    Then we at the finance evaluate proposals that

4    get submitted.

5          Q.    Was a request for proposal

6    generated?

7          A.    I believe we had an open

8    procurement that we put on the street, yes,

9    but that's my recollection.

10         Q.    Were there any other bidders other

11   than PayLock?

12         A.    To me memory we did get other

13   bidders.

14         Q.    Who?

15         A.    I don't remember who.

16               RQ.

17               MR. SMITH:  Garrett, I think I made

18         a request for some of these underlying

19         PayLock documents.  My understanding is

20         it was a no bid contract that went

21         through a separate process, not an RFP

22         process.

23               So I'm going to make a request that

24         Department of Finance search for any

25         requests for proposals bids that were

1                           Salkin

2    debt was assigned to the marshals, the person

3    who was directly responsible for overseeing

4    the marshals' collection of that debt was

5    Louis Jordan?

6           A.    It sounds okay, but I don't know

7    exactly what Louis Jordan did day to day, but

8    I believe he oversaw the marshal program in

9    some capacity related to towing or scofflaw.

10          Q.    The other choices that the

11   Department of Finance had for the assignment

12   of debt relating to parking judgments was the

13   sheriffs?

14          A.    No, we could assign the debt to

15   collection agencies.  We ran some additional

16   programs related to large ticket getters that

17   promoted the commerce of the City, and so

18   there was special programs related to delivery

19   vehicles, and we could also decide to do

20   nothing.  I think we could also assign debt at

21   a certain stage, you could have your

22   registration withheld if you were a driver,

23   and I'm sure there was probably a couple of

24   others.

25               MR. SMITH:  I'll show you what's

```
1                        Salkin

2               C E R T I F I C A T E

3

4    STATE OF _____:

5    COUNTY/CITY OF_____:

6

7    Before me, this day, personally appeared

8    ANDREW SALKIN, who, being duly sworn, states

9    that the foregoing transcript of his

10   Deposition, taken in the matter, on the date,

11   and at the time and place set out on the title

12   page hereof, constitutes a true and accurate

13   transcript of said deposition.

14

15                       _____

16                            ANDREW SALKIN

17

18   SUBSCRIBED and SWORN to before me this

19   _____ day of _____, 2017, in the

20   jurisdiction aforesaid.

21

22

23

24   _____  _____

25   My Commission Expires       Notary Public
```

1                          Salkin

2                  C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                          : ss.

5    COUNTY OF NEW YORK     )

6

7        I, Jeremy Frank, a Notary Public within

8    and for the State of New York, do hereby

9    certify:

10       That ANDREW SALKIN, the witness whose

11   deposition is hereinbefore set forth, was duly

12   sworn by me and that such deposition is a true

13   record of the testimony given by the witness.

14       I further certify that I am not related

15   to any of the parties to this action by blood

16   or marriage, and that I am in no way

17   interested in the outcome of this matter.

18       IN WITNESS WHEREOF, I have hereby

19   set my hand on the 23rd day of November, 2017.

20

21       _____

22              JEREMY FRANK, MPM

23

24

25