UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
GEORGE AIRDAY,

                                                  14-cv-8065 (RWS)

                Plaintiff,

          -against-

THE CITY OF NEW YORK, KEITH SCHWAM, and
DAVID M. FRANKEL,

                    Defendants.

-----------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Nathaniel B. Smith
225 Broadway – Suite 1901
New York, NY 10007
212-227-7062
natbsmith@gmail.com
Attorney for Plaintiff

Dated:  February 26, 2018

TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................5

STATEMENT OF FACTS ......................................................................................................6

    The City Marshal Office and Function ............................................................................6

    Airday's Career as a City Marshal......................................................................................8

    The Paylock Proposal ........................................................................................................9

    The Charges Against Airday............................................................................................11

ARGUMENT ....................................................................................................................19

    The Due Process Claims ................................................................................................19

    The Equal Protection Claim............................................................................................25

    The Free Speech Claim ..................................................................................................29

    Schwam is Not Entitled to Qualified Immunity ............................................................31

CONCLUSION ..................................................................................................................33

TABLE OF AUTHORITIES

*Airday v. City of New York*, 131 F. Supp. 2d 174, 180-81 (S.D.N.Y. 2015) ................................ 29

*Barsky v. City of New York Department of Investigations*, 40 A. D. 3d 531, 534-35

   (1st Dept. 2007) .......................................................................................................... 14

*Bell v Burson,* 402 U. S. 535 (1971) ........................................................................................ 21

*Best v. N.Y.C. Dep't of Corr.*, 14 F. Supp. 3d 341, 351 (S.D.N.Y. 2014) .................................... 25

*Board of Regents v Roth*, 408 U. S. 564, 577 (1972) ................................................................ 21

*Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007) ...................................... 25

*Ezekwo v. NYCHHC*, 940 F. 2d 775 (2d Cir. 1991) .................................................................. 20

*Gem Fin. Serv. v. City of N.Y.*, 2015 U.S. Dist. Lexis 42803 at \*21

   (E.D.N.Y. Mar. 31, 2015). ............................................................................................ 26

*Ginorio v. Contreras*, 409 F. Supp. 101, 107-08 (D. P. R. 2006) ................................................ 20

*Harlow v. Fitzgerald*, 457 U. S. 800, 819 (1982) ...................................................................... 32

*Iorio v. New York*, 96 Misc. 2d 955 (Civ. Ct. Bronx 1978) ........................................................ 6

*Jemzura v. Jemzura,* 36 N.Y. 496 (1975) ................................................................................ 22

*Kerman v. City of New York,* 261 F. 3d 229, 240 (2d Cir. 2001) ................................................ 32

*Kerman v. City of New York*, 374 F 3d 93, 108 (2d Cir. 2004) .................................................... 31

*Korea Life Ins. Co. v. Morgan Guar. Tr. Co.*, 269 F. Supp. 2d 424, 435 n.7 (S.D.N.Y. 2003) .... 19

*Lane v. Franks*, 134 S. Ct. 2369 (2014) .................................................................................... 29

*Martin v. Camanaro*, 156 F. 2d 127 (2d Cir. 1946) .................................................................... 22

*Martine's Serv. Ctr., Inc. v. Town of Wallkill*, 2014 U.S. App. LEXIS 1831, 2014 WL 321943

   at \*2 (2d Cir. 2014) ...................................................................................................... 25

*May Metropolitan Corp. v. May Oil Burner Corp.*, 290 N. Y. 260, 266 (1943)..........................22

*Mersereau v. McGuire*, 77 A.D. 2d 849 (1st Dept. 1980)...............................................6

*Mosdos Chofetz Chaim v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 696 (S.D.N.Y. 2011) ..25

*North America v. City of New York*, 198 A. D. 2d 148, 604 N.Y.S. 2d 56 (1st Dept. 1993)........22

*Parsa v. State of New York*, 64 N.Y. 2d 143 (1984)...................................................21

*Perry v. Sinderman*, 408 U. S. 593, 601 (1972) ......................................................21

*Spinelli v. City of New York*, 579 F. 3d 160 (2d Cir. 2009)..........................................19

*United States v. Greenfield*, 831 F. 3d 106, 127 (2d Cir. 2016).....................................14

*Zellner v. Summerlin*, 494 F. 3d 344, 367  (2d Cir. 2007) ...........................................32

## PRELIMINARY STATEMENT

Plaintiff George Airday ("Airday") submits this memorandum in partial opposition to the motion by the Defendants for summary judgment and as a pre-trial memorandum of law for the trial scheduled for February 5, 2018.

The record established during discovery provides Airday with the opportunity to limit the issues to be tried in this action. The claims against Defendant Frankel, the former Commissioner of the NYC Department of Finance, should be withdrawn because there is no evidence of his personal involvement in the actions taken against Airday by Defendant Keith Schwam ("Schwam"), the former Director of the Marshal's Bureau of the NYC Department of Investigations.  The record shows that Schwam acted unilaterally against Airday when Schwam suspended Airday in January of 2012.  The record also shows that Schwam acted unilaterally when Schwam removed Airday as a City Marshal in December of 2013.

In addition, the defendants correctly point out that the demand for punitive damages in the whereas clause of the Amended Complaint should be limited to Defendant Schwam and that no claim for punitive damages can be properly made against the City of New York.  Finally, the class-of-one equal protection claim and the substantive due process claim, which are set forth in the Amended Complaint, are duplicative of the procedural due process and selective enforcement claims.   Accordingly, Airday does not intend to raise those claims at trial.

In all other respects, however, the claims asserted in the Amended Complaint survive the defendants' motion for summary judgment for the reasons set forth in greater detail below and in the accompanying Rule 56.1 Responsive Statement.  In short, the motion for summary judgment on Airday's procedural due process, equal protection/selective enforcement and free speech claims should be denied.

## STATEMENT OF FACTS

Airday was a City Marshal for 29 years until December 23, 2013, when Schwam unilaterally removed Airday from his City Marshal office by re-assigning his badge without providing Airday with any notice or any opportunity to be heard.[1]   Airday was not simply an at-will agent or employee of a City agency; he held the office of City Marshal, which is a public office established by Article 16 of the New York City Civil Court Act.  As such, a determination about Airday's rights regarding that office should be grounded in an analysis of the nature of the City Marshal office as defined by law.

*The City Marshal Office and Function*

A City Marshal is a public officer who enforces civil judgments emanating from the New York City Civil Court.   A City Marshal is not a mere public agent or employee; he or she is an independent businessperson who maintains a public office and collects fees upon execution of civil judgments on behalf of judgment-creditors, who are the clients or customers of the City Marshal.[2]

The office of a City Marshal was established by Article 16 of the New York City Civil Court Act.   Section 1601 of the Civil Court Act provides that no more than 83 marshals shall be appointed by the Mayor of the City of New York and that the term of office shall be five years.[3] Section 1601 also established a Mayor's Committee on City Marshals (the "Mayor's Committee") that must consist of twelve individuals, with six appointees selected by the Mayor;

---

[1] Plaintiff's Trial Exhibit ("PTX") # 4; attached to the supporting declaration of Nathaniel B. Smith, dated February 26, 2018.   All the exhibits used in these opposition papers are also being submitted to the Court in a binder containing all of Airday's trial exhibits.

