UNITEDSTATESDISTRICTCOURT
SOUTHERNDISTRICTOFNEWYORK
---------------------------------------------------------X
GEORGE AIRDAY,

14-cv-8065 (RWS)

Plaintiff,

-against-

THE CITY OF NEW YORK, KEITH SCHWAM, and DAVID M. FRANKEL,

Defendants.
---------------------------------------------------------X

**PLAINTIFF'S RULE 56.1 RESPONSIVE AND COUNTER STATEMENT**

Plaintiff, George Airday, by the undersigned counsel, respectfully submits this as his Rule 56.1 Responsive and Counter Statement in which he admits or denies for purposes only of this motion the following statements by the Defendants:

ProceduralHistory

1. Plaintiff George Airday ("plaintiff" or "Airday") commenced this action on October 7, 2014 against the City of New York, Keith Schwam, and David Frankel alleging violations of 42 U.S.C. § 1983, and the First and Fourteenth Amendments of the United States Constitution. *See* Ex. F (Compl.). In particular, plaintiff alleged: (1) retaliation against him in violation of his First Amendment right of free speech; (2) violation of his Fourteenth Amendment procedural and substantive due process rights; and (3) violation of his Fourteenth Amendment right to equal protection. *Seeid*.

*Response*: Admitted for purposes of this motion.

2. The Court granted in part and denied in part defendants' dismissal motion on September 17, 2015. *See Airday v. City of N.Y.*, 131 F. Supp. 3d 174 (S.D.N.Y. 2015). In so doing, the Court dismissed *all* claims except for "Plaintiff's procedural due

process claim [ ] with respect to Defendants' decision to not renew his office in [December] 2013. *Id*. at184.

*Response*: Admitted for purposes of this motion and states that the Court also granted leave to replead, which Plaintiff did. *See* No. 3 below.

3. Plaintiff filed an amended complaint on October 8, 2015. *See* Ex. G (Am.Compl.); Ex. H (Comparing Compl. with Am. Compl).

*Response*: Admitted for purposes of this motion.

II. <u>City Marshals Occupy a Unique Place in the Field of LawEnforcement</u>

4. "New York City Marshals are officers of New York's court system, empowered to perform sensitive, law enforcement work, including enforcing judgments, garnishing wages, seizing property, and effecting evictions. . . . City marshals carry a badge and. . . are permitted to carry a firearm. They . . . are entrusted to use both . . . with the utmost discretion. The position is one of trust and requires sound judgment and an unwavering commitment to lawful and ethical conduct." Ex. I (Affirmation in Opposition to Respondent's Motion to Dismiss and Cross-Motion for Judgment on the Pleadings) at 3.

*Response:* Objection. There is no foundation for the attorney who makes these assertions and to the extent that they are legal conclusions they are not statements of fact for which any response is required. Since the assertions are conclusions of law, not a statement of fact, no response is required. *U.S. Info. Sys. v. IBEW Local Union No. 3*, 2006 U.S. Dist. LEXIS 52938 at *9 (S.D.N.Y. Aug. 1, 2006) ("Rule 56.1 statements are not argument. They should contain factual assertions with citation to the record. They should not contain conclusions.") (citing *Rodriguez v. Schneider*, 1999 U.S. Dist. LEXIS 9741 at n.3 (S.D.N.Y. June 29, 1999); *Giannullo v. City of New York*, 322 F.3d 139, 142 (2d Cir. 2003) (unsupported

facts in moving party's Local Rule 56.1 statement disregarded); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 & n.1 (2d Cir. 2001) (same)).

5. New York City Civil Court Act § 1601(1) authorizes the Mayor to appoint an applicant to a five-year term as a CityMarshal.

*Response*: Objection. Since the assertions are conclusions of law, not a statement of fact, no response is required. *U.S. Info. Sys. v. IBEW Local Union No. 3*, 2006 U.S. Dist. LEXIS 52938 at *9 (S.D.N.Y. Aug. 1, 2006) ("Rule 56.1 statements are not argument. They should contain factual assertions with citation to the record. They should not contain conclusions.") (citing *Rodriguez v. Schneider*, 1999 U.S. Dist. LEXIS 9741 at n.3 (S.D.N.Y. June 29, 1999); *Giannullo v. City of New York*, 322 F.3d 139, 142 (2d Cir. 2003) (unsupported facts in moving party's Local Rule 56.1 statement disregarded); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 & n.1 (2d Cir. 2001) (same)). Without waiving this objection, Airday states that City Marshals are appointed in practice to five-year terms that are regularly renewed by through a holdover status or a reappointment process. See Schwam Testimony in *Kregler v City of New York*; Plaintiff's Opposition and Trial Exhibit ("PTX") 43; Tang Deposition Transcript ("Tr.") at 73:24-76:16. (The depositions in this case are collected in a Deposition Appendix, which is being provided to the Court for purposes of the summary judgment motion and the trial.)

6. A City Marshal must seek reappointment before the expiration of his or her term, or risk not being reappointed to his or her office. Ex. D (Tang-Alejandro Tr.) at 77:11-18 (after a City Marshal's five-year term expires, that marshal "should know that their badge term while they are on holdover status is considered and deemed vacant . . . that's why they reapply . . . nothing is owed or given to them. They reapply. They are re-vetted and may or may

not be re-interviewed and they may or may not be reappointed.");*id*. at 77:19-78:02 ("Q. You don't think it is reasonable for a marshal to expect to be able to continue acting as a marshal after their five-year term expires? . . . A. My opinion is that I would not take it for granted."); *see also* New York City Civil Court Act § 1601(4) (providing that that "[n]o person shall be recommended to the mayor for appointment or reappointment as a marshal unless (i) a report on such person's background has been received by the committee from the department of investigation,and(ii)inthecaseofareappointment,thecommitteehasreviewedhisorherrecord of performance in office and has determined it to be satisfactory"); New York Public Officers Law § 5 (allowing a City Marshal to "hold over and continue to discharge the duties of his office, after the expiration of the term for which he shall have been chosen, until his successor shall be chosen and qualified; but after the expiration of such term, the office shall be deemed vacant for the purpose of choosing his successor").

Response: Objection on the ground that the assertions are a legal conclusion, not statements of fact. *See* No. 6 above. In addition, the evidence from the Tang-Alejandro deposition is not admissible because she lacks a foundation and is not qualified to render a legal opinion. Finally, the statutory provisions cited do not support the contention that an application for reappointment before a City Marshal goes into a holdover status is required as a condition to reappointment.

7. New York City Civil Court Act § 1610 authorizes the New York State Appellate Division to discipline, suspend, and remove a CityMarshal:

> The appellate division may discipline by reprimand or censure, or may temporarily suspend or permanently remove any marshal for cause, provided that written charges are first filed with said court, and that the marshal be given due notice thereof and be afforded an opportunity to be heard at a full and complete hearing. The appellate division may, in its discretion, suspend a marshal from the performance of his or her official duties pending a hearing upon the charges.

> Upon charges being preferred against a marshal by a judge of the appellate division, such court shall forthwith cause notice of suspension of the marshal to be served upon him or her, and the marshal shall thereupon remain suspended until the hearing and determination of the charges. . ..

*Response:* Admits that the statute so provides.

8. In November 1975 and February 1976, the Appellate Division for the First and Second Departments issued Joint Administrative Orders 453 and 456 setting forth the Department of Investigation's ("DOI") supervisory powers, which include the power to conduct investigations into a City Marshal's activities, examine their books and records, promulgate directives concerning the official records to be kept by them and the procedures for performing their official duties, as well as the power to discipline them. Joint Administrative Order 453 also authorized DOI to promulgate the New York City Marshals' Handbook of Regulations ("Marshals' Handbook"), which was approved by the Appellate Division in Joint Administrative Order 542. Ex. J (Excerpts from Marshals' Handbook) at905-909.