[2] NYC Civil Court Act ¶ 1609; *Mersereau v. McGuire*, 77 A.D. 2d 849 (1st Dept. 1980) (City Marshals are not employees of the City of New York); *Iorio v. New York*, 96 Misc. 2d 955 (Civ. Ct. Bronx 1978) ("To no extent, is a marshal an agent, servant or employee of the City of New York.").

[3] NYC Civil Court Act § 1601(1).

three by the First Department; three by the Second Department; and three by the deans of the law schools located in the City of New York.[4]   The members of the Mayor's Committee serve for a term that is concurrent with the Mayor's term of office.[5]

The Mayor's Committee has a central role in the appointment and reappointment process.[6]   The Civil Court Act provides that no person shall be appointed or reappointed as a City Marshal without the recommendation of the Mayor's Committee and that the Mayor's Committee must review a City Marshal's record of performance and determined it to be satisfactory before approving a reappointment.[7]

The Civil Court Act also sets forth a statutory process for the discipline, suspension and removal from office of a City Marshal.  Section 1610 of the Civil Court Act provides that:  "The appellate division may discipline by reprimand or censure, or may temporarily suspend or permanently remove any marshal for cause, provided that written charges are first filed with said court, and that the marshal be given due notice thereof and be afforded an opportunity to be heard at a full and complete hearing."[8]

The NYC Department of Investigations ("DOI") is also given specific functions regarding City Marshals under the law.  First, DOI is charged with conducting background investigations for all City Marshal candidates and reporting those findings to the Mayor's Committee.[9]   Second, by Joint Administrative Order, the First and Second Departments have

---

[4] *Id.* § 1601(2).
[5] *Id.*
[6] PTX 43 (Schwam Tr. 308:10-309:6).
[7] *Id.* § 1601(4).
[8] NYC Civil Court Act § 1610.
[9] Id. §1601(4).

delegated to DOI the authority to supervise City Marshals and to prosecute and present charges against City Marshals.[10]

   *Airday's Career as a City Marshal*

On January 24, 1984, Airday began his career as a City Marshal after being appointed by Mayor Koch.[11]   After his first five-year term ended in 1989, Airday continued in office as a "holdover" pursuant to Public Officer Law Section 5.[12]   That statute provides in relevant part that public officers, "having duly entered on the duties of his office, shall, unless the office shall terminate or be abolished, hold over and continue to discharge the duties of his office, after the expiration of the term for which he shall have been chosen until his successor shall be chosen and qualified."[13]

After holding over for five years, Mayor Dinkins reappointed Airday retroactively and prospectively for five-year terms effectively for the period 1989-1994 and for the period 1994-1998.[14]   When the latter term expired in 1998, Airday and all the other City Marshals went into holdover status for the next eight years until 2008 because Mayor Giuliani did not exercise his appointment or reappointment powers during either of Mayor Giuliani's two four-year terms of

---

[10] *See* Joint Administrative Order ("JAO") No. 453, dated Nov.12, 1975; attached as part of PTX 9 at D00908.

[11] PTX 49; Airday Deposition Transcript ("Tr.") at p. 41, line 23 (cited as "41:23").   The depositions in this case are assembled in the Deposition Appendix accompanying these papers, which contains the complete depositions of the witnesses, George Airday, Louis Jordan, Caroline Tang-Alejandro, Andrew Salkin, and Keith Schwam.

[12] Airday Tr. 41:21-42:4 (holdover for four or five years and then re-appointed retroactively by Mayor Dinkins).

[13] Public Officer Law § 5.

[14] Airday Tr. 41:21-42:17; *see also* Amended Complaint ("Amd. Cmplt") ¶¶ 13-15 (Docket Entry ("DE") # 33).

office.[15]  Then, on January 22, 2009, while still on holdover status, Airday received another five-year reappointment from Mayor Bloomberg with a term expiring on December 20, 2013.[16]

Airday's 29-year history as a City Marshal was similar to the history of the other 40 to 50 City Marshals who held the office over the years.  Although the Civil Court Act provides that the Mayor can appoint up to 83 City Marshals, in fact the total number of City Marshals each year has ranged from 40 to 50 City Marshals.[17]  As with Airday, the practice was for the City Marshals to be appointed and reappointed for a term of office or to be held over until their reappointment.[18]  None of the witnesses who ran the DOI's Marshal's Bureau since 1995 (Schwam and Tang-Alejandro) could identify any City Marshal who did not continuously maintain his or her office after the expiration of their term of office, other than Airday.[19]

*The Paylock Proposal*

In 2011, the Bloomberg Administration decided to take steps to "privatize" the City's system for collecting unpaid parking tickets by replacing City Marshals with a private company known as "Paylock."   Under this program, which was to be run by the NYC Department of Finance ("DOF") under the authority of Defendant David M. Frankel, as DOF Commissioner,

---

[15] Airday Tr. 42:21-25
[16] Airday 45:6-21; PTX 50.
[17] PTX 13 (list of City Marshals for the years from 2005 thru 2016 showing 40 to 50 City Marshals and their gross and net earnings per year).
[18] Tang-Alejandro Tr. 73:25-76:16.  Tang-Alejandro is the current DOI Director of the Marshal's Bureau who joined DOI in 1987 and started working for Schwam as a Chief Investigator in 2003.  She became the Director of the Marshal's Bureau in 2015.  (*Id.* at 9:2-13:22).  Schwam, who ran the DOI's Marshal's Bureau from 1995 through 2013, also admitted that Airday was the only City Marshal that he was aware of who was not ultimately reappointed after the expiration of the Marshal's term.  Schwam Tr. 66:2-12 & 165:20-166:21. *See also* Airday Tr. 45:14-21 (the marshal position was continuous and did not stop at the end of the term; the marshals simply continue their duties) & 111:1-17 (Airday believed that he was going to be reappointed because he had been a City Marshal for 30 years, had been exonerated of the criminal charges against him and other City Marshals with serious charges were reappointed) & 137:2 (removal was unprecedented).
[19] *Id.*

City Marshals would no longer enforce judgments by towing scofflaw vehicles.  Instead, private employees of a private company would affix a metal "boot" to a wheel of the scofflaw vehicle, and the owner would have to pay Paylock by credit card in order to release the boot.[20]