*Response:* Admitted for purposes of this motion, except states that New York City Civil Court Act § 1601 gives the Appellate Divisions for the First and Second Department the authority to discipline City Marshals, and the Appellate Divisions' JAO 456(4) expressly prohibits DOI from immediately or unilaterally suspending a City Marshal. NYC Civil Court Act *§* 1601; PTX 9 (Marshal's Handbook and JAO 453 and 456). In addition, Airday states that Schwam violated these procedural protections by unilaterally suspending him on January 19, 2012, which automatically led to Airday's suspension from the Scofflaw Program run by DOF. PTX 3 (Schwam letter to Airday, dated 1-19-12 at p. 1); Jordan Tr. 43:5-49:7 (Airday's suspension by DOF followed automatically from Schwam's suspension of Airday); PTX 21 (Schwam Memo at D0222) ("Marshal Airday's towing activity ended on January 18, 2012 and never resumed."); PTX 22 (Schwam Email: "DOI did not approve Marshal Airday to resume

towing for the City. In fact, I told his attorney the opposite yesterday [February 8, 2012].")

In addition, JAO 453(8) provides that a City Marshal can be disciplined for "failure to testify concerning his official duties at an investigative or administrative hearing held at the Department of Investigation after being granted immunity for the use of the testimony in a criminal proceeding." Kamen Exh. J at D0908. The Marshal's Handbook, Section 1-9(c) similarly provides a City Marshal with protection against self-incrimination in that a refusal to answer questions or provide information is grounds for discipline "after the marshal has been advised that neither his or her statement nor any information or evidence derived therefrom will be used against the marshal in a subsequent criminal prosecution other than for perjury or contempt arising from such testimony." (*Id.* at D0731.) Schwam, who was a governmental officer in direct contact with the Bronx ADA assigned Airday's criminal cases, did not provide Airday with these protections required by the Appellate Divisions and the Marshal's Handbook (Schwam Tr. 122:22-130:20) and nevertheless he proceeding to press (and re-press) charges against Airday for failure to cooperate with his investigation, in violation of those procedural protections as well as Airday's Fifth Amendment right to be free from self-incrimination. *Unites States v. Greenfield*, 831 F. 3d 106, 127 (2d Cir. 2016) (act of producing passport and travel documentation protected by Fifth Amendment)( "Compelled testimony need not be directly or inherently self-incriminating to be barred by the privilege. Compelled testimony that communicates information that may lead to incriminating evidence is privileged even if the information itself is not inculpatory"); *Barsky v. City of New York Department of Investigations*, 40 A. D. 3d 531, 534-35 (1st Dept. 2007) (motion quashing DOI subpoena for documents granted where compelling production of documents would constitute a compelled testimonial act; DOI had to provide the required immunity to enforce the subpoena).

9. Marshals' Handbook § 1-9 provides that "(a) No person shall prevent, seek to prevent, interfere with, obstruct, or otherwise hinder any study or investigationconducted pursuant to the New York City Charter, Joint Administrative Order 453, or this Handbook. A marshal's violation of this subsection shall constitute cause for removal from office or other appropriate penalty. . . . (b) Full cooperation with the Department of Investigation shall be afforded by every city marshal. . . . A marshal's violation of this subsection shall constitute cause of removal from office or other appropriate penalty. . . ." Ex. J (Excerpts from Marshals' Handbook) at 731.

*Response:* Admitted for the purpose of this motion, except also states that the governing provision as well as the Fifth Amendment protect a person from self-incrimination. *See* Response No. 8 above.

10. Marshals' Handbook § 1-16 provides that: "If the criminal charges bear upon the marshal's fitness for office, the pendency of such charges may be a cause for disciplinary action, including but not limited to an application to the Appellate Divisions for the marshal's suspension pending a hearing or pending resolution of the criminal charges." Ex. J (Excerpts from Marshals' Handbook) at735-736.

*Response:* *See* Response No. 8 above.

11. A City Marshal's day-to-day activities are overseen by two different mayoral agencies: DOI and the Department of Finance ("DOF"). *See* Ex. C (Jordan Tr.) at 38:22- 39:04. Keith Schwam served as the Director of the Marshals' Bureau at DOI, and Louis Jordan served as the Director of the Marshal Program at DOF. Ex. B (Schwam Tr.) at 7:21-24; Ex. C (Jordan Tr.) at 12:15-19; Ex. A (Pl. Tr.) at33:06-10.

*Response:* Admitted for purposes of this motion with the clarification that there

were over time about 12-14 City Marshals, including Airday, who were part of the DOF's Scofflaw Program at the relevant times and not all City marshals were part of the Scofflaw Program.

## III. Airday Served as a City Marshal From 1984 to2013

12. Mayor Edward Koch appointed plaintiff to a five-year term as a City Marshal with Badge Number 7 on January 24, 1984. *See* Ex. A (Pl. Tr.) at 17:04-05 ("Q. When did you become a City Marshal? A. 1984."); *id*. at 20:22-25 ("Q. Were you ever assigned a badge number? A. I was, yes. Q. What badge number was that? A. Number seven."); *id*. at 24:14-16 ("Q. When you were appointed as a City marshal were you appointed for a specified term? A. Itwas for a term of fiveyears.").

*Response:* Admitted for purpose of the motion.

13. After submitting an application for re-appointment (Ex. A (Pl. Tr.)at43:25-44:05), Mayor Michael Bloomberg re-appointed plaintiff on January 22, 2009 with a stated expiration date of December 20, 2013. Ex. K (1/22/2009 BloombergLetter).

*Response*: Admitted, except state that the statement is misleading because it skips over two decades of history where Airday was regularly heldover and re-appointed (along with other marshals).

14. Plaintiff's five-year term as a marshal expired on December 20, 2013. Ex. A (Pl. Tr.) at 106:13-15 ("Q. Your five-year term as a marshal expired on December 20, 2013; is that correct? A. That was the date, yes.").

*Response:* Admitted for purposes of the motion.

## IV. Plaintiff Served in The New York City ScofflawProgram

15. DOF oversees the New York City Scofflaw Program, a program in which

the DOF enforces parking related fines and judgments against offending owners by, among other things, securing or towing vehicles. Ex. A (Pl. Tr.) at 26:22-27:02 ("Q. What is scofflaw enforcement? A. Those people who are getting parking tickets and fail to pay them within a fixed time, usually three months or more. . . . then they become scofflaw based on the Parking Violation Bureau's data base."); *id*. at 27:20-23 (testifying that the "scofflaw enforcement program" falls within the purview DOF); Ex. C (Jordan Tr.) at 14:25-15:17 (in describing DOF, Jordan testified that: "[W]e define ways to collect outstanding judgment debt that is owed to the City. . . . [p]art of it [is] . . . the towing program . . . so it is a revenue generating program . . . we mainly report and monitor inventory, we monitor marshals in the field, how much revenue comes in, how many vehicles are towed, what the trends are, what the targets are. We supervise the marshals in that sense."); Ex. D (Tang-Alejandro Tr.) at 36:15-24 ("The scofflaw program is part of the Department of Finance . . . . If a respondent has gotten more than a certain amount of money in tickets they becomescofflaw").

*Response:* Admitted for purposes of the motion.

16. The Scofflaw Program can be effectuated in a number of ways, including but not limited to the use of City Marshals, New York City Sheriffs, and collection agencies. Ex. E (Salkin Tr.) at 55:10-24.

*Response:* Denied. The Scofflaw Program only applied to City Marshals. (PTX 27 (SOP for Scofflaw Seizure Program) (PDX 32).

17. DOF may select, suspend, and remove a City Marshal from the ScofflawProgram at any time and for any reason. Ex. C (Jordan Tr.) at 47:13-18 (DOF "has the right to not issue executions to any marshal that they choose not to issue themto").

*Response:* Denied. The SOP for the DOF's Scofflaw Program provides that the

City can terminate the services of a City Marshal for a conflict of interest or due to the appearance of impropriety and the law and the SOP provides a City Marshall with a reasonable opportunity to cure or address the conflict of interest or appearance of impropriety. (PTX 27 at DEF 955 (Scofflaw SOP; PDX 32). To the extent that this a conclusion of law about the scope of the due process clause and other constitutional limitations on the actions of the government, the statement is not one of fact and is objectionable on that ground and to that extent. *See* Response No. 5 above (citing authority).

18. Plaintiff served in the Scofflaw Program, where his responsibilities included the enforcement of parking and related fines and judgments against vehicles and their owners by towing vehicles, enforcing and collecting on the unpaid fines and judgments and otherwise taking responsibility for the care, custody and control of the vehicles. Ex. G (Am. Compl.) at ¶¶ 20-21. Plaintiff, like each City Marshal, was "assigned" to specific "areas of enforcement." Ex. A (Pl. Tr.) at31:20-32:24.