The Paylock proposal was inconsistent with established law and directly impacted the established operations of about a dozen City Marshals, including Airday, who focused their operations on the DOF's existing Scofflaw Program.[21]   As a result, Airday and other City Marshals began investigating the propriety of the Paylock proposal, including the legality of a private and non-public no-bid contract in violation of the competitive biddings laws.[22] Airday personally voiced his concerns with other City Marshals, with the Marshal's Association, with DOF, and with local politicians.[23]  In late 2011 and early 2012, Airday directly approached the offices of four local elected officials to raise his concerns about the Paylock booting program: (1) John Koppell, a City Council member from the Bronx; (2) John Liu, the New York City Controller; (3) Denny Farrell, an Assemblyman in Harlem; and (4) Jeff Dinowitz, an Assemblyman from the Bronx, for the purpose of creating political pressure to oppose the Paylock booting program.[24]

After reviewing the Paylock proposal, which was made available at the offices of DOF for inspection only, Airday identified several serious issues about the Paylock program, including: (a) how Paylock was chosen by the City and whether a no-bid contract was appropriate and legal; (b) who would be in charge under the proposal for tracking fines paid to

---

[20] PTX 1.
[21] Airday Tr. 47:15-55:16.
[22] *Id.*
[23] Airday Tr. 55:17-60:25 & 135:14-136:4.
[24] Amd. Cmplt. ¶ 36.  The Amended Complaint was, for purposes of this motion, verified by Plaintiff on January 25, 2018, and that verification is being filed with the Court as part of the plaintiff's papers submitted in opposition to the summary judgment motion.

Paylock; (c) who would be responsible for supervising Paylock; (d) what fees would be charged to the vehicle owners; (e) what would be the City Marshal's law enforcement and administrative roles, if any, in the booting process; (f) what would Paylock's fee be under the proposed system; (g) whether a vehicle could be legally "un-booted" upon payment of the outstanding fines and judgments and left operational on City streets if the vehicle's registration status had expired and the vehicle could not be lawfully parked or operated on public streets; and (h) whether it was appropriate to omit or disregard necessary and legal guidelines from the Paylock booting program.[25]

Airday disseminated his criticisms of the Paylock program to other City Marshals, to the Marshal's Association, to the Department of Finance, to local politicians and to the NYC Controller's Office.[26]   The Marshal's Association is a not-for-profit corporation organized under the laws of New York for the benefit of City Marshals.[27]

*The Charges Against Airday*

On January 19, 2012, Schwam sent Airday a letter demanding that he resign and ordering him immediately to stop all further work as a City Marshal.[28]   Schwam was the Director of the Marshal's Bureau at DOI who held supervisory functions over City Marshals, as proscribed by law.[29]   At the times relevant to this case, Schwam was the person in charge of the DOI's Marshal's Bureau.

Airday had recently been arrested and charged with two crimes:  (1) an allegation by his former girlfriend that Airday assaulted her on December 21, 2011; and (2) an allegation by a

---

[25] PTX 1.
[26] PTX 1; Airday Tr. 53:4-60:25 & 133:21-138:18.
[27] Plaintiff's Rule 56.1 Responsive Statement p. 11, n.1.
[28] PTX 3.
[29] Schwam Tr. 7:14-24.

police officer that Airday intentionally possessed a firearm on January 18, 2012, in violation of a temporary order of protection entered in connection with the domestic violence charge, where the temporary order of protection required Airday to turn in all his firearms.[30]

Other than obtaining information about the nature of the allegations from the charging instruments, Schwam did not conduct any investigation into the underlying merits of the charges.[31]  He simply told Airday to resign and ordered Airday to cease all further activities as a City Marshal.   Schwam's letter, which is dated January 19, 2012 – the day after Airday's January 18th arrest for allegedly violating the temporary order of protection – ordered Airday as follows:

> Pending that resignation or suspension you are not to perform any duties other than the orderly redemption of vehicles and collection and remittance of funds in relation to vehicles already in your custody and all necessary recordkeeping attendant to those activities. You are not to perform any other functions without the express written authorization of this Department.[32]

Schwam acted unlawfully and unilaterally when he gave Airday this order.  Section 1610 of the Civil Court Act provides that the First and Second Departments, not Schwam or DOI, have the authority to temporarily suspend a City Marshal.  Although Schwam, as the Director of DOI's Marshal's Bureau, had the authority to *supervise* City Marshals and to *present* charges against a City Marshal, the First and Second Department's Joint Administrative Order No. 456

---

[30] *Id.  See also* PTX 37 (explaining the circumstances of Airday's innocent possession of the handgun).

[31] Schwam Tr. 197:6 ("I did not consider that [further discussion with Airday or his lawyer] to be a productive use of my time.")

[32] *Id.*

specifically and clearly requires that any requests for temporary suspension of City Marshals be presented to the Appellate Divisions for *their* determination.[33]

As a result of Schwam's order, the NYC Department of Finance automatically suspended Airday from its Scofflaw Program, which was the vast bulk, if not all, of Airday's work.[34]  The Scofflaw Program is a unit of the Department of Finance run by Louis Jordan and established to collect debts against individuals (know as "scofflaws") who have accumulated over $350 in parking violations.  Under the Program, participating City Marshals are empowered to enforce judgments for the City by towing cars owned by scofflaws and collecting on the outstanding judgments directly from the judgment debtor or by selling the towed and impounded vehicle.[35]

In the motion for summary judgment, Schwam tries to distance himself from Airday's suspension from the Scofflaw Program by arguing that the decision to remove him was made by the Sheriff, as a third party, not by him.  (Def, Mem. at p. 18.)  There is no admissible evidence to support this contention and in fact there is overwhelming evidence that Schwam's January 19th order was the reason why DOF stopped issuing work to Airday.  The Director of the DOF Scofflaw Program, Louis Jordan, testified that once Schwam issued his suspension order on January 19, 2012, Airday's suspension from the Scofflaw Program was "automatic."[36]  In addition, Schwam confirmed in a contemporaneous memo to file that Airday's towing activities ended on January 18, 2012.[37]  Moreover, at his deposition, Schwam affirmatively claimed that he had the authority to suspend Airday from the Scofflaw Program because the Scofflaw Program

---

[33] PTX 9 at D0909:  JAO 456 (4) (If DOI believes charges require immediate suspension, it "shall not conduct any hearings or proceedings but shall file such charges in writing with both Appellate Divisions pursuant to NYC Civil Court Act § 1610.")
[34] Schwam Tr.  93:18.
[35] Airday 26:25-28:22.
[36] Jordan Tr. 48:22-49:7.
[37] PTX 20 at p. 1.

was a City program.[38]  Finally, Airday testified that after Schwam issued his January 19th suspension order, DOF stopped issuing work to him under the Scofflaw Program.[39]  Thus, there is no genuine issue of fact on the question; all the evidence shows that Schwam suspended Airday from the Scofflaw Program on January 19, 2012.