*Response:* Admitted for purposes of the motion.

19. DOF initiated an "open procurement that [the City] put on the street" for a "self-removing booting system with supporting turnkey technology that included the payment process and vehicle finding systems," which was responded to by Paylock and other bidders. Ex. E (Salkin Tr.) at 17:21-18:05, 19:05-15. The City ultimately "partnered with [Paylock] to provide a turnkey booting payment scofflaw finding services." *Id*. at 8:04-07.

*Response:* Denied. The Paylock contract was a five-year no-bid contract with the City for up to $70,152,000.00. Airday Tr. 134:2-22; Schwam Tr. 34:23-36:11; PTX 1 (Airday Paylock Memo) (PDX #1) at GA 105; PTX 2 at p. 1) (Paylock contract states Paylock "uniquely qualified" to provide the contracted services); PTX 41 (Public Hearing Notice at p. 9)

($70,152,000 Paylock contract is a "sole source procurement method pursuant to Section 3-05 of the Procurement Policy Board Rules"); PTX 40 (NYC Procurement Policy Board Rule 3-05 ( "Sole source procurement shall be used only when there is only one source for the required good, service, or construction. In such case, the accepted price and terms and conditions shall be achieved through negotiations between the agency and the vendor.")

20. Schwam and Jordan had no involvement in the negotiation of or approval for the Paylock contract. Ex. B (Schwam Tr.) at 60:16-21; Ex. C (Jordan Tr.) at 32:14-25.

*Response*: Denied. Both admitted to discussions about objections and concerns raised by the City Marshals over the Paylock proposal. Schwam Tr. 16:22-21:11 (discussions with DOF Commissioner Frankel); *id.*at 32:24-34:17 (Airday's memorandum on Paylock expressed the substance of the concerns discussed); Jordan Tr. 93:23-100:16 (Jordan attended many meetings at DOF where City Marshals raised concerns about the Paylock contract and the meetings were headed by Deputy Commissioner Salkin who signed the Paylock contract on behalf of DOF).

21. Under the Paylock Booting Program, a metal boot is affixed to a wheel of a vehicle as an alternative means to compel payment of unpaid fines and judgments. *See* Ex. A (Pl. Tr.) at47:15-21.

*Response*: Admitted for purposes of the motion.

22. Plaintiff alleges that from 2010 to 2012 he "question[ed] the appropriateness and the legality of the Paylock [B]ooting [P]rogram," and "disseminated his analysis and criticisms"to"Ken Kelly and the other marshals in the program."Ex. G(Am. Compl.) at ¶¶ 32, 34, 39; Ex. A (Pl. Tr.) at 53:04-08, 54:18-25.[1] Plaintiff identifies a number of

[1] In his capacity as Executive Director of the City Marshal Association, Ken Kelly served as

inquiries that he allegedly made to Ken Kelly and the other City Marshals, all of which concerned the program's implementation and operation including the following inquiries: (a) "how Paylock was chosen by the City and whether a no-bid contract was appropriate and legal;"(b) "who would be in charge under the proposal for tracking fines paid to Paylock;" (c) "who would be responsible for supervising Paylock; (d) what fees would be charged to the vehicle owners;" (e) "what would be the City Marshal's law enforcement and administrative roles, if any, in the booting process;" (f) "what would . . . Paylock's fee be under the proposed system;"(g) whether a vehicle could be legally "un-booted" upon payment of the outstanding fines and judgments and left operational on City streets where the vehicle's registration status had expired and the vehicle cannot under law be parked or operated on public streets; and (h) "whether it was appropriate to omit or disregard necessary and legal guidelines from the Paylock [B]ooting [P]rogram." Ex. G (Am. Compl.) at ¶¶ 39-40.

*Response*: Admitted for purposes of the motion.

23. Plaintiff alleges that he contacted four elected officials in 2011 and "early 2012" to "to create political pressure to oppose the Paylock Booting Program" by notifying them that Paylock "was not properly designed and that the program [was] a mistake and the fact that it was done without open bid." Ex. G (Am. Compl.) at ¶ 36; Ex. A (Pl. Tr.) at135:14-20.

*Response*: Admitted for purposes of the motion.

24. Plaintiff alleges that he spoke to City Councilmember Oliver Koppell in a "casual" manner on two or more occasions before and after March 2011 when he saw the

---

"spokesperson" for the City Marshals and he expressed on the association's behalf concerns about Paylock. Ex. B (Schwam Tr.) at 24:09-23; Ex. A (Pl. Tr.) at 33:11-20 ("Q. Who is Ken Kelly? A. Ken Kelly was the director of intergovernmental affairs for the marshal's association."). *Response:* Admitted for purposes of the motion.

Councilmemberwalking"onthestreet,"wherehe"toldhimthatitwouldbeagoodideaifhe and the City Council looked into this proposal that seems . . . to be way off the reservation." Ex. A (Pl. Tr.) at 56:07-57:15; Ex. G (Am. Compl.) at ¶ 37.[2].

*Response*: Admitted for purposes of the motion and state that Airday testified to bring up the issue at least twice with Councilman Koppell. *Id.*

25. Plaintiff also alleges that he spoke to a person in the "contracts department" at the Office for the New York City Comptroller in or around March 2011 to ask "if they had any information about the [Paylock] contract; if they were aware of it[,] [a]nd that it seems as if there's a problem with this proposed contract." Ex. A (Pl. Tr.) at 57:16-60:02; Ex. G (Am. Compl.) at ¶37.

*Response*: Admitted for purposes of the motion.

26. Plaintiff did not communicate with Schwam or anyone else at DOI about his concerns as to Paylock. Ex. A (Pl. Tr.) at 60:03-07 ("Q. Did you ever speak with anyone at DOI about the Paylock proposal? . . . A. I did not, no."); *id*. at 60:18-20 ("Q. Did you ever speak to Keith Schwam about the Paylock proposal? A. No, I did not."); *id*. at 139:13-16 ("Q. Did you ever learn what Schwam's opinion on the Paylock program was? A. He never told me personally and . . . I don't have any insight."); Ex. B (Schwam Tr.) at 12:23-13:20,31:12-18.

*Response*: Admitted for purposes of the motion.

27. Plaintiff did not communicate with Frankel about Paylock in any manner, and did not communicate with Jordan about Paylock until after the program had "already

---

[2]In the amended complaint, plaintiff references an elected official named John Koppel. Ex. G (Am. Compl.) at ¶ 36. Defendants are unaware of a councilmember with the surname Keoppel or the full name John Koppel; however, from January 1, 2002 through December 32, 2013, Oliver Koppell served as a member of the New York City Council for District 11. *Response*: Acknowledge the typographical error in the Amended Complaint.

started." Ex. A (Pl. Tr.) at 60:21-61:09; *id*. at 136:04-08 ("Q. Did you ever speak with David Frankel about the Paylock program? A. I never spoke with him, no. Q. Did you ever speak to him about anything? A. Never spoke to him aboutanything.").

*Response*: Admitted as to Frankel for the purpose of the motion and denied as to Jordan. *See* Airday Tr. 60:21-61:25 & Jordan Tr. 93:23-100:16.

V. **Plaintiff is Asked to Resign as a City Marshal After Being ArrestedTwice**

28. On December 21, 2011, plaintiff was arrested and charged with assault in the third degree (a class A misdemeanor), menacing in the third degree (a class Band harassment in the second degree following an incident with his fiancée. Those charges were filed by the Bronx District Attorney's Office in the Bronx Supreme Court, Criminal Division. The criminal complaint charged that plaintiff "shoved" his fiancée to the ground, "struck her several times in the face with an open hand," and threatened to "kill" her, and further charged that plaintiff's actions caused his fiancée to sustain "bruising and swelling to her lower back and face and experienced annoyance, alarm and fear for her physical safety." Ex. L (5/30/2012 Schwam Email with Enclosures) at 238-239.