Although Airday's only significant source of business had been removed, Airday refused to succumb to Schwam's demand that he resign.[40]  As a result, on January 30, 2012, Schwam's office issued to Airday another letter demanding that he produce "any and all" documents relating to the pending criminal charges.[41]  The letter, which directly implicated Airday's Fifth Amendment right to be free from self-incrimination, also demanded that the documents be produced by the close of business the following day.[42]

Schwam's demand for the production of documents violated Airday's Fifth Amendment rights.[43]  It also violated the Marshal's Handbook and a Joint Administrative Order, which provide a mechanism whereby a City Marshal is provided with immunity before being required to provide information on the subject of a pending criminal charge against a City Marshal.[44]

---

[38] Schwam Tr. 89:13-94:23.
[39] Airday Tr. 89:7-90:7.
[40] Airday Tr. 83:13.
[41] PTX 5 at ECF p. 139.
[42] *Id.*
[43] *United States v. Greenfield*, 831 F. 3d 106, 127 (2d Cir. 2016) (act of producing passport and travel documentation protected by Fifth Amendment) ("Compelled testimony need not be directly or inherently self-incriminating to be barred by the privilege.  Compelled testimony that communicates information that may lead to incriminating evidence is privileged even if the information itself is not inculpatory"); *Barsky v. City of New York Department of Investigations*, 40 A. D. 3d 531, 534-35 (1st Dept. 2007) (motion quashing DOI subpoena for documents granted where compelling production of documents would constitute a compelled testimonial act; DOI had to provide the required immunity to enforce the subpoena).
[44] PTX 9 (Marshal's Handbook § 1-9 (c)) at D00731 & JAO 453 (8) at D00908).

To protect Airday's Fifth Amendment rights, Airday's counsel informed Schwam that Airday would not be in a position to produce the requested records.[45]   Schwam did not, however, at any time provide Airday with immunity for the production of the requested documents.[46]

Later that month, while Airday was fighting for his office, on February 27, 2012, the 70 million dollar Paylock contract was executed, and the other City Marshals who were involved in Scofflaw Program fell in line, dropping their opposition the Paylock program.[47]   Absent any opposition or a request for public debate on the issue, a public hearing before the City Council was dispensed with and the no-bid Paylock contract became operational.[48]

Four months later, on May 30, 2012, while Airday was already suspended from the Scofflaw Program and effectively shut down for business, Schwam ultimately submitted to the First and Second Department an application for the temporary suspension of Airday as a City Marshal.[49]   Schwam did not at the time of the filing of this application serve Airday or his counsel with a copy of the application,[50] even though the Civil Court Act and the Court's Joint Administrative Order requires notice be given.[51]   Two days later, after being told by the Court to do so, Schwam served a copy of the charges on Airday's attorney.[52]   Although Schwam, who is a

---

[45] PTX 5 at ECF p. 142.
[46] Schwam Tr. 129:13-24.
[47] Amd. Cmplt. ¶¶ 62; PTX 2 at GA 481; & Airday Tr. 137:2-138:18.
[48] PTX 2 at p.  GA 461 (Paylock uniquely qualified); PTX 40 (Section 3-05 Sole Source Procurement Rules) & PTX 41 (City Counsel Notice 41 at p. 10).
[49] PTX 5.
[50] Schwam Tr. 109:6-11.
[51] NYC Civil Court Act § 1610 ("the marshal must be given due notice" of the charges); PTX 9 at D00907; JAO 453 (6) (b) (marshal shall have written notice of the charges, shall be finished with a copy of the charges, and shall be allowed at least eight days for answering the charges).
[52] PTX 6,7 & 8; Schwam Tr. 10-9:6-11.

lawyer, admitted that notice is a fundamental aspect of due process, he claimed that the rules did not require that he provide Airday with a copy of the charges.[53]

On June 11, 2012, the First and Second Departments issued their Order, temporarily suspending Airday, pending a hearing. [54]  The grounds for the suspension were based on three charges:  (1) Charge One alleged that Airday failed to cooperate with DOI in its investigation; (2) Charge Two alleged that the assault, if true, warranted Airday's removal or other penalty; and (3) Charge Three alleged that intentional violation the temporary order of protection, if true, warranted Airday's removal or other penalty.[55]  As a result of the temporary suspension order, Airday closed down his operations, let go of his staff, notified all his clients of the suspension, and transferred his active files to another City Marshal.[56]

In accordance with established administrative procedures, the Appellate Division's temporary suspension order directed OATH to conduct a hearing on the charges.  Since the parallel criminal charges against Airday were still pending, DOI and Airday agreed to adjourn the OATH hearing pending the resolution of the criminal charges.[57]

On October 22, 2012, the Assistant District Attorney informed Schwam that Airday had been found not guilty after trial on the assault charge.  The trial court did not find the complaining witness, Airday's former girlfriend, credible and Schwam was so informed.[58] Several months later, on March 6, 2013, the Assistant District Attorney informed Schwam that

---

[53] Schwam Tr. 108:14-19 & 109:20-24.
[54] Kamen Exh. W.
[55] PTX 5 at ECF p. 117-118.
[56] Airday Tr. 87:14-21; PTX 18 & 26.
[57] Kamen Exh. Y.
[58] PTX 10 at D476.

the District Attorney was not able to meet their burden on the contempt charge and had to dismiss the contempt charge as well.[59]

Although the criminal charges were resolved in Airday's favor, Schwam nevertheless persisted in his determination to press the failure-to-cooperate charge against Airday.[60]   After the failure-to-cooperate charge was reinstated, Schwam and Airday agreed to enter into a stipulation finally resolving that charge upon a payment by Airday of a fine of $7,500.[61]   In accordance with that settlement stipulation, the First and Second Departments restored Airday to his status as a City Marshal on June 6, 2013,[62] and Airday began the process of re-opening his office.[63]

Schwam, however, would not let it go.   On the eve of Schwam's departure from DOI,[64] on December 23, 2013, he sent Airday a letter informing Airday that his term had expired and that Airday's successor had been appointed and assigned Airday's badge.[65]   Schwam acted unilaterally to terminate Airday's office by simply arranging to have Airday's badge reassigned. Importantly, Schwam did not get approval or authorization from anyone before sending Airday

---

[59] PTX 10 at D480.  *See also* PTX 11 (certificates of disposition of the charges).  As detailed in a DOI memorandum, Airday did not intentionally possess the handgun.  While being held at the local precinct on the assault charge, Airday gave the police access to his safe, and the police officer simply did not locate the small handgun that was in Airday's safe. PTX 37.
[60] PTX 20 at D105 (Schwam letter to Appellate Divisions, noting DOI's request on March 7, 2013 to reinstate Charge One).
[61] PTX 12.
[62] Kamen Exh. DD (DE # 77-3 at ECF p. 22).
[63] Airday Tr. 103:4-104:18; *see also* PTX 45, 46 & 47 (Airday reappointment application; request for new ID card; and request for restoration to Scofflaw Program).
[64] Schwam Tr. 161:8-17.
[65] PTX 4.

the letter.[66]  Schwam also admitted that he gave Airday *no* notice that Airday's office was going

to be terminated:

> Q.  Did you give Marshal Airday any notice, other than the December 23, 2013
> letter, that his office was going to end?
> A.  No.[67]

Indeed, Schwam freely admitted at his deposition that while Schwam was negotiating with

Airday over the restoration of Airday's office earlier that year, Schwam did not think it was "his

business" to tell Airday "exactly what he was going to do down the road."[68]

The timing and surrounding circumstances of Schwam's letter are important.   Schwam

sent Airday his December 23rd letter just seven days before Mayor Bloomberg was scheduled to

leave his office and Mayor de Blasio was scheduled to begin his new term on January 1, 2014.[69]

Thus, as of January 1st a new Mayor's Committee[70] would have to be constituted because the

terms of office of nine of the twelve members of the Mayor's Committee ended when Mayor

Bloomberg's term ended on December 31, 2013.[71]  Hence, had Schwam not taken any action

against Airday by the end of the year, Airday would have automatically gone into holdover status

as a City Marshal in accordance with the long-established practice of continuing the offices of

City Marshals after the expiration of their five-year terms of office.  At that point and in

---

[66] Schwam Tr. 68:7-9 ("Q.  Did you obtain anybody's approval before sending this letter? A.
No.")

[67] Schwam Tr. 224:20-23.

[68] Schwam Tr. 188:17.

[69] City Charter Section 4 (providing that the Mayor term of office begins on January 1st for a
four-year term).

[70] PTX 53 (list of current Mayor's Committee members).

[71] Civil Court Act § 1601(2) ("The [Mayor's Committee] members chosen by the mayor and the
presiding justices shall serve for a term concurrent with the mayor's term of office").

accordance with an established course of dealing, the newly constituted Mayor's Committee would have considered Airday's application for reappointment.[72]

Schwam unilaterally and vindictively arranged for the appointment of a new City Marshal to take Airday's badge and office by assigning Airday's badge to a new marshal as opposed to assigning any number of empty and available badges.[73]  By failing to provide Airday with notice or an opportunity to continue his office, Schwam violated Airday's due process rights to renew his office and to have his re-appointment request considered by the Mayor's Committee, as required by Section 1601 of the Civil Court Act.

## ARGUMENT

The motion for summary judgment on the due process, equal protection and free speech claims should be denied because there are material issues of fact that must be resolved by a fact finder.

*The Due Process Claims*

First, Schwam's temporary suspension of Airday in January 2012 violated Airday's rights to due process.  The evidence in the record shows that Schwam acted unilaterally in violation of specific statutory provisions that require that a request for temporary suspension be made to the First and Second Departments and that only the Appellate Divisions -- not Schwam or DOI -- have the power to temporarily suspend a City Marshal.  *See* NYC Civil Court Act § 1610.

Although Schwam ultimately did obtain the required temporary suspension order from the First and Second Departments four months later on June 11, 2012, Schwam and the City are liable to Airday for damages for the period of suspension of Airday because he was denied notice

---

[72] PTX 45 (reappointment application) & 53 (new Mayor's Committee membership).

[73] Kamen Exh. FF (Mayor appointment letter); PTX 11 (Schwam memorandum to file setting forth his plan to replace Airday).

or opportunity to be heard in violation of due process rights required by statute. *See, e.g. Spinelli v. City of New York*, 579 F. 3d 160 (2d Cir. 2009) ("NYPD licensing authorities liable for damages for period in which they unlawfully suspended plaintiff's license to sell guns in violation of plaintiff's due process rights). Indeed, on this issue, the Court should search the record[74] and make the determination that Schwam and the City are liable for the January 2012 suspension because there is no genuine issue that due notice and a meaningful opportunity to be heard was not given until June 1, 2012 when Schwam sent Airday the suspension application.[75]

Second, the evidence also shows that Schwam unilaterally and without notice permanently removed Airday from his office in December of 2013 in violation of Airday's due process rights based on the long-standing practice for all City Marshals to renew their terms. Again, there is no genuine issue about the failure to provide notice; Schwam admitted that he did not provide notice and admitted that he purposefully and knowingly withheld information about his plans from Airday because Schwam didn't think it was "his business" to tell Airday "what I was going to do down the road."[76]

In addition, the Court has already held that Airday's renewal right is sufficient to establish a fact issue about Airday's property interest for purposes of the due process claim. *See*

---

[74] *Korea Life Ins. Co. v. Morgan Guar. Tr. Co.*, 269 F. Supp. 2d 424, 435 n.7 (S.D.N.Y. 2003) ("Although plaintiffs have not moved for summary judgment, a motion for summary judgment authorizes the district judge to search the record, and to grant summary judgment to the party entitled thereto, regardless whether that party was the moving party.") (citing *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991); *Project Release v. Prevost*, 722 F.2d 960, 969 (2d Cir. 1983)).

[75] In *Ezekwo v. NYCHHC*, 940 F. 2d 775 (2d Cir. 1991) and *Spinelli v. City of New York*, 579 F. 3d 160 (2d Cir. 2009) the Second Circuit held that a determination of liability in favor of the plaintiff was proper when there was no genuine issue about the failure to provide the plaintiff with notice and an opportunity to be heard. *Accord Ginorio v. Contreras*, 409 F. Supp. 101, 107-08 (D. P. R. 2006) (unlawful suspension order by commissioner of insurance warranted summary judgment on liability in favor of plaintiff).

[76] Schwam Tr. 158:13-16 & 224:20-23.

*Airday v. City of New York*, 131 F. Supp. 3d 174, 183 (S.D.N.Y. 2015) (for purposes of determining whether Airday had a property interest in his office, the pleading raises a factual issue about whether the parties shared a mutual understanding of renewal of the office based on an established practice of renewal for Airday and all other 40 to 50 City Marshals over the past 30 years).  To the same effect is the Second Circuit's decision in *Ezekwo v. NYCHHC*, 940 F. 2d 775 (2d Cir. 1991).  There, the Circuit held that a doctor had property interest in being rotated into the Chief Resident position at the defendant hospital based on a long-standing practice of rotating all residents into the position and the resident's reasonable reliance on the practice; the parties through their conduct and practice can create additional rights and duties based on a course of dealing between the parties.[77]

In *Perry v. Sinderman*,[78] the Supreme Court held that a professor who spoke out against educational authorities had a protected property interest in his position.  A person has the required property interest for purposes of due process where rules or mutually explicit understandings support an expectation of continued employment.[79]  *Perry* also holds that the law of contracts, including the rules governing implied contract, can establish the required property