*Response:* Admit that Lynda Schaefer make a criminal compliant against Airday; deny that she was his "fiancée" on the ground that she was his girl friend (Airday Tr. 62:5-10), and state that Airday was acquitted of the charge after a trial when the trial court found that the complaining witness was not credible. (PTX 10: ADA Email to Schwam; PDX 10). In addition, Airday states that the menacing and harassment charges all arose out of a single incident at his home with his ex-girl friend and that those charges are lesser-included offenses of the misdemeanor charge of assault. Kamen Exh. L at ECF page 128 of 223

29. Judge Ruben Franco of the Bronx County Criminal Court issued an

Order of Protection against plaintiff on December 22, 2011 that directed him to "surrender any and all . . . firearms owned or possessed" and plaintiff was advised in court of the contents of that order and that the order was served on him in court. Ex. L (5/30/2012 Schwam Email with Enclosures) at 243.

*Response:* Admitted that the TOP was so issued, and state that in the early morning hours of December 22, 2011, before the TOP was issued and while Airday was locked up at the local precinct on the charge, he gave the arresting police officer the information and access required to taken his five weapons from his safe at home. PTX 37 (Memorandum re PO Cancel gun retrieval)

30. The New York City Police Department ("NYPD") took custody of five handguns in plaintiff's possession during the overnight period of December 21-22, 2017. Each gun is listed with a detailed description, including its make, model number, caliber, color, and serial number, on the NYPD property clerk's invoice that the arresting Officer prepared on December 22, 2011. Ex. L (5/30/2012 Schwam Email with Enclosures) at240-242.

*Response*: Admitted except to state that while in lock-up, Airday told the arresting police officer that he had five guns in his safe at home and gave the police officer information and access to retrieve the guns from his safe. The arresting police officer searched the safe, which is three feet square and stopped searching after finding five guns, not locating a sixth gun that Airday had been given in 1980 when he was a probation officer. (PTX 17). Airday had forgotten all about the small handgun given to him 30 years ago, which he never used and for which he did not even have any bullets. When he received it in 1980 he was not required to register it as he was a peace and probation officer at the time. Airday Tr. 68:9-25 & 71:15-20.

31. On December 22, 2011, DOI learned that "[plaintiff] was arrested last night (12/21/2011 at about 10 p.m.) . . . on a domestic violence complaint by his fiancée." Ex. M (12/22/2011 SchwamEmail).

*Response:* Admitted except state the complaining witness was Airday's girlfriend, not fiancée. *See* Response No. 28 above.

32. On January 10, 2012, the Bronx District Attorney's Office notified DOI that the "injuries [allegedly caused by plaintiff] to the complainant [were] more severe than originally believed and that she had some broken ribs." Ex. N (1/10/2012 PinckneyEmail)

*Response:* Admitted and state that the injuries occurred earlier in the month of December 2011 when the complaining witness was in a car accident.

33. On January 13, 2012, the NYPD License Division mailed a letter to plaintiff advising him that his gun licenses were suspended and instructing him to surrender any and all firearms immediately at his local precinct. Ex. L (5/30/2012 Schwam Email with Enclosures) at0245-0246.

*Response:* Admitted for purposes of the motion.

34. On January 18, 2012, the NYPD License Division notified detectives that (1) a gun registered to plaintiff had not been turned over on December 22, 2011 following his arrest and (2) one of the five guns removed on that date was unregistered. *See* Ex. A (Pl. Tr.) at 72:25-76:01.

*Response:* Denied. The evidence does not support the assertion.

35. On January 18, 2012, plaintiff was arrested on charges of (1) criminal contempt and criminal possession of a weapon based on his possession of a .22 caliber Derringer in violation of the abovementioned order of protection and (2) criminal possession of

a weapon, specifically, an unregistered .25 caliber Hawes handgun. The criminal complaint, filed by the Bronx District Attorney's Office in Bronx Supreme Court, Criminal Division, charged plaintiff with criminal contempt in the second degree (a class A misdemeanor). Ex. L (5/30/2012 Schwam Email with Enclosures) at247-248.

*Response:* Denied. The evidence cited shows that Airday was only charged with criminal contempt. Kamen Exh. L at NYC 00247.

36. By email dated January 19, 2012, defendant Schwam informed Commissioner Rose Gill Hearnthat:

[Y]esterday evening . . . Airday . . . was arrested and charged with 2 counts of Criminal Possession of a Weapon (firearm) and Criminal Contempt, both class A misdemeanors. These are arrest charges. . . . The contempt charge and one weapon charge is based on his possession yesterday of a handgun, in his residence, in violation of an Order of Protection issued on December 22, 2012, which in turn was a result of his arrest the previous day on an assault charge in a domestic incident involving his fiancee. Yesterday, the police . . . went to Airday'sBronx residence in response to the NYPD Licensing Division's report that one of the firearms on his license was not turned in on12/22/2011.

I have told [Airday's attorney] Ken Litwack that under these circumstances, Airday cannot be permitted to perform the duties of a marshal and that he should resign. Litwack does not disagree . . . . I am sending both of them a letter that saysthe same and that unless Airday resigns we will be compelled to seek his immediate suspension and removal.

I am also directing him pending further instructions to cease performing duties other than redeeming cars already in his custody (a function that his office staff handles). Will keep you posted.

Ex. O (1/19/2012 Schwam Email).

*Response:* Objection to the hearsay, speculation and lack of personal knowledge.

37. In making this recommendation, Schwam relied on the "police report" and "the records of the guns that were recovered from Marshal Airday's premises on two occasions, which came from the police[;] . . . there were conversations between [the] detectives or investigators at DOI and [the] detectives [and] police officers at the police department. We

also had records at DOI that in effect listed all the guns that we know about that Marshal Airday had. [Schwam] also . . . had a discussion with [Airday's attorney] Ken Litwack, who made certain representations about what had occurred." Ex. B (Schwam Tr.) at101:23-102-20.

*Response:* Admit that Schwam so testified.

38. Commissioner Rose Gill Hearn acknowledged Schwam's recommended course of action. Ex. O (1/19/2012 Schwam Email).

*Response:* Denied. The evidence does not support the assertion and is hearsay.

39. On January 19, 2012, Schwam sent a letter to plaintiff requesting that he resign his appointment as a CityMarshal:

[DOI] has been informed that you were arrested on . . . January 18, 2012 and charged by the arresting officer with two counts of Criminal Possession of a Weapon (firearm) in the Fourth Degree and Criminal Contempt in the Second Degree, both class A misdemeanors, based in part upon your possession yesterday of a handgun, recovered by the Police in violation of an Order of Protection dated December 22, 2011 and upon your possession on December 22, 2011 of an unregistered handgun. That arrest follows closely your arrest on December 21, 2011 on assault and other charges in a domestic incident, which resulted in the above-mentioned Order of Protection. Furthermore the Police Department reports that a handgun listed on your license was not turned in by you and is unaccounted for.

Under these circumstances, you cannot be permitted to hold office and perform the duties of a City marshal, and this Department will be compelled to seek your removal and immediate suspension unless you immediately submit your resignation. Pending that resignation or suspension you are not to perform any duties other than the orderly redemption of vehicles and collection and remittance of funds in relation to vehicles already in your custody and all necessary recordkeeping attendant to those activities. You are not to perform any other functions without express written authorization of this Department. Upon resignation you will be responsible to comply with the wind-down procedure specified in Joint Administrative Order 453 and the Marshals Handbook.

Ex. O (1/19/2012 Schwam Email).

*Response:* Admit that Schwam sent the letter and state that by unilaterally suspending Airday Schwam violated Airday's due process rights. *See* Response No. 8 above. *See also* Tang-Alejandro Tr. 43:14-44:17 (never previously saw a letter such as Schwam's letter

to Airday on January 19, 2012, and the Director of the Marshal's Bureau does not have the authority to suspend unilaterally a City Marshal); Schwam Tr. 89:13-94:23(Schwam, who is an attorney, is unable to identify any legal authority for the direction in his letter to Airday to cease acting as a City Marshal).

40. The January 19, 2012 letter advised plaintiff that he could continue to "collect money" and "release vehicles," and as well as "perform the functions that involved the accounting for the money and remitting it" and further advised plaintiff that he "could not . . . tow additional vehicles for the City of New York while this matter was in this particular status." Ex. B (Schwam Tr.) at 94:10-23. *See also* Ex. A (Pl. Tr.) at 87:22-88:05 (plaintiff testified that after his second arrest he worked "in the booting program," did "income and property executions and some landlord/tenant work as well as small claimswork").