---

[77] As the Court noted in its decision on the motion to dismiss, Airday's property rights in the renewal process for his office of City Marshal are grounded on well-settled due process jurisprudence by the Supreme Court.  *Bell v Burson,* 402 U. S. 535 (1971) (revocation of driver's license by a person whose livelihood depends on it implicated due process rights; "[s]uspension of issued licenses thus involve state action that . . . are not to be taken away without that procedural due process required by the Fourteenth Amendment"); *Perry v. Sinderman*, 408 U. S. 593, 601 (1972) ("A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at the hearing."); *id.* at 602 ("Explicit contractual provisions may be supplemented by other agreements implied from the promisor's words and conduct in the light of the surrounding circumstances" and the meaning of those words and conduct "can be found by relating them to the usage of the past"); *Board of Regents v. Roth*, 408 U. S. 564, 577 (1972) (property interests can be based on "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits").
[78] 408 U.S. 593 (1972).
[79] *Id.* at 601.

interest, based on a party's words, conduct, the surrounding circumstances, and the meaning of the parties' conduct as found based on their past practices.[80]

Under New York law, a contract implied can be based upon the conduct of the parties, not just their verbal or written words.[81]  Whether an implied contract was formed involves factual issues regarding the parties' intent and the surrounding circumstances.[82]  The common law of New York also recognizes that an expired contract can be renewed based on the parties' continued performance; under those circumstances, an implication arises that they have mutually assented to a new contract containing the same provisions as the old contract.[83]  The existence of such a new implied contract is ordinarily determined by an objective test; that is, whether a reasonable person would think the parties intended to made a new binding agreement.[84]  Finally, New York common law also acknowledges that the parties to a contract also have an obligation to act in good faith in connection with their discussions about renewal of a contract based on a past course of dealings between the parties.[85]

Here, Airday had a reasonable expectation of renewal based on the fact that he and all the other 40 to 50 City Marshals regularly were reappointed after going into holdover status.  Unlike the situation with an ordinary public employee, it is important to note that Airday and all other City Marshals were required to work exclusively as a City Marshal; to maintain and staff a public business office with specific hours and public access; and to enter into contracts and

---

[80] *Id.* at 602.
[81] *Parsa v. State of New York*, 64 N.Y. 2d 143, 148 (1984).
[82] *Jemzura v. Jemzura,* 36 N.Y. 496, 503-504 (1975).
[83] *North America v. City of New York*, 198 A. D. 2d 148, 604 N. Y. S. 2d 56 (1st Dept. 1993).
[84] *Martin v. Camanaro*, 156 F. 2d 127 (2d Cir. 1946).
[85] *May Metropolitan Corp. v. May Oil Burner Corp*, 290 N. Y. 260, 266 (1943).

agreements with towing companies and other vendors associated with the ordinary operations of a City Marshal's office.[86]

Thus, a course of dealings for renewal and continuation was established over the course of at least 30 years and applied generally not just to Airday but to all other City Marshals as well. Yet Schwam unilaterally cut off Airday's ability to go through that renewal process by simply reassigning Airday's badge to a new City Marshal, thereby preventing consideration of Airday's reappointment application by the Mayor's Committee on City Marshals, which has the statutorily defined role of vetting applications for reappointment.  NYC Civil Court Act § 1601(2) & (4). Importantly, Schwam and the other Director of the Marshal's Bureau admitted that Schwam's December 23, 2013 letter removing Airday was unprecedented and neither of them could identify any other City Marshal whose term was not renewed or held over. [87]

The defendants argue that Airday does not have any property interest protected by the due process clause, but in making this assertion they cite to cases where a plaintiff asserted a property interest based upon the plaintiff's subjective expectation, nothing more.   For example, the defendants rely heavily on *Schwartz v. Mayor's Committee on Judiciary*, 816 F. 2d 54, 55 (2d Cir. 1987) for the proposition that Airday did not have any property interest in his City Marshal office.  A close analysis of that case, however, proves Airday's point that he did have a property interest in the renewal process.

In *Schwartz* the plaintiff was appointed to a single term as a Family Court judge and after that term expired the Mayor's Committee on the Judiciary did not reappoint the plaintiff.

---

[86] NYC Civil Court Act § 1601-a (2) (a) ("no marshal shall actively engage or participate in any other occupation or employment"); PTX 9 at 847 (Marshal's Handbook, Chapter X; full-time position with regular hours open to the public eight hours a day)
[87] Schwam Tr. 66:2-12 & 165:20-166:21; Tang-Alejandro Tr. 73:25-76:16; *see also* Airday Tr. 137:2 (unprecedented treatment by Schwam).

The plaintiff brought a due process claim against that Mayor's Committee.  There was no long-established history of reappointment for the plaintiff or for other Family Court judges based on a holdover status because the holdover statute, Pubic Officer Law Section 5, does not apply by its terms to judicial appointments.  Moreover, the fact that many other judges were often reappointed could not raise the plaintiff's subjective expectation of reappointment when doing so would contradict the relevant statute and rules.  Finally and most important, in *Schwartz* the plaintiff *was* given the opportunity to be considered for reappointment by the proper authority, the Mayor's Committee on the Judiciary.

Here, on the other hand, Schwam's bureaucratic gamesmanship was purposefully used by Schwam to deny Airday the opportunity to have his reappointment application heard by the Mayor's Committee on City Marshals, a role assigned to it by statute, NYC Civil Court Act 1601 (2) & (4).  Indeed, Schwam previously testified that the Mayor's Committee on City Marshals was a specific part of the appointment process that was created by law for the very purpose of making sure that *no single person* could control the appointment process.[88]

Although the defendants also argue that Airday or his attorneys knew Airday would not be reappointed (Def. Mem. at p. 16), there is no evidence to support that claim.  Moreover, Schwam flatly admitted at his deposition that he gave Airday no notice that his office was going to end.[89]  Based on this record, the Court should find that Schwam and the City are liable because Schwam cut off Airday's renewal rights and his opportunity to seek reappointment by the Mayor's Committee without notice.

---

[88] PTX 43 (Schwam Tr. 308:13-309:6) (Mayor's Committee was established by state law to provide a process that no one individual controlled and would not be subject to control by any single person).

[89] Schwam Tr. 224:20-23.

*The Equal Protection Claim*

Airday also contends that his suspension as a City Marshal in January 2012 and his removal as a City Marshal in December 2013 violated his rights to the equal protection of the law.   The evidence show that there were several other City Marshals who were accused of assault, harassment or other misconduct in their roles as City Marshals.   Yet Schwam never suspended those City Marshals; never sought their suspension from the Appellate Divisions; and never removed them from office at the end of their terms.

The comparator evidence, which is summarized below, also shows that two other City Marshals invoked the right to be free from self-incrimination and Schwam took no action to discipline them for failing to cooperate in a DOI investigation.   On the other hand, when Airday asserted that same right, Schwam brought Airday up on charges of failing to cooperate with a DOI investigation and even continued to press that charge after Airday was exonerated of the underlying criminal charges.