*Response:* The letter speaks for itself and should be read in its entirety. The selected portions omit that the letter suspended Airday: "Pending that resignation or suspension you are not to perform any duties other than the orderly redemption of vehicles and collection and remittance of funds in relation to vehicles already in your custody and all necessary recordkeeping attendant to those activities. You are not to perform any other functions without express written authorization from the Department." (PTX 3: Schwam Letter to Airday, 1-19-12 (PDX 4). This unilateral action by Schwan was contrary to Appellate Division Orders, the Marshal's Handbook and Airday's due process rights. *See* Response No. 8 above.

41. On January 20, 2012, plaintiff's attorney, Ken Litwack, sent a letter to DOI setting forth plaintiff's account of the two arrests. In that letter, Litwack made the following representations:

I am following up on our conversation . . . in which I proposed that Marshal Airday be allowed to maintain his office with his duties severely circumscribed until the matters before the

Criminal Court are sorted out. *Under my proposal Marshal Airday will not be allowed to do any work whatsoever in the field . . . I have spoken to the Marshal and he will be willing to agree to this*. . . .

*I know there are some troubling facts here* and I know that if any of the negative inferences that can be drawn from these facts are established it would not bode well for the Marshal. . . . *I am requesting that the Marshal be put on limited duty, pending the outcome of these matters*. . . .

Ex. P (1/20/2012 Litwack Email & Cover Letter) (emphasis added).

*Response:* Objection on the grounds that the letter is not admissible under Rule 408 of the Federal Rules of Evidence in that reflects an attempt by counsel for Airday to reach a resolution of the dispute with DOI and that it is being used as an alleged admission of liability in violation of that rule. The letter is also cited out of context in that the offer of compromise by Airday's counsel was that Airday would not be required to close his office and that an Associate Marshal would carry out Airday's City Marshal's duties while the criminal charges were pending. *See* Kamen Exh. P.

42. Defendant Schwam issued a response to the January 20, 2012 Litwack letter that same day. Ex. P (1/20/2012 Litwack Email & CoverLetter).

*Response:* Admitted for purposes of the motion.

43. The January 23, 2012 DOI Weekly Status Report reports that: "CityMarshal Airday was arrested on charges relating to possession of handguns either not on his license or in his possession after an Order of Protection required his surrender of all guns. Discussions with his attorney re[garding] possible resignation are underway." Ex. Q (DOI's Weekly Status Reports) at 023-024.

*Response:* Objection on best evidence and hearsay grounds.

## VI. <u>**Plaintiff Refuses to Cooperate with DOI'sInvestigation**</u>

44. On January 30, 2012, DOI instructed plaintiff to provide documents by

January 31, 2012 related to his NYPD-issued handgun licenses and handguns identified by the NYPD as having been in his custody, including: (1) a copy of the criminal complaint; (2) any correspondence or notices he received from the NYPD on or after December 22, 2011 regarding his handgun licenses; (3) copies of all applications for handgun licenses and renewals, (4) records reflecting the loss, theft, or transfer of any handgun and any notifications to the NYPD of such loss, theft, or transfer; and (5) any and all records relating to the above-described Derringer and Hawes handguns. Ex. R (1/30/2012 PinckneyLetter).

*Response:* Admit that that letter was prepared on the 30th of January and that it demanded that by the close of business the following day that Airday provide the documents.

45. Plaintiff did not produce the requested documentation by the date directed in the above-mentioned letter; instead, his attorney, Stuart London, inquired on January 31, 2012 whether: (1) can plaintiff resume his tow operation using an Associate Marshal; and (2) if he refuses to resign, will DOI bring departmental charges against him? Ex. S (1/31/2012 Pinckney Email).

*Response:* Admit that that letter was prepared on the 30th of January and that it demanded that by the close of business the following day that Airday provide the documents.

46. DOF learned from plaintiff on February 7, 2012 that he had been arrested in December 2011 and January 2012. *See* Ex. C (Jordan Tr.) at 40:23-41:06. Louis Jordan contacted his supervisor, New York City Sheriff Edgar Domenech, to advise him of the situation and, in response, Sheriff Domenech "said to send him a recommendation." Ex. C (Jordan Tr.) at 44:13-20.

*Response:* Denied. DOF suspended Airday when DOI suspended him. Airday Tr. 89:4-90:7; Jordan Tr. 48:11-49:7.

47. On February 8, 2012, Louis Jordan sent a recommendation to Sheriff Domenech advising that plaintiff would not be "reinstated [into the Scofflaw Program] due to lack of notification to DOF of the incident and not hearing from him until . . . yesterday February 7, 2012." Ex. T (2/9/2012 Domenech Email) at 946; *see also* Ex. C (Jordan Tr.) at 52:04-53:12 (testifying that plaintiff was removed from the Scofflaw Program for the following reasons: the criminal charges pending against plaintiff and "based on the fact that . . . [plaintiff] never notified [DOF] . . . of any arrest or that any of these things tookplace").

*Response:* Denied. Jordan testified that DOI suspended Airday in January of 2012 and that suspension from the Scofflaw Program was therefore automatically following Schwam's suspension. Jordan Tr. 48:11-49:2; *see also* Airday Tr. 89:4-90:7 (DOF suspended him from the Scofflaw Program at the time Schwam sent Airday the letter dated January 19, 2012). In addition, the DOF sent Airday a letter formally stating that it was not providing him with work under the Scofflaw Program because of the pending charges. PTX 17: DOF Letter, dated 5-29-12 (PDX 16).

48. In response to a request by Sheriff Domenech that DOI state its position, defendant Schwam stated in relevant partthat:

> My understanding is that it is DOF's discretionary decision to choose which marshal or marshals to enforce the City's judgments, including the decision not to have Airday towing for the City. I believe that is an entirely appropriate decision, given the pending criminal charges, including that of violating the Court's order of protection, particularly when the work of a City marshal, for DOF and others, is to enforce court orders. I also understand that you have additional operational concerns, including, among others, Airday's failure to notify you or provide information to DOF regarding his status in the weeks since his January 18 arrest, during which he was nottowing.

Ex. T (2/9/2012 Domenech Email) at 945.

*Response:* Objection to the hearsay.

49. Sheriff Domenech accepted Jordan's recommendation that plaintiff not

be reinstated into the Scofflaw Program and "made the decision to remove Marshal Airday from the Scofflaws . . . Program" on or about February 9, 2012. Ex. C (Jordan Tr.) at 47:09-48:10; Ex. T (2/9/2012 Domenech Email) at 945 ("Louis I support your decision not to reinstatehim.").

*Response:* Denied.See Response No. 47 above (decision made as a result of actions by DOI). In addition, the cited document states that Jordan made the decision.

50. In separate and in conjunction, the December 2011 arrest, the January 2012 arrest, and the failure to notify DOF of the two arrests were a sufficient basis to terminate plaintiff from the Scofflaw Program. Ex. C (Jordan Tr.) at 55:06-20 (it would be "appropriate to keep [plaintiff] off of the Scofflaws Program" even if "the charges were resolved in favor of [plaintiff]"); *id*. at 56:10-23 (it "was still appropriate to keep him off of the scofflaws program" "[b]ecause we were never notified. We should have been notified . . . the first arrest took placeinDecember . . . the second was in January. We were not notified . . . That would have been enough . . . to also recommend that he be terminated from the program"); *id*. at 62:05-14, 65:10- 15 (plaintiff's failure to present the two arrests and the two criminal charges directly to DOF immediately after these events occurred violated DOF's standard operating procedure and that his "improper behavior" was "sufficient basis to suspend [the] marshal from the Scofflaws Program [and] . . . even to stop issuing executions[entirely].").

*Response:* Denied. Jordan testified that the official position of DOF was set forth in the letter by its counsel on May 29, 2012, which states that Airday was suspended because of the pending criminal charges. PTX 17; Jordan Tr. 81:16-85:8

51. In a letter dated February 10, 2012, DOI advised plaintiff that: "It is [DOI's] position that under the circumstances . . . [that] Airday needs to step down, following a

brief wind-down period. It is our hope that rather than attempting to prolong the process, the marshal will avail himself of the opportunity he is being offered to bring his business as a City marshal to an orderly and responsible conclusion, deal with the criminal charges he faces, and put this matter behind him." Ex. U (2/10/2012 SchwamLetter).

*Response:* Admitted for the purpose of the motion.