"To state a selective-enforcement claim, a plaintiff must show two things: first, that he was treated differently from other similarly situated individuals; and second, that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.[90]

---

[90] *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007)); *see also Martine's Serv. Ctr., Inc. v. Town of Wallkill*, 2014 U.S. App. LEXIS 1831, 2014 WL 321943, at *2 (2d Cir. 2014) ("An equal protection claim premised on selective enforcement requires a showing that (1) compared with others similarly situated, [the plaintiff] was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure [the plaintiff]." (internal quotation marks and some alterations omitted)); *Best v. N.Y.C. Dep't of Corr.*, 14 F. Supp. 3d 341, 351 (S.D.N.Y. 2014).

To prove that others were similarly situated to Airday, the comparators must only be roughly equivalent to Airday; an exact correlation between Airday and the comparators is not required.[91]

Here, Airday contends that he was treated harshly by Schwam because Airday exercised his constitutional rights to defend himself; to due process; to be free from self-incrimination and to speak freely.  Airday also contends that Schwam's relentless and vindictive conduct toward him demonstrates Schwam's malice and bad faith, which is another basis for a selective enforcement claim.

In their motion the defendants argue that the other City Marshals identified by Airday are not similarly situated, but in making this argument they do not make any attempt to address the evidence or explain their position.  (Def. Mem. at p. 20 -21).  Since an exact correlation is not required, a jury could easily find that the circumstance of other City Marshals (summarized below) are roughly equivalent to Airday's circumstances and that Airday was unfairly singled out for suspension and removal by Schwam for illicit reasons.

1.  *Charles Marchisotto*. On June 20, 2008, City Marshal Charles Marchisotto was arrested for aggravated harassment and stalking of his former girlfriend over the course of several months with repeated text messages and tailgating her in his car.  A few days after Marchisotto's arrest, Marchisotto invoked his Fifth Amendment right against self-incrimination

---

[91] *Abel v. Morabito*, 2009 U.S. Dist. LEXIS 9631 at *5 (S.D.N.Y. Feb. 10, 2009); *see also Mosdos Chofetz Chaim v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 696 (S.D.N.Y. 2011) (adopting and applying selective enforcement test, noting "[t]he test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated . . . . the 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result" and "[e]xact correlation is neither likely [n]or necessary, but the cases must be fair congeners") (internal quotation marks and citations omitted)); *Gem Fin. Serv. v. City of N.Y.*, 2015 U.S. Dist. Lexis 42803 at *21 (E.D.N.Y. Mar. 31, 2015).

at a meeting at DOI with Schwam.[92]   The NYPD Licensing Division also revoked Marchisotto's

firearm permit because Marchisotto failed to notify the Licensing Division of the arrest and he

failed to cooperate with their investigation.[93] Schwam never suspended Marchisotto; never told

him to resign; never filed any charges against him.[94] Marchisotto was also found not guilty of the

criminal charges against him on March 25, 2010, but unlike Airday, Marchisotto was not

charged and continues to be a Marshal today.

Marchisotto is also a landlord in Brooklyn, owning two large residential buildings.  In

2006 Schwam learned that these buildings had over 115 violations issued by the NYC

Department of Buildings, with 43 of those violations for hazardous lead paint conditions.

Schwam told Marchisotto to simply continue in his purported efforts to address the violations

and did not take any disciplinary action.[95]

2. *Joel Shapiro*.  On April 20, 2004, City Marshal Joel Shapiro was accused of assault by

a victim of alleged assault, and the only step that Schwam took was to issue to Shapiro a letter of

admonition.[96]  Previously, Shapiro was arrested on November 5, 1985 for menacing and criminal

possession of a weapon and was acquitted on July 24, 1986.[97]  In a third incident, on May 5,

2009, Schwam interviewed Shapiro about a claim that he committed perjury during a landlord-

tenant proceeding, and Shapiro asserted the Fifth Amendment right against self-incrimination.[98]

---

[92] PTX  28.
[93] PTX  28 (Licensing Division Decision).
[94] Schwam Tr. 170:4-171:7.
[95] PTX 29.
[96] Schwam Tr. 80:16-24 &171:8-172:14; *see also* PTX 31 & PTX 32 (Letter from Schwam to Shain, dated 12-3-2004) and (DOI notes reflecting letter of admonition) (D2685).
[97] PTX 31: (D2772).
[98] PTX 33 (Shapiro Perjury Case) at D003174.

Schwam took no action to immediately suspend Shapiro and five months after the perjury charge was made, Shapiro resigned his office.[99]

3. *Howard Schain*.  On January 26, 2000, DOI announced that City Marshal Howard Schain admitted being guilty of misconduct, including tampering with official records and filing false records, paid a fine of $50,000 and agreed to a four-month suspension.  At no time during Schwam's investigation of Schain, did Schwam seek Schain's temporary suspension.  Nor did he tell Schain to resign or cease his activities, and after the four-month suspension, Schain resumed duties as a City Marshal in the Scofflaw Program, and after his term expired Schain was held over and continues to act as a City Marshal.[100]

4. *Jeffrey Rose*.  On March 31, 2009, Schwam resolved disciplinary issues against City Marshal Jeffrey Rose with a $40,000 fine for several acts of misconduct, including false arrest and assault; failing to provide DOI with information; and preparing and filing false records of his office.[101]  In resolving the related false arrest and assault civil action, the City paid $10,000 and Rose and his attorney paid $5,000.[102] Although all these events took place while Schwam was the Director of the Marshal's Bureau, Schwam never directed Rose to cease operations during the pendency of the charges either as a City Marshal or as a member of the DOF Scofflaw Program and Rose was held over as a City Marshal after these charges were resolved, continuing to be a City Marshall today.[103]

---

[99] Schwam Tr. 76:8-83:6.

[100] Schwam Tr. 173:14-179:4; PTX 30 (DOI Press Release on Schain).

[101] PTX 34 & 35 (Rose Stipulation); Schwam Tr. 183:12-184:24; *Schaer v. City of New York and City Marshal Jeffery Rose*, 09-cv-7441 (CM) (MHD), 2011 U. S. Dist. Lexis 36380 (S.D.N.Y. Mar. 25, 2011).

[102] PTX 35: Rose Settlement Agreement.

[103] Schwam Tr. 183:12-184:21.

This comparator evidence is sufficient for a jury to find that Airday was more harshly treated by Schwam for purposes of the selective enforcement claim.