52. DOI added, "[l]eaving aside the domestic violence allegations, Marshal Airday's failure to comply with a court order fully and scrupulously, while already facing criminal charges in a matter as serious as this one, demonstrates a lack of fitness for his office." *Id*.

*Response:* Admit that that is what the letter states and deny that the charges demonstrate a lack of fitness because a charge or allegation is not evidence of a fact and does not establish or demonstrate the alleged fact, which must be proven.

53. The February 13, 2012 DOI Weekly Status Report reports that: "DOI's position is that Airday must resign." Ex. Q (DOI's Weekly Status Reports) at071.

*Response:* Objection to the hearsay.

54. In a letter dated February 13, 2012 and a letter dated February 17, 2012, plaintiff's attorney informed DOI that plaintiff would not provide the documentation requested by DOI unless DOI filed formal disciplinary charges against him. Ex. L (5/30/2012 Schwam Email with Enclosures) at 250 & 252.

Response: Denied. *See* Response No 8 above (setting forth the rules governing compelled testimony by a governmental agency). In addition, Airday asserts that due to the pending criminal charges, which took precedent over administrative proceeding, Airday was not able to provide documents. PTX 38 (London Letter, dated 2-17-12; D0052)

55. On February 17 and on February 23, 2012, DOI advised plaintiff's attorney that plaintiff's continuing failure to comply with DOI's instruction was a breach of his legal obligations under the City Charter, the Marshals' Handbook, and Joint Administrative Order 453, and was obstructing DOI's investigation. Ex. L (5/30/2012 Schwam Email with Enclosures) at 253-254 (stating in the February 17, 2012 letter that Airday had "failed to produce the records that DOI directed him to produce by January 31, 2012" and that Airday had "breached his responsibility to refrain from preventing, seeking to prevent, interfering with, obstructing, or otherwise hindering any DOI investigation and to afford full cooperation to DOI"; stating in the February 23, 2012 letter that Airday had "elected to disregard DOI's direction and withhold documents he was directed to produce . . . [t]he marshal is therefore subject to all lawful measures that DOI may take inresponse").

*Response:* Admit that the letter so states.

## VII. <u>**The New York State Appellate Divisions SuspendsPlaintiff**</u>

56. On May 30, 2012, DOI filed Charges and Specifications with the Appellate Division for the First and Second Departments. Ex. L (5/30/2012 Schwam Email with Enclosures) at 226-228. Charge One alleged that plaintiff interfered and failed to cooperate with an investigation by the DOI into issues related to his handguns and discrepancies in his handgun license records uncovered by the NYPD in the wake of his arrests, and that this conduct violated Chapter I, §§ 1-9(a) and (b) of the Marshals' Handbook. *Id*. at 227. Charge Two and Charge Three alleged that plaintiff had been arrested in December 2011 and January 2012 with charges stemming from those arrests pending in criminal court, and that violated New York City Civil Court Act § 1610 and Chapter I, § 1-1 of the Marshals' Handbook. *Id*. at227-228.

*Response:* Admitted and state that Schwam was the one who filed the charges.

57. On June 1, 2012, DOI served plaintiff and plaintiff's attorney with the Charges and Specifications. Ex. V (6/1/2012 SchwamEmail).

Response: Admitted except state that Schwam emailed the charges to the Appellate Division on May 30, 2012 failed to provide Airday with notice of the charges until two days later on June 1, 2012 because the Appellate Divisions told Schwam to make such service of process. Schwam Tr. 106:2-113:9; PTX 5-8.

58. On June 11, 2012, the Appellate Division for the First and Second Departments issued Joint Administrative Order 2012-1, which suspended plaintiff from servingas a City Marshal pending a hearing on the Charges and Specifications. Ex. W (6/11/2012 Torres Email with Enclosure).

*Response:* Admitted for purposes of the motion.

59. On June 13, 2012, DOI Deputy Commission & General Counsel Marjorie Landa filed the Charges and Specifications with the New York City Office of Administrative Trials and Hearings ("OATH"). Ex. X (6/13/2012 Landa Letter with Enclosures).

*Response:* Admitted for purposes of the motion.

60. On July 2, 2012, OATH Administrative Law Judge Faye Lewis granted the parties request to adjourn *In the Matter of Department of Investigation v. George Airday*, Index No., 12-2038, pending the resolution of the matters pending in criminal court. Ex. Y (7/2/2012 OATH Tr.). *See also* Ex. B (Schwam Tr.) at 133:09-14 ("The outcome of that conference was that Marshal Airday consented to an open-ended period of suspension pending the resolution of what was then two criminal cases that were pending against him, and that the disciplinary proceeding was adjourned in theinterim.").

*Response:* Admitted for purposes of the motion.

61. On October 19, 2012, plaintiff was found not guilty as to the charges stemming from the December 2011 arrest and the Bronx District Attorney's Office elected to dismiss the remaining charges on March 1, 2013. Ex. Z (3/4/2013 Sterinbach Letter); Ex. A (Pl. Tr.) at18-25.

*Response:* Admitted for purposes of the motion.

62. DOI contacted OATH and plaintiff on or about March 7, 2013 to reinstate Charge One of the Charges and Specifications. Ex. AA (3/7/2013 KearneyLetter).

*Response:* Admitted for purposes of the motion.

## VIII. **DOI Allows Plaintiff to Complete His Term as CityMarshal**

63. In April and May 2013, DOI and plaintiff's attorney discussed resolving the disciplinary proceeding pending before OATH by way of a "fine, with Airday to be replaced at the end of his term in December 2013." *See* Ex. Q (DOI's Weekly Status Reports) at 748-749, 765-766, 779-780, &806-807.

*Response:* Denied. The document, which is hearsay, does not support the contention that there was discussion about Airday being replaced and Schwam testified that he did not give notice to Airday when he replaced him and that he did not feel obligated to tell Airday what he was going to do "down the road." Schwam Tr. 158:14-160:19 & 224:20-23.

64. On May 23, 2013, the Appellate Division for the First and Second Departments received a stipulation executed by plaintiff, plaintiff's attorney, and DOI resolving the formal disciplinary proceeding pending before OATH. Ex. BB (5/23/2013 Schwam Email) at 850-852.

*Response:* Admitted for purposes of the motion.

65. By entering into this stipulation, plaintiff agreed: (i) to "plead guilty to some administrative charge, [i.e.,] not cooperating with DOI"; (ii) to pay a $7,500 fine as the penalty for his failure to provide DOI with the documents specified in Charge One of the Charges and Specifications; (iii) to "fully cooperate with DOI's investigation of his conduct"; and (iv) that his guilty plea would be "filed as a public record in DOI and with the Appellate Divisions of the New York State Supreme Court . . . and will be considered for all purposes as part of Marshal Airday's official record." Ex. A (Pl. Tr.) at 96:02-11; Ex. BB (5/23/2013 Schwam Email) at850-852.

*Response:* Admitted, except state that the Stipulation provides that Charge Two and Three are withdrawn and that the Stipulation was the "final disposition" of Charge One. *Id.*

66. The "statement that the stipulation . . . will be considered for all purposes as part of Marshal Airday's official record" "indirectly" "reflects the fact that Marshal Airday was not going to be reappointed or held over." Ex. B (Schwam Tr.) at152:13-153:04.

*Response*: Denied. This is just argument, not a statement of fact. *See also* Response No. 63 (no notice given and not Schwam's "business" to tell Airday what he was going to do "down the road.")

67. In a May 29, 2013 email sent plaintiff's attorney and the Appellate Division for the First and Second Departments, DOI clarified that the stipulation was a "final disposition of Charge One" and warned that the stipulation "does not resolve the underlying issues or foreclose the possibility of future disciplinary charges." Ex. CC (5/29/2013 Agostino Email).

Response: Denied. The evidence does not show that Schwam sent the email to Airday's counsel and the assertion is hearsay.

68. On June 11, 2013, the Appellate Division for the First and Second Departments issued Joint Administrative Order 2013-5 lifting plaintiff's suspension, which began one year earlier on June 11, 2012. Ex. DD (6/11/2013 Agostino Email with Joint Admin. Order2013-5).

*Response:* Admitted for purposes of the motion.