*The Free Speech Claim*

Finally, Airday contends that Schwam's actions against Airday violated his rights to free speech.  The evidence shows that in 2011 and 2012 Schwam was working directly with the Department of Finance (Commissioner Frankel; Deputy Commissioner Salkin; and Director Louis Jordan) to institute a $70 million no-bid contract with Paylock for the collection of scofflaw judgments.[104]  The evidence also shows that Airday was heading and leading the other City Marshals in formulating opposition to the Paylock contract when Schwam suspended him.[105]  The evidence shows that Airday voiced his complaints to fellow City Marshal, the Marshal's Association and its lobbyist, DOF, the NYC Controller's office and several elected officials and that after Airday's January 2012 suspension, the other City Marshals fell in line and withdrew their opposition to Paylock.[106]

While the Court held that Airday did not allege that he spoke out as a citizen in the initial pleading,[107] leave to amend was granted, and the Amended Complaint, which has been verified by Airday, and Airday's deposition testimony both show that Airday's speech was not merely limited to internal or job-related avenues and included the types of outlets used by ordinary citizens, such as elected officials.[108]  Here, Airday spoke to the NYC Controller's Office and several elected officials as well as members of the Marshal's Association, which is a trade

---

[104] Rule 56.1 Responsive Statement ¶¶ 19 & 20.
[105] Airday Tr. 47:15-60:25 & 133:21-138:18.
[106] Rule 56.1 Statement ¶¶ 20-27; Airday Tr. 47:15-60:25 & 137:2-22; Amd. Cmplt ¶ 68
[107] *Airday v. City of New York*, 131 F. Supp. 2d 174, 180-81 (S.D.N.Y. 2015).
[108] Airday Tr. 47:15-60:25 & 133:21-138:18; Amd. Cmplt. ¶  36.

organization of City Marshals.  We submit that these facts address the deficiencies found by the Court in the initial pleading.

In making their arguments about how Airday was a governmental agent with limited First Amendment rights, the defendants do not address important shifts in First Amendment law.  In 2014, the Supreme Court issued its decision in *Lane v. Franks,* which dramatically altered the law on the scope of the First Amendment in the public employment context.[109]

In *Lane,* the plaintiff, who was a governmental employee, testified at a public hearing about misconduct on the job, and the Court (in a 9-0 decision) held that the governmental employee had a First Amendment right to speak about any matters relating to the job and that those protections cease only when the speech is part and parcel of the employee's *ordinary* job duties.[110]

Indeed, *Lane* specifically rejected the argument pressed here by the defendants.  In their motion, the defendants argue that Airday does not have First Amendment rights because his inquiries about Paylock resulted from knowledge which he acquired though performance of his duties as a City Marshal.   Yet *Lane* squarely rejected that argument, holding that just because an employee learned about the subject matter of his speech in the course of his employment does *not* render that speech unprotected.[111]

The defendants also argue that there is no evidence that Airday's objections to the Paylock proposal played a role in Schwam's suspension and removal decisions, claiming that Schwam did not "know" about Airday's objections.  (Def. Mem. at 11.)  But there is evidence

---

[109] *Lane v. Franks*, 134 U. S. 688, 134 S. Ct. 2369 (2014).
[110] *Id.*
[111] *Id.* at 2379.

from which a rational jury could easily find that Schwam did know of Airday's objections and is simply feigning lack of knowledge

First, Schwam himself admitted that the Marshals as a group objected to the Paylock proposal.[112]  Second, Tang-Alejandro, who was Schwam's direct report at the time, testified that Schwam knew about specific objections made by Marshals but could not recall their names.[113]  Third, Scofflaw Director Louis Jordan testified that several marshals raised objections to Paylock at DOF meetings and that he believed that Airday might have been one of the marshals who was at the meetings raising objections.[114]  Based on this evidence, a jury should determine if Schwam is feigning a lack of knowledge.

*Schwam is Not Entitled to Qualified Immunity.*

As a general rule, governmental actors are entitled to qualified immunity:  (1) if their conduct does not violate clearly established constitutional rights; or (2) it was objectively reasonable for them to believe that their acts did not violate those rights.[115]  While the issue of whether a right was clearly established is a question of law, whether an official's conduct was objectively reasonable (*i.e.,* whether a reasonable official would reasonably believe his conduct did not violate a clearly established right) is a mixed question of law and fact.[116]

Here, Schwam is an attorney who admitted that notice is a fundamental aspect of due process.[117]  He also prepared the detailed submission to the First and Second Departments which sets forth the law on how the Appellate Division, not DOI or Schwam, makes the

---

[112] Schwam Tr. 24:10.
[113] Tang-Alejandro 71:14-18.
[114] Jordan Tr. 34:24-36:7.
[115] *Kerman v. City of New York*, 374 F 3d 93, 108 (2d Cir. 2004).
[116] *Id.* at 109.
[117] Schwam Tr. 109:21-24.

decision to temporarily suspend a City Marshal.[118]  In addition, the decisions on due process

property interests, cited above at pp. 19-22, show that the law has been clearly established since

the early 1970s that a property interest for due process purposes extends to implied and mutual

understandings on a continuing work relationship.  Indeed, the Second Circuit in 1991 in

*Ezekwo v. NYCHHC*, 940 F. 2d 775 (2d Cir. 1991) re-affirmed these established rules.  Finally

and most important, there is no question that Schwam knew that the Mayor's Committee was an

integral part of the process under Civil Court Act ¶ 1601 and that the Mayor's Committee was

designed, in Schwam's own words, to prevent control of the process by a single individual.[119]

   Under these circumstances, there is no basis for suggesting the Schwam is entitled to

qualified immunity.  The Supreme Court holds that a reasonably competent public official

should know the law governing his conduct.[120]  Indeed, the Supreme Court in a leading

qualified immunity decision stated that:  "the objective element of [qualified immunity]

involves a presumptive knowledge of and respect for basic, unquestioned constitutional

rights."[121]  Yet the facts of this case show Schwam acting maliciously and in bad faith to punish

Airday without notice or opportunity to be heard.

   While the defendants' arguments on qualified immunity are not very clear, they

apparently suggest that it was objectively reasonable for Schwam to act as he did in this case

"has its principal focus on the particular facts of the case."[122]  When the facts are not in dispute,

the Court can determine the issue of objective reasonableness as a matter of law, but "if there is

---

[118] PTX 5 at NYCE000234.

[119] PTX 43 (Schwam Tr. 308:10-309:6).

[120] *Harlow v. Fitzgerald*, 457 U. S. 800, 819 (1982).

[121] *Id.* at 814.

[122] *Kerman v. City of New York,* 261 F. 3d 229, 240 (2d Cir. 2001) (quoting *Hurlman v. Rice*, 927 F. 2d 74, 78079 (2d Cir. 1991)).

such a dispute, the factual questions must be resolved by the fact finder."[123]   Hence, summary

judgment on qualified immunity grounds is not justified because there are at the very least

disputed issues of fact and the qualified immunity issue cannot be resolved as a matter of law.[124]

## CONCLUSION

For these reasons, the motion for summary judgment should be denied.

Dated:  January 26, 2018

*s/NBS*
_____
Nathaniel B. Smith

---

[123] *Id.*

[124] *Kerman, supra,* at 240 ("summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness"); *Zellner v. Summerlin*, 494 F. 3d 344, 367  (2d Cir. 2007) (lower court erred in granting police officers qualified immunity on issue of whether it was objectively reasonable to believe that plaintiff was engaging in disorderly conduct because jury found underlying facts after trial against defendants and lower court had to accept those facts as true).