69. In June 2013 and in accordance with the stipulation, plaintiff was questioned by DOI about the circumstances giving rise to the gun charges. Ex. A (Pl. Tr.) at 97:25-98:23. Plaintiff stated, among other things, that he had "forgotten" that he possessed an unlicensed firearm and admitted that he never "registered" that firearm. *Id*. at 71:15-17, 99:09-18. Tang-Alejandro testified that "it didn't seem that [plaintiff] was cooperating with Mr.Schwam's investigation." Ex. D (Tang-Alejandro Tr.) at 61:23-62:10.

*Response:* Admits that Airday when questioned by Schwam stated that the gun was not registered because when Airday was given the gun in 1980 he was a peace officer and registration was not required. (Airday Tr. 68:9-21.) In addition, object to the evidence about how Airday "seemed" to cooperate as speculation.

70. Following this questioning, plaintiff resumed working as a City Marshal. *See* Ex. A (Pl. Tr.) at 102:20-22.

*Response:* Admitted for purposes of the motion and state that on June 11, 2013 Airday's suspension was lifted and he was restored to his office.

71. In an October 23, 2013 memorandum entitled "Appointment of New City Marshal to Succeed City Marshal George Airday," defendant Schwam recommended that "one of the four prospective new City Marshals be appointed to succeed City Marshal George Airday, Badge No. 7, upon expiration of his term on December 20, 2013." Ex. EE (10/23/2013

Schwam Memo.). In that memorandum, Schwam detailed the basis for **his** decision, which included among other things: (1) plaintiff's possession of an "unlicensed gun"; (2) plaintiff's failure to "list all of his guns" on numerous applications throughout his tenure as a City Marshal; (3) the disclosure on June 14, 2013 that plaintiff misrepresented the origin of the unlicensed gun to DOI investigators in January 20, 2012; and (4) plaintiff's refusal to provide documents and records to DOI, which was the subject of Charge One in the above-described Charges and Specifications that resulted in plaintiff's one year suspension and a $7,500 fine.*Id*. (Plaintiff's emphasis).

*Response:* Deny that Schwam made any "recommendation" because he testified that he acted unilaterally and did not obtain or seek approval for **his** decision. Schwam Tr. 148:9-150:13 & 213:23-217:23.

72. Defendant Schwam made a recommendation to the "Office of the Mayor" that "Marshal Airday's successor be appointed to the office that [Airday] held, which in effect would replace Marshal Airday as a City marshal in accordance with the New York City Civil Court Act that expressly authorizes that." Ex. B (Schwam Tr.) at65:03-67:17.

*Response:* Denied. *See* Response No. 71 above.

73. Defendant Schwam identified the "reasons for recommending that [the Office of the Mayor appoint a successor upon the expiration of Airday's term] . . . had to do with Marshal Airday's conduct and judgment that was exposed in the aftermath of his two arrests in December 2011 and January 2012." Ex. B (Schwam Tr.) at 68:24-69:10. In particular, Schwam testifiedthat:

It involved several elements. One, the marshal was in possession unlawfully of two firearms. Two, the fact became known after the marshal was arrested on a domestic violence charge, and was under an obligation to surrender all of his firearms. The fact that he was arrested within four weeks of the domestic violence arrest with facts that indicated that he had not surrendered

all his firearms as directed by the court, and that he had been in possession for some period of time before his domestic violence arrest of an unregistered firearm were the principal acts that caused me to make the recommendation.

Those acts . . . reflected judgment that fell far short of the standard that I believe was warranted for someone who is, Number 1, [a] mayoral appointee; and Number 2, holding the position that involves the scrupulous attention to rules, court orders, and adherence to the law in situations that involve actions that – the position involves actions at ken against members of thepublic.

[T]he position involves a mayoral appointment, a delegation of very serious authority to take away people's property, to remove people's vehicles, to remove people from their homes, to remove money from people's bank accounts. Those are very serious responsibilities that call for uncompromised integrity, mature judgment, adherence, scrupulous adherence to rules, laws and court orders and basic seriousness in how the person goes about conducting their affairs both personal and official.

The conduct that I described and the fact that the marshal having been arrested once failed to do the things that were required of him to stay well clear of being arrested again, and that he had not done those things and that, in fact, done the opposite, said to me that we need[ed] to replace Marshal Airday.

Ex. B (Schwam Tr.) at 69:11-71:07.

Response: Do not dispute the testimony but deny that there was any recommendation or consultation. *See* Response No. 71 above.

74. The December 6, 2013 DOI Weekly Status Report reports that: "We expect that a new marshal, already approved and qualified, will be appointed to succeed City Marshal George Airday upon expiration of Airday's term on December 20. Special Investigator Caroline Tang-Alejandro is coordinating the prospective marshal's completion of the necessary statutory steps (bond, oath, badge, etc.)." Ex. Q (DOI's Weekly Status Reports) at 937-938 & 943-944.

*Response:* Objection to the hearsay.

75. Plaintiff's five-year term as a marshal expired on December 20, 2013. Ex. A (Pl. Tr.) at 106:13-15.

*Response:* Admitted for purposes of the motion.

76. The December 20, 2013 DOI Weekly Status Report reports that: "A letter of appointment for new City Marshal Frankie Alvarez signed by the Mayor will be issued . . . appointing Alvarez to the office that will be vacant upon the expiration of City Marshal George Airday's term on December 20." Ex. Q (DOI's Weekly Status Reports) at949-950.

*Response:* Objection to the hearsay.

77. Frankie Alvarez was appointed to Airday's badge number (Badge No. 7) on December 20, 2013, and "qualified" for the office on December 21, 2013, by filing his oath of office with the City clerk. Ex. FF (12/21/2013 BloombergLetter).

*Response:* Admitted for purpose of the motion.

78. DOI notified plaintiff by letter dated December 23, 2013 that: "Your term of office has expired. In accordance with Section 1601 of the New York City Civil Court Act [], your successor has been appointed to that office. Accordingly, your service as a City Marshal has ended." Ex. GG (12/23/2013 Schwam Letter).

*Response*: Admitted except state that it was Schwam who made the notification.

IX. **Plaintiff Knew He Would Not Be Reappointed or Heldover as a CityMarshal**

79. DOI advised plaintiff, through his attorneys, that he would not be reappointed at the expiration of his term in December 2013 on multiple occasions, including in January/February 2012 and May 2013. *See*, *e.g.*, Ex. B (Schwam Tr.) at 151:03-152:02 ("I told [plaintiff's attorney] Mr. London . . . that when the marshal's term expired, he certainly wasn't going to be reappointed," which Schwam "told Mr. London at various times" with the first such occasion occurring in or around "January [or] February 2012");*id*. at 152:03-18 (Schwam "conveyed in substance [to plaintiff's attorneys] while there was a negotiation over the stipulation"inoraboutMay2013that"[plaintiff]wasnotgoingtobereappointed"whenhisterm

expired in December 2013).

*Response:* Denied on the ground that Schwam testified that he gave Airday no notice. Schwan Tr. 224:20-23. Plaintiff also objects to the hearsay.

80. Defendant Schwam testified that was not reasonable for plaintiff to have assumed that he would remain a City Marshal after the expiration of histerm:

[T]he law is very clear that upon the expiration of a marshal's term, his successor shall be appointed, and that upon expiration of the term, the marshal's office is considered vacant for purposes of choosing his successor.

To me, that should put anyone who understands anything about the business of being a marshal on notice that what you get is a five-year term. At the end of that five-year term, the presumption is you are going to be replaced.

In light of Marshal Airday's conduct and the lack of judgment that was exposed by his two arrests and the facts that were developed as a result of them, Marshal Airday should have been well aware that his future as a marshal was in grave jeopardy.

Ex. B (Schwam Tr.) at 159:16-160:19.

*Response:* Admit that Schwam so testified but object to the speculation and opinion testimony.

81. Plaintiff concedes that he had "no[] explicit" reason to believe he would be reappointed as a City Marshal or maintained in a holdover role after the expiration of his five- year term in December 2013. Ex. A (Pl. Tr.) at 136:10-14 ("Q. At any time did anybody tell you that you would be permitted to holdover or be reappointed upon the expiration of your term December 2013? . . . . A. Notexplicit.").

Response: Admit for purposes of this motion that he so testified.

82. Plaintiff told City Councilmember Andrew Cohen that: "*While it is the NYC Civil Court Act Sect 1602 states that a Marshal may be replaced without cause[.] This is true for all Marshals whose terms expire; a marshal whose term has expired can be replaced at will. . . . My agreement to the stipulation was pro-forma. The option to terminate is in the law*

*whether or not I had agreed to the stipulation*." Ex. HH (1/17/2014 Airday Email) at971.

Response: Objection on the ground that Airday is not qualified to provide a legal opinion and that his lay reading of Section 1602 is wrong. Admit to the making of the statement for the purpose of the motion and further state that the context shows that Airday was stating that the law generally gives the courts the power to discipline City Marshals.

83. Prior to commencing this action, plaintiff believed that the reason he was not reappointed as a City Marshal was because: "[Schwam held] animosity and anger at [him] for challenging his order to resign or face charges." Ex. HH (1/17/2014 Airday Email) at971.

*Response*: Admit that Airday made the statement and state that there were other reasons expressed in the email and in the subsequent court pleadings for why the defendants acted as they did against Airday. In addition, Airday states that his statements about Schwam's state of mind are not admissible and incomplete. Finally, a statement of one reason why a person acts does not as a matter of law or as a matter of fact establishes that there are no other reasons also motivating a person to act. See *Leon v. N.Y.C. Dept. of Education,* 612 Fed. Appx. 632, 634-35 (2d Cir. 2015) (error to find that a "termination for cause necessarily precludes the possibility of a termination motivated by unlawful animus.")

COUNTERSTATEMENT

84. DOI and DOF were notified of the arrests of Airday when they happened. PTX 42 (Schwam Emails 12-22-11& 1-18-12); Jordan Tr. 43:5-49:7 (Airday's suspension by DOF followed automatically from Schwam's suspension of Airday); PTX 21 (Schwam Memo at D0222) ("Marshal Airday's towing activity ended on January 18, 2012 and never resumed."); PTX 22 (Schwam Email: "DOI did not approve Marshal Airday to resume towing for the City. In fact, I told his attorney the opposite yesterday [February 8, 2012].").

85. There is no evidence in the record that Airday misrepresented the origins of the Hawes .25 caliber weapon.

86. There is no evidence that Airday was charged with criminal possession of an unregistered firearm, as asserted by the defendant. (City Mem. at p. 4.)

87. Airday always performed satisfactorily as a member of the DOF's Scofflaw Program. (Jordan Tr. 79-80.)

88. Airday did not participate in the DOF Scofflaw Program in February of 2012. Jordan Tr. 43:5-49:7 (Airday's suspension by DOF followed automatically from Schwam's suspension of Airday); PTX 21 (Schwam Memo at D0222) ("Marshal Airday's towing activity ended on January 18, 2012 and never resumed."); Airday Tr. 89:4-90:7 (DOF suspended him from the Scofflaw Program at the time Schwam sent Airday the letter dated January 19, 2012); PTX 23-24 (Airday-Jordan Letters) ("As you know I have not worked in the PVB Marshal Scofflaw Program since Jan 18th, 2012."). In addition, the DOF sent Airday a letter formally stating that it was not providing him with work under the Scofflaw Program because of the pending charges. PTX 17: DOF Letter, dated 5-29-12 (PDX 16)

89. Airday's objections and concerns about Paylock were not limited to concerns about how his job would be performed and his first concern was the means whereby Paylock was selected and the procurement process. PTX 1: Airday Paylock Memo at GA 00015.

90. Although Schwam denied believing that Airday objected to the Paylock proposal, a jury could rationally infer that Schwam knew that Airday was objecting to the Paylock proposal. PTX 1(Airday Memorandum on Paylock, send to Ken Kelly of the Marshal's Association): Schwam Tr. 24:10 ("The Marshals objected [to the Paylock proposal]

as a group."); Schwam Tr. 34:5-35:3 (Airday's memorandum to Kelly reflected the general objections articulated by the group); Jordan Tr. 73:15-22 & 93:15-98:23 (the concerns raised in the Airday memorandum were the concerns raised at DOF meetings with Salkin, and Airday and others often meet at DOF to discuss Paylock); Tang Tr. 70:22-71:19 (Schwam told Tang that there were several City Marshals who objected to Paylock); Salkin Tr. 27:24-35:12 (DOF had several discussions with the City Marshals and Airday's memorandum fall squarely within their concerns as a group).

91. There are several comparable City Marshals who were not harshly disciplined or replaced as Schwam treated Airday: Charles Marchisotto; Joel Shapiro; Howard Schain; and Jeffrey Rose.

92. On June 20, 2008, City Marshal Charles Marchisotto was arrested for aggravated harassment and stalking of his former girlfriend over the course of several months with repeated text messages and tailgating her in his car, and a few days after Marchisotto's arrest, Marchisotto invoke his Fifth Amendment right against self-incrimination at a meeting at DOI with Schwam and his attorney. PTX 28: (Marchisotto Documents). The NYPD Licensing Division also revoked his firearm permit because Marchisotto failed to notify the Licensing Division of the arrest and he failed to cooperate with their investigation. PTX 28 (Licensing Division Decision). Schwam never suspended Marchisotto; never told him to resign; never filed any charges against him. (Schwam Tr. 170:4-171:7.) Marchisotto was also found not guilty of the criminal charges against him on March 25, 2010, but unlike Airday, Marchisotto was never suspended and continues to be a Marshal today.

93. Marchisotto is also a landlord in Brooklyn, owning two large residential buildings. In 2006 Schwam learned that these buildings had over 115 violations with 43 of

those violations deem hazardous by the NYC Department of Buildings for lead paint violations. Schwam told Marchisotto to simply continue in his purported efforts to address the violations and did not take any disciplinary action. PTX 29.

94. On April 20, 2004, City Marshal Joel Shapiro was accused of assault by a victim of allegedassault, and the only step that Schwam took was to issue to Shapiro a letter of admonition. Schwam Tr. 80:16-24 &171:8-172:14; *see also* PTX 31 & PTX 32 (Letter from Schwam to Shain, 12-3-2004) and (DOI notes reflecting letter of admonition)( D2685) . Previously, Shapiro was arrested on November 5, 1985 for menacing and criminal possession of a weapon and was acquitted on July 24, 1986. (PTX 31: (D2772)). In a third incident, on May 5, 2009, Schwam interviewed Shapiro about a claim that he committed perjury during a landlord-tenant proceeding, and Shapiro asserted the Fifth Amendment right against self-incrimination. PTX 33 (Shapiro Perjury Case) at D003174). Schwam took no action to suspend Shapiro and five months after the charge was made, Shapiro resigned his office. (Schwam Tr. 76:8-83:6.).

95. City Marshal Howard Schain was found guilty of misconduct by Schwam, including tampering with official records and filing false records, and paid a fine of $50,000 and agreed to a four-month suspension. At no time during Schwam's investigation of Schain, Schwan did not seek his temporary suspension; did not tell him to resign or cease his activities and after the four-month suspension, Schain resumed duties as a City Marshal and as a part of the Scofflaw Program and after his term expired he was held over and continues to act as a City Marshal. (Schwam Tr. 173:14-179:4; PTX 30 (DOI Press Release on Schain).

96. On March 31, 2009, Schwam resolved disciplinary issues against City Marshal Jeffrey Rose with a $40,000 fine for several violations or other acts of misconduct,

including false arrest and assault; failing to provide DOI with information; preparing and filing false records of his office. (PTX 34 & 35: Rose Stipulation); Schwam Tr. 183:12-184:24; *Schaer v. City of New York and City Marshal Jeffery Rose*, 09-cv-7441 (CM) (MHD), 2011 U. S. Dist. Lexis 36380 (S.D.N.Y. Mar. 25, 2011). In resolving the false arrest and assault charge, the City paid $10,000 and Rose and his attorney paid $5,000. (PTX 35: Rose Settlement Agreement). Although all these events took place while Schwam was the Director of the Marshal's Bureau, Schwam never directed Rose to cease operations during the pendency of the charges either as a City Marshal or as a member of the DOF Scofflaw Program; Rose was held over as a City Marshal after these charges were resolved; and Roses continues to be a City Marshall today. Schwam Tr. 183:12-184:21.

Dated: New York, New York
January 26, 2018

*s/NBS*

Nathaniel B. Smith
225 Broadway – Suite 1901
New York, New York 10007
natbsmith@gmail.com