UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

GEORGE AIRDAY,

                Plaintiff,                14 Civ. 8065

    -against-                        OPINION

THE CITY OF NEW YORK, KEITH SCHWAM, and
DAVID M. FRANKEL,

                Defendants.

------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5-10-18

A P P E A R A N C E S:

### Attorneys for Plaintiff

LAW OFFICE OF NATHANIEL B. SMITH
111 Broadway, Suite 1305
New York, NY 10006
By: Nathaniel B. Smith, Esq.

### Attorneys for Defendants

ZACHARY W. CARTER, ESQ.
Corporation Counsel of the City of New York
100 Church Street, Room 2-122
New York, NY 10007
By: Don H. Nguyen, Esq.

**Sweet, D.J.**

Defendants the City of New York (the "City"), Keith Schwam ("Schwam") and David Frankel ("Frankel") (collectively, the "Defendants") have moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the Amended Complaint ("AC") of plaintiff George Airday ("Airday" or the "Plaintiff") alleging violations of 42 U.S.C. §§ 1983 and 1988, and the First, Fifth, and Fourteenth Amendments of the United States Constitution. Based on the facts and conclusions which follow, the motion of the Defendants is granted in part and denied in part, and the First Amendment claims of the Plaintiff are dismissed.

## I. Prior Proceedings

Airday commenced this action on October 7, 2014 against the City of New York, Keith Schwam, and David Frankel alleging violations of 42 U.S.C. §§ 1983 and 1988, and the First, Fifth, and Fourteenth Amendments of the United States Constitution. In particular, Plaintiff alleged: (1) retaliation against him in violation of his First Amendment right of free speech; (2) violation of his Fourteenth Amendment procedural and

1

substantive due process rights; and (3) violation of his
Fourteenth Amendment right to equal protection.

This Court granted in part and denied in part
Defendants' dismissal motion on September 15, 2015 (the
"September Opinion"). See Airday v. City of New York, 131 F.
Supp. 3d 174 (S.D.N.Y. 2015). In so doing, this Court dismissed
all claims except for "Plaintiff's procedural due process claim
with respect to Defendants' decision to not renew his office in
[December] 2013." Id. at 184.

Plaintiff filed an amended complaint (the "AC") on
October 8, 2015, alleging that Airday was a City Marshal for 29
years from January 1984 through December 2013; that a City
Marshal is a public officer who operates his or her own business
enforcing judgments and collecting fees upon execution of those
judgments on behalf of judgment-creditors who are his clients or
customers; and that as a City Marshal, Airday satisfactorily
performed his duties over the course of his career. (See id. ¶¶
8-17.) Plaintiff further alleges that his five-year term of
office was regularly renewed, consistent with the established
practice of renewing the terms of the other City Marshals. (Id.
¶¶ 13-16.) Discovery proceeded.

Defendants brought the instant motion for summary judgment on January 10, 2018, and it was heard and marked fully submitted on February 21, 2018.

## II. **The Facts**

The facts have been set forth in the Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, (Dkt. No. 76), the Plaintiff's Rule 56.1 Responsive and Counter-Statement, (Dkt. No. 83), and Defendants' Responses to Plaintiff's Local Rule 56.1 Statement, (Dkt. No. 91). The facts are not in dispute except as noted below.

Defendants assert that New York City Marshals ("City Marshals") are officers of New York's court system, empowered to perform sensitive, law enforcement work, including enforcing judgments, garnishing wages, seizing property, and effecting evictions. (Affirmation of Marjorie Landa in Opposition to Respondent's Motion to Dismiss and Cross-Motion for Judgment on the Pleadings dated March 28, 2013 ("Landa Aff."), Ex. I, Dkt. No. 77 at ¶ 8.) City Marshals carry a badge and are permitted to carry a firearm. (Id.) They are entrusted to use both with the utmost discretion. (Id.) The position is one of trust and requires sound judgment and an unwavering commitment to lawful

3

and ethical conduct. (Id.) These statements are objected to by Plaintiff as lacking foundation and instead being legal conclusions rather than statements of fact. (Pl.'s 56.1 ¶ 4.)

Defendants assert that New York City Civil Court Act § 1601(1) authorizes the Mayor to appoint an applicant to a five-year term as City Marshal, (Defs.' 56.1 ¶ 5), but Plaintiff objects to this statement on the ground that it is a conclusion of law, not a statement of fact, for which no response is required. (Pl.'s 56.1 ¶ 5.) Plaintiff further states that City Marshals are appointed in practice to five-year terms that are regularly renewed by way of holdover status or a reappointment process. (Id.) Defendants provide that a City Marshal must seek reappointment before the expiration of his or her term, or risk not being reappointed to office, (Tang-Alejandro Dep. 77:11-18[1].) Again, Plaintiff objects to this assertion as a legal conclusion and states that the evidence from this deposition is inadmissible because the deposition itself lacks foundation and qualification since the statutory provisions cited do not support the contention that an application for reappointment

---

[1] Citations to "Tang-Alejandro Dep." refer to the deposition of Caroline Tang-Alejandro dated August 17, 2017, Ex. D, Dkt No. 77, deposition pages for which were submitted with the Declaration of Garrett S. Kamen dated January 10, 2018 ("Kamen Decl."), Ex. A, Dkt. No. 77, and incorporates the exhibits referenced therein.

before a City Marshal goes into a holdover status is required as a condition to reappointment. (Pl.'s 56.1 ¶ 6.)

New York City Civil Court Act § 1610 authorizes the New York State Appellate Division to discipline, suspend and remove a City Marshal:

> The appellate division may discipline by reprimand or censure, or may temporarily suspend or permanently remove any marshal for cause, provided that written charges are first filed with said court, and that the marshal be given due notice thereof and be afforded an opportunity to be heard at a full and complete hearing. The appellate division may, in its discretion, suspend a marshal from the performance of his or her official duties pending a hearing upon the charges. Upon charges being preferred against a marshal by a judge of the appellate division, such court shall forthwith cause notice of suspension of the marshal to be served upon him or her, and the marshal shall thereupon remain suspended until the hearing and determination of the charges. . . .

(N.Y. City Civ. Ct. Act § 1610.)

In November 1975 and February 1976, the Appellate Division for the First and Second Departments issued Joint Administrative Orders ("JAO") 453 and 456 setting forth the Department of Investigation's ("DOI") supervisory powers, which include the power to conduct investigations into a City Marshal's activities, examine their books and records,

promulgate directives concerning the official records to be kept
by them and the procedures for performing their official duties,
as well as the power to discipline them. (New York City Marshals
Handbook of Regulations effective April 24, 2013 ("Marshals'
Handbook" or the "Handbook"), Ex. J, Dkt No. 77.) JAO 453 also
authorized DOI to promulgate the Marshals' Handbook, which was
approved by the Appellate Division in JAO 542. (Id. at 905-909.)

Plaintiff concurs with the above, but states that §
1601 gives the Appellate Divisions for the First and Second
Department the authority to discipline City Marshals, and the
Appellate Divisions' JAO 456(4) prohibits DOI from immediately
or unilaterally suspending a City Marshal. (Pl.'s 56.1 ¶ 8.)
Plaintiff further states that JAO 453(8) provides that a City
Marshal can be disciplined for "failure to testify concerning
his official duties at an investigative or administrative
hearing held at the [DOI] after being granted immunity for the
use of the testimony in a criminal proceeding." (Marshals'
Handbook at 908.) Plaintiff asserts that the Marshals' Handbook
similarly provides a City Marshal with protection against self-
incrimination in that a refusal to answer questions or provide
information is grounds for discipline "after the marshal has
been advised that neither his or her statement nor any
information or evidence derived therefrom will be used against

6

the marshal in a subsequent criminal prosecution other than for perjury or contempt arising from such testimony." (Id. at 731.)

The Marshals' Handbook provides that "(a) No person shall prevent, seek to prevent, interfere with, obstruct, or otherwise hinder any study or investigation conducted pursuant to the New York City Charter, [JAO] 453, or this Handbook. A marshal's violation of this subsection shall constitute cause for removal from office or other appropriate penalty. . . . (b) Full cooperation with the [DOI] shall be afforded by every city marshal. . . . A marshal's violation of this subsection shall constitute cause of removal from office or other appropriate penalty. . . ." (Id. at 731.) Moreover, Section § 1-16 of the Handbook provides that: "If the criminal charges bear upon the marshal's fitness for office, the pendency of such charges may be a cause for disciplinary action, including but not limited to an application to the Appellate Divisions for the marshal's suspension pending a hearing or pending resolution of the criminal charges." (Id. at 735-36.)

A City Marshal's day-to-day activities are overseen by two different mayoral agencies, the DOI and the Department of Finance ("DOF"). (Deposition of Louis Jordan dated August 8, 2017 ("Jordan Dep.") Ex. C, Dkt. No. 77 at 38:22-39:04.) Keith

7

Schwam ("Schwam") served as the Director of the Marshals' Bureau at DOI, and Louis Jordan ("Jordan") served as the Director of the Marshal Program at DOF. (Deposition of Keith Schwam dated March 30, 2017 ("Schwam Dep.") Ex. B, Dkt. No. 77 at 7:21-24; Jordan Dep., Ex. C. at 12:15-19; Deposition of George Airday dated March 29, 2017 ("Airday Dep.") Ex. A, Dkt. No. 77 at 33:06-10.)

Plaintiff was appointed to a five-year term as a City Marshal with Badge Number 7 on January 24, 1984 by Mayor Edward Koch. (Airday Dep. at 17:04-05, 20:22-25.) After Plaintiff submitted an application for re-appointment, Mayor Michael Bloomberg re-appointed Plaintiff on January 22, 2009 with a stated expiration date of December 20, 2013. (Re-appointment Letter by Mayor Bloomberg dated January 22, 2009 ("Bloomberg Letter") Ex. K, Dkt. No. 77.) Plaintiff states that this statement skips over two decades of history where he was regularly held over and re-appointed, along with other marshals. (Pl.s' 56.1 ¶ 13.) Plaintiff's five-year term as a marshal expired on December 20, 2013. (Airday Dep. at 106:13-15.)

The DOF oversees the New York City Scofflaw Program ("Scofflaw Program"), a program in which the DOF enforces parking related fines and judgments against offending owners by,

among other things, securing or towing vehicles. (Id. at 26:22-27:02.) Defendants assert that the Scofflaw Program can be effectuated in a number of ways, including but not limited to the use of City Marshals, New York City Sheriffs, and collection agencies. (Deposition of Andrew Salkin dated November 21, 2017 ("Salkin Dep.") Ex. E, Dkt. No. 77 at 55:10-24.) However, Plaintiff denies this statement. (Pl.'s 56.1 ¶ 16.) Defendants further provide that DOF may select, suspend, and remove a City Marshal from the Scofflaw Program at any time and for any reason. (Jordan Dep. at 47:13-18.) Plaintiff disagrees with this statement to the extent that it is a conclusion of law. (Pl.'s 56.1 ¶ 17.)

Plaintiff served in the Scofflaw Program, where his responsibilities included the enforcement of parking and related fines and judgments against vehicles and their owners by towing vehicles, enforcing and collecting on the unpaid fines and judgments, and otherwise taking responsibility for the care, custody, and control of the vehicles. (Am. Compl. at ¶¶ 20-21.) Plaintiff provides that over time about 12-14 City Marshals, including Plaintiff, were part of the DOF's Scofflaw Program at the relevant times and not all City Marshals were part of the Scofflaw Program. (Pl.'s 56.1 ¶ 11.) Plaintiff, like each City

Marshal, was "assigned" to specific "areas of enforcement."
(Airday Dep. at 31:20-32:24.)

Plaintiff asserts that Jordan provided that Plaintiff always performed satisfactorily as a member of the DOF's Scofflaw Program, (Jordan Dep. at 79-80), but Defendants state that there were "minor" issues that "raised questions or concerns" about whether Plaintiff should be allowed to participate in the Scofflaw Program (Id. at 78:21-79:21.)

The DOF initiated the Paylock Booting Program ("Paylock Booting Program" or the "Booting Program"), a program in which a metal boot is affixed to a wheel of a vehicle as an alternative means to compel payment of unpaid fines and judgments. (Airday Dep. at 47:15-21.) In other words, the Booting Program is an "open procurement that [the City] put on the street" for a "self-removing booting system with supporting turnkey technology that included the payment process and vehicle finding systems." (Salkin Dep. at 17:21-18:05, 19:05-15.) Defendants assert that the City engaged in an "open procurement" in which it invited bidders to respond, and to which Paylock and other bidders responded. (Id.) Plaintiff disagrees with this statement, instead noting that this contract (the "Paylock Contract") was a five-year no-bid contract with the City for up

10

to $70,152,000.00. (See Airday Dep. at 134:2-22; Schwam Dep. 34:23-36:11.) Defendants further assert that Schwam and Jordan had no involvement in the negotiation of or approval of the Paylock Contract, (see Schwam Dep. at 60:16-21; Jordan Dep. at 32:14-25); however, Plaintiff alleges that both Schwam and Jordan admitted to having discussions about objections and concerns raised by the City Marshals over the Paylock proposal. (Schwam Dep. at 16:22-21:11.)

From 2010 to 2012, Plaintiff alleges that he "question[ed] the appropriateness and the legality of the Paylock [B]ooting [P]rogram," and "disseminated his analysis and criticisms" to "Ken Kelly and the other marshals in the program." (See Am. Compl. at ¶¶ 32, 34, 39; Airday Dep. at 53:04-08, 54:18-25.) In his capacity as Executive Director of the City Marshal Association, Ken Kelly ("Kelly") served as "spokesperson" for the City Marshals and expressed concerns about Paylock on the association's behalf. (See Schwam Dep. at 24:09-23; Airday Dep. at 33:11-20.)

Plaintiff identified a number of inquiries that he allegedly made to Kelly and the other City Marshals, all of which concerned the program's implementation and operation including the following inquiries: (a) "how Paylock was chosen

by the City and whether a no-bid contract was appropriate and legal"; (b) "who would be in charge under the proposal for tracking fines paid to Paylock"; (c) "who would be responsible for supervising Paylock"; (d) "what fees would be charged to the vehicle owners"; (e) "what would be the City Marshal's law enforcement and administrative roles, if any, in the booting process"; (f) "what would . . . Paylock's fee be under the proposed system"; (g) "whether a vehicle could be legally 'un-booted' upon payment of the outstanding fines and judgments and left operational on City streets where the vehicle's registration status had expired and the vehicle cannot under law be parked or operated on public streets"; and (h) "whether it was appropriate to omit or disregard necessary and legal guidelines from the Paylock [B]ooting [P]rogram." (Am. Compl. at ¶¶ 39-40.)

Plaintiff alleges that he contacted four elected officials in 2011 and "early 2012" to "create political pressure to oppose the Paylock Booting Program" by notifying them that Paylock "was not properly designed and that the program [was] a mistake and the fact that it was done without open bid." (See Am. Compl. at ¶ 36; Airday Dep. at 135:14-20.) Plaintiff further alleges that he spoke to City Council Member Oliver Koppell ("Councilman Koppell") in a "casual" manner on two or more

12

occasions before and after March 2011 when he saw the Council member walking "on the street," where he "told him that it would be a good idea if he and the City Council looked into this proposal that seems . . . to be way off the reservation." (Am. Compl. at ¶ 37.) Plaintiff states that he testified to bringing up the issue at least twice with Councilman Koppell. (Id.)

Plaintiff also alleges that he spoke to a person in the "contracts department" at the Office for the New York City Comptroller in or around March 2011 to ask "if they had any information about the [Paylock] contract; if they were aware of it[,] [a]nd that it seems as if there's a problem with this proposed contract." (See Airday Dep. at 57:16-60:02; Am. Compl. at ¶ 37.) Plaintiff did not communicate with Schwam or anyone else at DOI about his concerns as to Paylock. (Airday Dep. at 60:03-07.) Moreover, Plaintiff did not communicate with Frankel about Paylock in any manner, and did not communicate with Jordan about Paylock until after the program had "already started," (see Airday Dep. at 60:21-61:09; 136:04-08), although Plaintiff denies the statement with respect to Jordan, (see id. at 60:21-61:25; Jordan Dep. at 93:23-100:16.)

On December 21, 2011, Plaintiff was arrested and charged with assault in the third degree (a class A

misdemeanor), menacing in the third degree (a class B misdemeanor), and harassment in the second degree following an incident with his fiancée. (Schwam Email, dated May 30, 2012 ("May 30, 2012 Schwam Email"), Ex. L.) Those charges were filed by the Bronx District Attorney's Office in the Bronx Supreme Court, Criminal Division. (Id. at 238-39.) The criminal complaint charged that Plaintiff "shoved" his fiancée to the ground, "struck her several times in the face with an open hand," and threatened to "kill" her, and further charged that Plaintiff's actions caused his fiancée to sustain "bruising and swelling to her lower back and face and experienced annoyance, alarm and fear for her physical safety." (Id.)

In response to this allegation, Airday admits that Lynda Schaefer ("Schaefer") made a criminal complaint against him but denies that she was his "fiancée" on the ground that she was his girlfriend. (Airday Dep. at 62:5-10.) Plaintiff further states that he was acquitted of the charges after a trial when the court found that the complaining witness was not credible. Judge Ruben Franco of the Bronx County Criminal Court issued an Order of Protection ("OP") against Plaintiff on December 22, 2011 that directed Plaintiff to "surrender any and all . . . firearms owned or possessed." (May 30, 2012 Schwam Email, Ex. L at 243.) Plaintiff was advised in court of the contents of the

14

OP, and it was served on him in court later that day. (Pl.'s
56.1 ¶ 29.)


        In the early morning hours of December 22, 2011,
before the OP was issued and while Airday was locked up at the
local precinct on the charge, Plaintiff admits that he gave the
arresting police officer the information and access required to
take his five weapons from his safe at home. (May 30, 2012
Schwam Email, Ex. L at 243.) The New York City Police Department
("NYPD") took custody of five handguns in Plaintiff's possession
during the overnight period of December 21-22, 2017. (Id. at
240-42.) The arresting police officer searched the safe, which
is three feet square, and stopped searching after finding five
guns, not locating a sixth gun that Airday had been given in
1980 when he was a probation officer. (Pl.'s 56.1 ¶ 30.)
Plaintiff alleges that he did not recall that he owned a sixth
gun, a small handgun given to him 30 years prior, which he never
used and for which he did not even have any bullets. (Id.)
Plaintiff further provides that when he received this sixth gun
in 1980, he was not required to register it as he was a peace
and probation officer at the time. (Id.) Each of the five guns
retrieved was listed with a detailed description, including its
make, model number, caliber, color, and serial number, on the
NYPD property clerk's invoice that the arresting Officer

                              15

prepared on December 22, 2011. (May 30, 2012 Schwam Email, Ex. L. at 240-42.)

On December 22, 2011, DOI learned that "[plaintiff] was arrested last night (12/21/2011 at about 10 p.m.) . . . on a domestic violence complaint by his fiancée." (Dec. 22, 2011 Schwam Email, Ex. M, Dkt. No. 77.) Airday notes that the complaining witness was his girlfriend, not his fiancée. (Pl.'s 56.1 ¶ 31.)

On January 10, 2012, the Bronx District Attorney's Office notified DOI that the "injuries [allegedly caused by plaintiff] to the complainant [were] more severe than originally believed and that she had some broken ribs." (Email from Teresa Pinckney dated January 10, 2012 ("Pinckney Email"), Ex. N, Dkt. No. 77.) Plaintiff denies this assertion, and provides instead that the injuries Pinckney refers to occurred earlier in the month of December 2011 when Plaintiff's girlfriend was in a car accident. (Pl.'s 56.1 ¶ 32.)

On January 13, 2012, the NYPD License Division mailed a letter to Plaintiff advising him that his gun licenses were suspended and instructing him to surrender any and all firearms immediately to his local precinct. (May 30, 2012 Schwam Email at

245-46.) On January 18, 2012, the NYPD License Division notified detectives that a gun registered to Plaintiff had not been turned over on December 22, 2011, following Plaintiff's arrest, and that one of the five guns removed on that date was unregistered. (Airday Dep. at 72:25-76:01.) However, Plaintiff denies this statement. (Pl.'s 56.1 ¶ 34.)

On January 18, 2012, Plaintiff was arrested on charges of (1) criminal contempt and criminal possession of a weapon based on his possession of a .22 caliber Derringer in violation of the OP, and (2) criminal possession of a weapon, specifically, an unregistered .25 caliber Hawes handgun. (May 30, 2012 Schwam Email at 247-48.) The criminal complaint, filed by the Bronx District Attorney's Office in Bronx Supreme Court, Criminal Division, charged Plaintiff with criminal contempt in the second degree (a class A misdemeanor). (Id.) Plaintiff denies these statements, and contends that he was only charged with the first count of criminal contempt. (Id. at 247.)

Plaintiff asserts that there is no evidence in the record supporting that he misrepresented the origins of the Hawes .25 caliber weapon. (Pl.'s 56.1 ¶ 86.) Defendants object to this statement on the grounds that Plaintiff has failed to cite admissible evidence, and that it is instead based on

17

uncorroborated, self-serving hearsay contradicted by the record evidence. (Defs.' Responses to Pl.'s 56.1 ¶ 85.) NYPD determined that the Hawes .25 firearm taken from Plaintiff on December 22, 2011 was unregistered and unlicensed and on January 20, 2012, Plaintiff's attorney represented to DOI that the "unlicensed gun that was recovered from [Plaintiff's] safe . . . belong[ed] to his father and when his father passed away [Plaintiff] put it in his safe for safe keeping." (Litwack letter to Schwam, dated January 20, 2012 ("Litwack Letter to Schwam"), Defs.' Ex. P at 31.) Plaintiff later testified instead that he received this firearm from a "supervisor at the Probation department" in 1980, i.e., several years before Plaintiff became a City Marshal. (Airday Dep. at 68:14-19.)

By email dated January 19, 2012, Schwam informed Commissioner Rose Gill Hearn ("Commissioner Hearn") that:

> [Y]esterday evening . . . Airday . . . was arrested and charged with 2 counts of Criminal Possession of a Weapon (firearm) and Criminal Contempt, both class A misdemeanors. These are arrest charges . . . . The contempt charge and one weapon charge is based on his possession yesterday of a handgun, in his residence, in violation of an Order of Protection issued on December 22, 2012, which in turn was a result of his arrest the previous day on an assault charge in a domestic incident involving his fiancée. Yesterday, the police . . . went to Airday's Bronx residence in response to the NYPD Licensing Division's report that one of the firearms on his license was not turned in on 12/22/2011.

> I have told [Airday's attorney] Ken Litwack that under
> these circumstances, Airday cannot be permitted to
> perform the duties of a marshal and that he should
> resign. Litwack does not disagree . . . . I am sending
> both of them a letter that says the same and that
> unless Airday resigns we will be compelled to seek his
> immediate suspension and removal.
>
> I am also directing him pending further instructions
> to cease performing duties other than redeeming cars
> already in his custody (a function that his office
> staff handles). Will keep you posted.

(Schwam Email to Hearn, dated January 19, 2012 ("Jan. 19, 2012

Schwam Email to Hearn"), Ex. O, Dkt. No. 77.) The statement is

objected to as hearsay, speculation, and for lack of personal

knowledge. (Pl.'s 56.1 ¶ 36.)


        In making this recommendation, Defendants allege that

Schwam relied on the "police report" and "the records of the

guns that were recovered from Marshal Airday's premises on two

occasions, which came from the police[;] . . . there were

conversations between [the] detectives or investigators at DOI

and [the] detectives [and] police officers at the police

department. We also had records at DOI that in effect listed all

the guns that we know about that Marshal Airday had. [Schwam]

also . . . had a discussion with [Airday's attorney] Ken

Litwack, who made certain representations about what had

occurred." (Schwam Dep. at 101:23-102:20.) Defendants allege

that Commissioner Hearn acknowledged Schwam's recommended course

of action, (see Jan. 19, 2012 Schwam Email to Hearn); however
Plaintiff denies this statement.

On January 19, 2012, Schwam sent a letter to Plaintiff
requesting that he resign his appointment as a City Marshal:

> [DOI] has been informed that you were arrested
> on . . . January 18, 2012 and charged by the arresting
> officer with two counts of Criminal Possession of a
> Weapon (firearm) in the Fourth Degree and Criminal
> Contempt in the Second Degree, both class A
> misdemeanors, based in part upon your possession
> yesterday of a handgun, recovered by the Police, in
> violation of an Order of Protection dated December 22,
> 2011 and upon your possession on December 22, 2011 of
> an unregistered handgun. That arrest follows closely
> your arrest on December 21, 2011 on assault and other
> charges in a domestic incident, which resulted in the
> above-mentioned Order of Protection. Furthermore the
> Police Department reports that a handgun listed on
> your license was not turned in by you and is
> unaccounted for.
>
> Under these circumstances, you cannot be permitted to
> hold office and perform the duties of a City marshal,
> and this Department will be compelled to seek your
> removal and immediate suspension unless you
> immediately submit your resignation. Pending that
> resignation or suspension you are not to perform any
> duties other than the orderly redemption of vehicles
> and collection and remittance of funds in relation to
> vehicles already in your custody and all necessary
> recordkeeping attendant to those activities. You are
> not to perform any other functions without express
> written authorization of this Department. Upon
> resignation you will be responsible to comply with the
> wind-down procedure specified in Joint Administrative
> Order 453 and the Marshals Handbook.

(Schwam Email to Airday, dated January 19, 2012 ("Schwam Email
to Airday"), Pl.'s Ex. 4, Dkt. No. 86-4.) In this letter, Schwam

advised Plaintiff that he could continue to "collect money" and "release vehicles," as well as "perform the functions that involved the accounting for the money and remitting it." (Id.)

On January 20, 2012, Plaintiff's attorney, Ken Litwack ("Litwack"), sent a letter to DOI setting forth Plaintiff's account of the two arrests. In that letter, Litwack made the following representations:

> I am following up on our conversation . . . in which I proposed that Marshal Airday be allowed to maintain his office with his duties severely circumscribed until the matters before the Criminal Court are sorted out. Under my proposal Marshal Airday will not be allowed to do any work whatsoever in the field . . . I have spoken to the Marshal and he will be willing to agree to this . . . .

> I know that there are some troubling facts here and I know that if any of the negative inferences that can be drawn from these facts are established it would not bode well for the Marshal . . . . I am requesting that the Marshal be put on limited duty, pending the outcome of these matters . . . .

(Litwack Letter to Schwam at 30-31.) Plaintiff objects to this email as inadmissible under Rule 408 of the Federal Rules of Evidence in that it reflects an attempt by Litwack to reach a resolution of the dispute with DOI, and that it is being improperly used as an alleged admission of liability in violation of that Rule. (Pl.'s 56.1 ¶ 41.) Moreover, Plaintiff contends that the letter is cited out of context in that the offer of compromise by Plaintiff's counsel was that Plaintiff

21

would not be required to close his office and that an Associate Marshal would carry out Plaintiff's City Marshal duties while the criminal charges remain pending. (Id.) Schwam responded to Litwack's letter that same day. (Schwam Letter to Litwack, dated January 20, 2012 ("Schwam Letter to Litwack"), Defs.' Ex. P at 27-29.)

The January 23, 2012 DOI Weekly Status Report states that: "City Marshal Airday was arrested on charges relating to possession of handguns either not on his license or in his possession after an Order of Protection required his surrender of all guns. Discussions with his attorney re[garding] possible resignation are underway." (DOI's Weekly Status Report, dated January 23, 2012 ("DOI Weekly Status Reports"), Defs.' Ex. Q at 23.) The statement is objected to by Plaintiff on best evidence and hearsay grounds. (Pl.'s 56.1 ¶ 43.)

On January 30, 2012, DOI instructed Plaintiff to provide documents by the following day, January 31, 2012, related to his NYPD-issued handgun licenses and handguns identified by the NYPD as having been in his custody, including but not limited to: (1) a copy of the criminal complaint; (2) any correspondence or notices he received from the NYPD on or after December 22, 2011 regarding his handgun licenses; (3)

22

copies of all applications for handgun licenses and renewals;
(4) records reflecting the loss, theft, or transfer of any
handgun and any notifications to the NYPD of such loss, theft,
or transfer; and (5) any and all records relating to the above-
described Derringer and Hawes handguns. (Pinckney Letter to
Plaintiff, dated Jan. 30, 2012 ("Pinckney Letter to Plaintiff"),
Defs.' Ex. R at 61.) Defendants state that Plaintiff did not
produce the requested documentation by the date directed in the
above-mentioned letter. (Defs.' 56.1 ¶ 45.) On January 31, 2012,
Plaintiff's attorney, Stuart London ("London"), posed two
questions to Schwam: (1) whether Plaintiff could resume his tow
operation using an Associate Marshal; and (2) whether DOI would
bring departmental charges against Plaintiff if he refused to
resign as City Marshal. (London Letter to Schwam, dated Jan. 31,
2012 ("London Letter to Schwam"), Defs.' Ex. S at 36.)

Defendants assert that on February 7, 2012, DOF
learned from Plaintiff that he had been arrested in December
2011 and January 2012. (Jordan Dep. at 40:23-41:06.) Jordan
contacted his supervisor, New York City Sheriff Edgar Domenech
("Sheriff Domenech"), to advise him of the situation and, in
response, Sheriff Domenech requested Jordan "send him a
recommendation." (Id. at 44:13-20.) Plaintiff denies these
statements, and instead provides that DOI and DOF were notified

23

of Plaintiff's arrests when they happened, and that DOF
suspended Plaintiff when DOI suspended him. (See Pl.'s 56.1 ¶
46.)

The following day, on February 8, 2012, Jordan sent a
recommendation to Sheriff Domenech advising that Plaintiff not
be "reinstated [into the Scofflaw Program] due to lack of
notification to DOF of the incident and not hearing from him
until . . . yesterday February 7, 2012." (Jordan Letter to
Domenech, dated Feb. 8, 2012 ("Jordan Letter to Domenech"),
Defs.' Ex. T at 946.) Plaintiff denies this statement, and notes
that Jordan testified that DOI suspended Plaintiff in January of
2012 and that suspension from the Scofflaw Program was therefore
automatic following his suspension by Schwam. (Pl.'s 56.1 ¶ 47.)
Plaintiff further states that the DOF sent Plaintiff a letter
formally stating that it was not providing him with work under
the Scofflaw Program because of the pending charges. (Id.)

In response to a request by Sheriff Domenech that DOI
state its position, Schwam stated in relevant part that:

> My understanding is that it is DOF's discretionary
> decision to choose which marshal or marshals to
> enforce the City's judgments, including the decision
> not to have Airday towing for the City. I believe that
> is an entirely appropriate decision, given the pending
> criminal charges, including that of violating the
> Court's order of protection, particularly when the

24

work of a City marshal, for DOF and others, is to
enforce court orders. I also understand that you have
additional operational concerns, including, among
others, Airday's failure to notify you or provide
information to DOF regarding his status in the weeks
since his January 18 arrest, during which he was not
towing.

(Schwam Letter to Domenech, dated Feb. 9, 2012 ("Schwam Letter

to Domenech"), Defs.' Ex. T at 945.) Plaintiff objects to this

statement as hearsay. (Pl.'s 56.1 ¶ 48.)


Defendants assert that Sheriff Domenech accepted

Jordan's recommendation that Plaintiff not be reinstated into

the Scofflaw Program and "made the decision to remove Marshal

Airday from the Scofflaws . . . Program" on February 9, 2012.

(Jordan Dep. at 47:09-48:10.) However, Plaintiff states that he

was removed as a result of actions taken by the DOI, and not

based on Sheriff Domenech's decision and Jordan's

recommendation. (Pl.'s 56.1 ¶ 49.)


In separate and in conjunction, Defendants assert that

the December 2011 arrest, the January 2012 arrest, and the

failure to notify DOF of the two arrests formed a sufficient

basis to terminate Plaintiff from the Scofflaw Program. (Jordan

Dep. at 55:06-20.) Plaintiff denies this statement, and states

that Jordan testified that the official position of DOF was set

forth in the letter by its counsel on May 29, 2012, which states

that Plaintiff was suspended because of the pending criminal charges. (Grossel Letter to Sterinbach, dated May 29, 2012 ("Grossel Letter to Sterinbach"), Pl.'s Ex. 17.)

In a letter dated February 10, 2012, DOI advised Plaintiff that: "It is [DOI's] position that under the circumstances . . . [that] Airday needs to step down, following a brief wind-down period. It is our hope that rather than attempting to prolong the process, the marshal will avail himself of the opportunity he is being offered to bring his business as a City marshal to an orderly and responsible conclusion, deal with the criminal charges he faces, and put this matter behind him." (Schwam Letter to London, dated Feb. 10, 2012 ("Schwam Letter to London"), Defs.' Ex. U at 689.) DOI added, "[l]eaving aside the domestic violence allegations, Marshal Airday's failure to comply with a court order fully and scrupulously, while already facing criminal charges in a matter as serious as this one, demonstrates a lack of fitness for his office." (Id. at 690.) Plaintiff denies that the charges or allegations demonstrate a lack of fitness to serve as City Marshal. (Pl.'s 56.1 ¶ 52.)

The February 13, 2012 DOI Weekly Status Report reports that: "DOI's position is that Airday must resign." (Jan. 23,

26

2012 DOI Status Report). Plaintiff objects to this statement as hearsay. (Pl.'s 56.1 ¶ 53.)

Defendants provide that in a letter dated February 13, 2012 and a letter dated February 17, 2012, Plaintiff's attorney informed DOI that Plaintiff would not provide the documentation requested by DOI unless DOI filed formal disciplinary charges against him. (May 30, 2012 Schwam Email.) Plaintiff denies this statement and provides that he was not able to provide the requested documents due to the pending criminal charges, which took precedent over administrative proceedings. (Pl.'s 56.1 ¶ 54.)

On February 17 and on February 23, 2012, DOI advised Plaintiff's attorney that Plaintiff's continuing failure to comply with DOI's instruction was a breach of his legal obligations under the City Charter, the Marshals' Handbook, and JAO 453, and was obstructing DOI's investigation. (May 30, 2012 Schwam Email at 253-54.) On May 30, 2012, DOI filed Charges and Specifications with the Appellate Division for the First and Second Departments. (Id. at 226-28.) Charge One alleged that Plaintiff interfered and failed to cooperate with an investigation by the DOI into issues related to his handguns and discrepancies in his handgun license records uncovered by the

NYPD in the wake of his arrests, and that this conduct violated Chapter I, §§ 1-9(a) and (b) of the Marshals' Handbook. (Id. at 227.) Charges Two and Three alleged that Plaintiff had been arrested in December 2011 and January 2012 with charges stemming from those arrests pending in criminal court, in violation of New York City Civil Court Act § 1610 and Chapter I, § 1-1 of the Marshals' Handbook. (Id. at 227-28.) Plaintiff confirms the above, but asserts that Schwam was the one who filed the charges. (Pl.'s 56.1 ¶ 56.)

On June 1, 2012, DOI served Plaintiff and Plaintiff's attorney with the Charges and Specifications. (Schwam Email to Airday & London, dated June 1, 2012 ("Schwam Email to Airday & London"), Defs.' Ex. V.) Plaintiff states that Schwam emailed the charges to the Appellate Division on May 30, 2012 and failed to provide him with notice of the charges until two days later on June 1, 2012 because the Appellate Divisions told Schwam to make such service of process. (Pl.'s 56.1 ¶ 57.)

On June 11, 2012, the Appellate Division for the First and Second Departments issued JAO 2012-1, which suspended Plaintiff from serving as a City Marshal pending a hearing on the Charges and Specifications. (Joint Administrative Order 2012-1, dated June 11, 2012 ("JAO 2012-1"), Defs.' Ex. W at 364-

28

65.) On June 13, 2012, DOI Deputy Commission & General Counsel Marjorie Landa ("Deputy Landa") filed the Charges and Specifications with the New York City Office of Administrative Trials and Hearings ("OATH"). (Landa Letter to OATH, dated June 13, 2012 ("Landa Letter to OATH"), Defs.' Ex. X at 382-83.)

On July 2, 2012, OATH Administrative Law Judge Faye Lewis granted the parties' request to adjourn In the Matter of Department of Investigation v. George Airday, No. 12-2038 (July 2, 2012) pending the resolution of the matters pending in criminal court. (Defs.' Ex. Y.) On October 19, 2012, Plaintiff was found not guilty as to the charges stemming from the December 2011 arrest and the Bronx District Attorney's Office elected to dismiss the remaining charges on March 1, 2013. (Sterinbach Letter, dated March 4, 2013 ("March 4, 2013 Sterinbach Letter"), Defs.' Ex. Z.) DOI contacted OATH and Plaintiff on March 7, 2013 to reinstate Charge One of the Charges and Specifications. (Kearney Letter to OATH, dated March 7, 2013 ("March 7, 2013 Kearney Letter to OATH"), Defs.' Ex. AA.)

In April and May 2013, DOI and Plaintiff's attorney discussed resolving the disciplinary proceeding pending before OATH by way of a "fine, with Airday to be replaced at the end of

his term in December 2013." (See Jan. 23, 2012 DOI Status Report
at 748-749, 765-766, 779-780 & 806-807.) Plaintiff denies this
statement, noting that the DOI Status Report is hearsay and does
not support the contention that there was discussion about
Plaintiff being replaced. (Pl.'s 56.1 ¶ 63.) Also, Plaintiff
states that Schwam testified that he did not give notice to
Plaintiff when he replaced him and that he did not feel
obligated to tell Plaintiff what he was going to do "down the
road." (Schwam Dep. at 158:14-160:19 & 224:20-23.)

On May 23, 2013, the Appellate Division for the First
and Second Departments received a stipulation executed by
Plaintiff, Plaintiff's attorney, and DOI resolving the formal
disciplinary proceeding pending before OATH.(Stipulation, dated
May 20, 2013 ("the Stipulation"), Defs.' Ex. BB at 850-52.) By
entering into this Stipulation, Plaintiff agreed: (i) to "plead
guilty to some administrative charge, [i.e.,] not cooperating
with DOI"; (ii) to pay a $7,500 fine as the penalty for his
failure to provide DOI with the documents specified in Charge
One of the Charges and Specifications; (iii) to "fully cooperate
with DOI's investigation of his conduct"; and (iv) that his
guilty plea would be "filed as a public record in DOI and with
the Appellate Divisions of the New York State Supreme Court . .
. and will be considered for all purposes as part of Marshal

Airday's official record." (See id.; Airday Dep. at 96:02-11.)
Plaintiff further states that the Stipulation provides that
Charges Two and Three are withdrawn and that the Stipulation was
the "final disposition" of Charge One. (Pl.'s 56.1 ¶ 65.)

In a May 29, 2013 email sent to Plaintiff's attorney
and the Appellate Division for the First and Second Departments,
DOI clarified that the Stipulation was a "final disposition of
Charge One" and warned that it "does not resolve the underlying
issues or foreclose the possibility of future disciplinary
charges." (Agostino Email to Schwam, dated May 28, 2013
("Agostino Email to Schwam"), Defs.' Ex. CC at 891.) Plaintiff
denies this statement, and provides that the evidence does not
show that Schwam sent the email to Plaintiff's counsel. (Pl.'s
56.1 ¶ 67.)

On June 11, 2013, the Appellate Division for the First
and Second Departments issued JAO 2013-5 lifting Plaintiff's
suspension, which began one year earlier on June 11, 2012.
(Tang-Alejandro Dep. at 61:23-62:10.) Also in June 2013 and in
accordance with the Stipulation, Plaintiff was questioned by DOI
about the circumstances giving rise to the gun charges. (Airday
Dep. at 97:25-98:23.) Plaintiff stated, among other things, that
he had "forgotten" that he possessed an unlicensed firearm and

31

admitted that he never "registered" that firearm. (Id. at 71:15-17 & 99:09-18.) Tang-Alejandro testified that "it didn't seem that [Plaintiff] was cooperating with Mr. Schwam's investigation." (Tang-Alejandro Dep. at 61:23-62:10.) Following this questioning, on June 11, 2013 Plaintiff's suspension was lifted and he resumed working as a City Marshal. (Airday Dep. at 102:20-22.)

In an October 23, 2013 memorandum entitled "Appointment of New City Marshal to Succeed City Marshal George Airday," Schwam recommended that "one of the four prospective new City Marshals be appointed to succeed City Marshal George Airday, Badge No. 7, upon expiration of his term on December 20, 2013." (Schwam Memorandum, dated Oct. 23, 2013 ("Schwam Memo"), Defs.' Ex. EE.) In this memorandum, Schwam detailed the basis for his decision, which included among other things: (1) Plaintiff's possession of an "unlicensed gun"; (2) Plaintiff's failure to "list all of his guns" on numerous applications throughout his tenure as a City Marshal; (3) the disclosure on June 14, 2013 that Plaintiff misrepresented the origin of the unlicensed gun to DOI investigators in January 20, 2012; and (4) Plaintiff's refusal to provide documents and records to DOI, which was the subject of Charge One in the above-described

Charges and Specifications that resulted in Plaintiff's one year suspension and a $7,500 fine. (Id. at 987-88.)

Defendants further state that Schwam made a recommendation to the "Office of the Mayor" that "Marshal Airday's successor be appointed to the office that [Airday] held, which in effect would replace Marshal Airday as a City marshal in accordance with the New York City Civil Court Act that expressly authorizes that." (Schwam Dep. at 65:03-67:17.) Schwam identified the "reasons for recommending that [the Office of the Mayor appoint a successor upon the expiration of Airday's term] . . . had to do with Marshal Airday's conduct and judgment that was exposed in the aftermath of his two arrests in December 2011 and January 2012." (Id. at 68:24-69:10.) In particular, Schwam testified that:

> It involved several elements. One, the marshal was in possession unlawfully of two firearms. Two, the fact became known after the marshal was arrested on a domestic violence charge, and was under an obligation to surrender all of his firearms. The fact that he was arrested within four weeks of the domestic violence arrest with facts that indicated that he had not surrendered all his firearms as directed by the court, and that he had been in possession for some period of time before his domestic violence arrest of an unregistered firearm were the principal acts that caused me to make the recommendation.
>
> Those acts . . . reflected judgment that fell far short of the standard that I believe was warranted for someone who is, Number 1, [a] mayoral appointee; and Number 2, holding the position that involves the

scrupulous attention to rules, court orders, and adherence to the law in situations that involve actions that – the position involves actions at ken against members of the public.

[T]he position involves a mayoral appointment, a delegation of very serious authority to take away people's property, to remove people's vehicles, to remove people from their homes, to remove money from people's bank accounts. Those are very serious responsibilities that call for uncompromised integrity, mature judgment, adherence, scrupulous adherence to rules, laws and court orders and basic seriousness in how the person goes about conducting their affairs both personal and official.

The conduct that I described and the fact that the marshal having been arrested once failed to do the things that were required of him to stay well clear of being arrested again, and that he had not done those things and that, in fact, done the opposite, said to me that we need[ed] to replace Marshal Airday.

(Id. at 69:11-71:07.) Plaintiff denies that Schwam made any "recommendation" because Schwam testified that he acted unilaterally and did not obtain or seek approval for his decision. (Id. at 148:9-150 & 213:23-217:23.)

The December 6, 2013 DOI Weekly Status Report reports that: "We expect that a new marshal, already approved and qualified, will be appointed to succeed City Marshal George Airday upon expiration of Airday's term on December 20. Special Investigator Caroline Tang-Alejandro is coordinating the prospective marshal's completion of the necessary statutory steps (bond, oath, badge, etc.)." (DOI Weekly Status Report at

34

937-938 & 943-944.) Plaintiff objects to this statement as
hearsay. (Pl.'s 56.1 ¶ 74.)

Plaintiff's five-year term as a marshal expired on
December 20, 2013. (Airday Dep. at 106:13-15.)

The December 20, 2013 DOI Weekly Status Report reports
that: "A letter of appointment for new City Marshal Frankie
Alvarez signed by the Mayor will be issued . . . appointing
Alvarez to the office that will be vacant upon the expiration of
City Marshal George Airday's term on December 20." (DOI Weekly
Status Report at 949-950.) Plaintiff objects to this statement
as hearsay. (Pl.'s 56.1 ¶ 76.)

Frankie Alvarez ("Alvarez") was appointed to Airday's
badge number (Badge No. 7) on December 20, 2013, and "qualified"
for the office on December 21, 2013, by filing his oath of
office with the City clerk. (Bloomberg Letter to Alvarez, dated
Dec. 21, 2013 ("Bloomberg Letter"), Defs.' Ex. FF.) DOI notified
Plaintiff by letter dated December 23, 2013 that: "Your term of
office has expired. In accordance with Section 1601 of the New
York City Civil Court Act [], your successor has been appointed
to that office. Accordingly, your service as a City Marshal has
ended." (Schwam Letter to Airday, dated Dec. 23, 2013 ("Dec. 23,

2013 Schwam Letter to Airday"), Defs.' Ex. GG.) Plaintiff
provides that it was Schwam who made the notification.

Defendants assert that DOI advised Plaintiff, through
his attorneys, that he would not be reappointed at the
expiration of his term in December 2013 on multiple occasions,
including in January and February 2012, as well as in May 2013.
(See, e.g., Schwam Dep. at 151:03-152:02 & 152:03-18.) Plaintiff
denies this statement on the grounds that Schwam testified that
he gave Airday no notice and objects that it is hearsay. (Pl.'s
56.1 ¶ 79.)

Schwam testified that it was not reasonable for
Plaintiff to have assumed that he would remain a City Marshal
after the expiration of his term:

> [T]he law is very clear that upon the expiration of a
> marshal's term, his successor shall be appointed, and
> that upon expiration of the term, the marshal's office
> is considered vacant for purposes of choosing his
> successor.
>
> To me, that should put anyone who understands anything
> about the business of being a marshal on notice that
> what you get is a five-year term. At the end of that
> five-year term, the presumption is you are going to be
> replaced.
>
> In light of Marshal Airday's conduct and the lack of
> judgment that was exposed by his two arrests and the
> facts that were developed as a result of them, Marshal
> Airday should have been well aware that his future as
> a marshal was in grave jeopardy.

36

(Schwam Dep. at 159:16-160:19.) Airday objects to these statements as speculation and opinion, (Pl.'s 56.1 ¶ 80), although he concedes that he had "no[] explicit" reason to believe he would be reappointed as a City Marshal or maintained in a holdover role after the expiration of his five-year term in December 2013. (Airday Dep. at 136:10-14.)

Defendants provide that Plaintiff told City Council member Andrew Cohen that: "[T]he NYC Civil Court Act Sect[ion] 1602 states that a Marshal may be replaced without cause. . . . This is true for all Marshals whose terms expire; a marshal whose term has expired can be replaced at will. . . . My agreement to the stipulation was pro-forma. The option to terminate is in the law whether or not I had agreed to the stipulation." (Airday Letter, dated Jan. 17, 2014 ("Jan. 17, 2014 Airday Letter"), Defs.' Ex. HH at 971.) Plaintiff objects on the ground that he is not qualified to provide a legal opinion and that his lay reading of Section 1602 is wrong. (Pl.'s 56.1 ¶ 82.) Plaintiff further states that the context of his statement shows that he was simply stating that the law generally gives the courts the power to discipline City Marshals. (Id.)

Defendants assert that prior to commencing this action, Plaintiff believed that the reason he was not reappointed as a City Marshal was because: "[Schwam held] animosity and anger at [him] for challenging his order to resign or face charges." (Jan. 17, 2014 Airday Letter at 971.) Plaintiff states that there were other reasons expressed in that letter and in the subsequent court pleadings for why the Defendants acted as they did against Airday. (Pl.'s 56.1 ¶ 83.) Plaintiff further provides that his statements about Schwam's state of mind are incomplete and not admissible. (Id.)

Plaintiff provides that there are several comparable City Marshals who were not harshly disciplined or replaced in the way that Schwam treated Airday, including Charles Marchisotto ("Marchisotto"); Joel Shapirro ("Shapirro"); Howard Schain ("Schain"); and Jeffrey Rose ("Rose"). (Pl.'s 56.1 ¶ 91.) Defendants object to this statement because Plaintiff does not identify or describe what he means by this statement, making it impossible to provide a meaningful response. Defendants further object for failing to cite admissible evidence to support the contention, and because it is based on an uncorroborated, self-serving hearsay statement.

Plaintiff provides that on June 20, 2008, City Marshal
Marchisotto was arrested for aggravated harassment and stalking
of his former girlfriend. (Marchisotto Record, dated June 24,
2008 ("Marchisotto Record"), Pl.'s Ex. 28.) Over the course of
several months, Marchisotto repeatedly text messaged and
tailgated his girlfriend. (Id.) A few days after Marchisotto's
arrest, he invoked his Fifth Amendment right against self-
incrimination at a meeting at DOI with Schwam and his attorney.
(Id.) The NYPD Licensing Division also revoked his firearm
permit because Marchisotto failed to notify the Licensing
Division of the arrest and failed to cooperate with their
investigation. (Id.) Schwam never suspended Marchisotto; never
told him to resign; never filed any charges against him. (Id.)
Marchisotto was also found not guilty of the criminal charges
against him on March 25, 2010, but unlike Airday, Marchisotto
was never suspended and continues to be a Marshal today. (Id.)

        Moreover, Plaintiff states that Marchisotto is also a
landlord in Brooklyn, owning two large residential buildings,
and in 2006, Schwam learned that these buildings had over 115
violations, 43 of which had been deemed hazardous by the NYC
Department of Buildings for lead paint violations. (City Marshal
Records, Pl.'s Ex. 29.) Plaintiff says that Schwam told
Marchisotto to simply continue in his purported efforts to

address the violations and did not take any disciplinary action. (Pl.'s 56.1 ¶ 93.) Defendants object to these statements as failing to cite admissible evidence, and as being based on an uncorroborated, self-serving hearsay statement. (Defs.' 56.1 ¶ 93.) Defendants further state that the issue pertaining to the buildings owned by Marchisotto pre-dates his initial appointment as a City Marshal, and that DOI could not discipline a person before being appointed as a City Marshal. (City Marshal Records at 1450.) Moreover, the cited documentation confirms that DOI investigated Marchisotto's background and presented its findings to the Mayor's Committee on City Marshals on October 31, 2006. (Id. at 1394-95.) As Committee Member Judge Daniel Joy observed, the Committee examined the "documents and other information provided . . . by Keith Schwam, and . . . concluded that the nature and extent of the violations currently pending against this applicant's buildings should not disqualify Mr. Marchisotto from further processing by this Committee." (Id. at 1450.) Defendants also state that the statement is not material or relevant. (Defs.' 56.1 ¶ 93.)

Next, Plaintiff provides that on April 20, 2004, City Marshal Shapirro was accused of assault by a victim of alleged assault, and the only step that Schwam took was to issue to Shapirro a letter of admonition. (See Schwam Dep. at 80:16-24 &

40

171:8-172:14; Shapirro Investigation, dated Dec. 3, 2004

("Shapirro Investigation"), Pl.'s Ex. 31.) Previously, Shapirro

was arrested on November 5, 1985 for menacing and criminal

possession of a weapon and was acquitted on July 24, 1986.

(Shapirro Investigation at 2772.) In a third incident, on May 5,

2009, Schwam interviewed Shapirro about a claim that he

committed perjury during a landlord-tenant proceeding, and

Shapirro asserted his Fifth Amendment right against self-

incrimination. (Shapirro Perjury Case, dated Oct. 10, 2009

("Shapirro Perjury Case"), Pl.'s Ex. 33 at 3174.) Schwam took no

action to suspend Shapirro and five months after the charge was

made, Shapirro resigned his office. (Schwam Dep. at 76:8-83:6.)


Defendants object to this paragraph as failing to cite

admissible evidence to support its contention, and argue that it

is based on an uncorroborated, self-serving hearsay statement.

(Defs.' 56.1 ¶ 94.) Defendants further state that Shapirro was

not accused of "assault" by a victim, but was the "subject of a

complaint from a person who called [DOI's] office, and said he

put his hands on [him]" while effecting an eviction in April

2004, and that Schwam took many steps after this accusation,

e.g., Schwam conducted an investigation that included

interviewing Shapirro, the complainant, and three additional

witnesses and that based on the investigation, Schwam issued

Shapirro a "letter of admonition" and that Schwam immediately commenced an investigation following accusations that Shapirro lied under oath while testifying in an eviction proceeding in 2008 and analyzed the "court decision, Marshal Shapirro's records, and the court's audio and printed record of his testimony" and had DOI investigators interview Marshal Shapirro and Judge Madhavan, (Shapirro Perjury Case at 3172), and that Schwam "substantiate[d] the allegation" that Shapirro committed perjury and instructed Shapirro to resign "no later than September 15, 2009," warning that he could be removed from office after a "formal disciplinary proceeding" with the Appellate Division and, even if Shapirro prevailed, the Mayor could exercise his "discretionary authority to appoint a qualified successor" and that Shapirro resigned from office effective on September 15, 2009, obviating the need for "further administrative action by DOI with respect to any potential disciplinary penalty or removal," (id. at 3171, 3175), and that Shapirro was not a member of the Scofflaw Program. (Schwam Dep. at 82:23-83:03.) Defendants also state that the statement is not material or relevant.

Next, Plaintiff provides that City Marshal Schain was found guilty of misconduct by Schwam, including tampering with official records and filing false records, paid a fine of

$50,000 and agreed to a four-month suspension. (Pl.'s 56.1 ¶ 95.) At no time during Schwam's investigation of Schain did Schwam seek Schain's temporary suspension or tell Schain to resign or cease activities after the four-month suspension. (Schwam Dep. at 173:14-179:4.) Schain resumed duties as a City Marshal and as a part of the Scofflaw Program, and after his term expired he was held over and continues to act as a City Marshal. (Id.)

Defendants object to these statements for failure to cite admissible evidence and for being based on an uncorroborated, self-serving hearsay statement. (Defs.' 56.1 ¶ 95.) Schwam investigated Schain and brought charges against him on or before 2000, ultimately resulting in Schain "acknowledg[ing] his responsibility for the charged misconduct, and agree[ing] to [a 4 month] suspension and [$50,000] fine." (DOI Press Release, dated Oct. 6, 2015, ("DOI Press Release"), Pl.'s Ex. 30.) Schwam did not recommend Schain for reappointment after he investigated the conduct described above. (Schwam Dep. at 175:03-05.) Defendants also state that the statement is not material or relevant.

Finally, on March 31, 2009, Schwam resolved disciplinary issues against City Marshal Rose with a $40,000

fine for several violations or other acts of misconduct, including false arrest and assault; failing to provide DOI with information; and preparing and filing false records of his office. (Rose Disciplinary Stipulation, dated March 31, 2009 ("Rose Disciplinary Stipulation"), Pl.'s Ex. 34; Rose Stipulation of Settlement and Order of Dismissal, dated March 5, 2013 ("Rose Settlement Agreement"), Pl.'s Ex. 35.) In resolving the false arrest and assault charge, the City paid $10,000 and Rose and his attorney paid $5,000. (Rose Settlement Agreement.) Although all these events took place while Schwam was the Director of the Marshal's Bureau, Schwam never directed Rose to cease operations during the pendency of the charges either as a City Marshal or as a member of the DOF Scofflaw Program. (Schwam Dep. at 183:12-184:21.) Rose was held over as a City Marshal after these charges were resolved, and he continues to be a City Marshall today. (Id.)

Defendants object to these statements on the grounds of failing to cite admissible evidence to support the contention, and for being an uncorroborated, self-serving hearsay statement. (Defs.' 56.1 ¶ 96.) Defendants state that DOI investigated Rose for seizing a car in a traffic lane, inaccurate recordkeeping, and delays in reporting criminal activity by an employee (not a false arrest or assault), and

44

that Rose cooperated with the investigation, took responsibility for his actions, and agreed to a $40,000 fine as an "alternative to a formal disciplinary proceeding." (Rose Disciplinary Stipulation; Schwam Dep. at 183:12-23). Plaintiff cites to a civil lawsuit, where the parties reached a "settlement [that] does not indicate any fault or liability on the part of any party." (Rose Settlement Agreement.) Defendants also state that the statement is not material or relevant.

### III. **The Applicable Standard**

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. Westinghouse Elec. Corp. v. N.Y.C. Transit Auth., 735

F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting Anderson, 477 U.S. at 249). "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original).

## IV. Defendants' Motion for Summary Judgment is Granted in Part, and Denied in Part

The claims against Defendant Frankel, the former Commissioner of the DOF, have been withdrawn by the Plaintiff as there is no evidence of his personal involvement in the actions taken against Plaintiff by Schwam. (Pl.'s Opp. Br. 5.) Moreover, the demand for punitive damages in the 'whereas clause' of the AC is limited to Schwam as a claim for punitive damages may not be made against the City of New York. (Id.) The class-of-one equal protection claim and the substantive due process claim in the AC are duplicative of the procedural due process and

selective enforcement claims, so the latter have similarly been withdrawn. (Id.)

a. Defendants' Motion for Summary Judgment Dismissing Plaintiff's Due Process Claim is Granted in Part, and Denied in Part

Plaintiff's AC asserts that Defendants violated his right to procedural due process when, first, Schwam temporarily suspended Airday in January 2012 without notice or a hearing, and second, Schwam unilaterally and without notice permanently removed Airday from his office in December 2013 by not adhering to the long-standing practice for all City Marshals to renew their terms. (Pl.'s Br. 19-21.) The facts upon which Plaintiff bases his procedural due process violation are established in part and disputed in part. As a consequence, Defendants' motion for summary judgment as to this claim is granted in part, and denied in part.

The Due Process Clause of the Fourteenth Amendment provides certain procedural safeguards as to the deprivation of liberty and property interests. Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570 (1972). "When protected interests are implicated, the right to some kind of prior hearing is

47

paramount." Id. Accordingly, "[t]he threshold issue is always
whether the plaintiff has a property or liberty interest
protected by the Constitution." Narumanchi v. Bd. of Trustees,
850 F.2d 70, 72 (2d Cir. 1988). To determine whether procedural
requirements apply at all, "we must look not to the weight but
to the nature of the interest at stake." Roth, 408 U.S. at 571
(citing Morrissey v. Brewer, 408 U.S. 471, 481).


"Property interests . . . are created and their
dimensions are defined by existing rules or understandings that
stem from an independent source such as state law—rules or
understandings that secure certain benefits and that support
clams of entitlement to those benefits." Id. at 577. "To have a
property interest in a benefit, a person clearly must have more
than an abstract need or desire for it. He must have more than a
unilateral expectation of it. He must, instead, have a
legitimate claim of entitlement to it." S & D Maint. Co., Inc.
v. Goldin, 844 F.2d 962, 965 (2d Cir. 1988) (citing Roth, 408
U.S. at 577); see also Roth, 408 U.S. at 578 ("Just as the
welfare recipients' property interest in welfare payments was
created and defined by statutory terms, so the respondents'
property interest in employment at Wisconsin State University-
Oshkosh was created and defined by the terms of his
appointment."). In the public employment context, a person is

deemed to have a property interest in continued employment where a tenured position is held, see Slochower v. Bd. of Educ., 350 U.S. 551, 559 (1956), a contract provides as such, see Wieman v. Updegraff, 344 U.S. 183 (1952), or where there is a clearly implied promise of continued employment, see Connell v. Higginbotham, 403 U.S. 207, 208 (1971).

First, Plaintiff asserts that he maintained a property interest in his continued employment with the Scofflaw Program, and that his procedural rights were violated when he was temporarily suspended from the program in January 2012. Pursuant to the Standard Operating Procedures ("SOP") of the Scofflaw Program, "DOF . . . reserves the right . . . to direct a Marshal to discontinue the participation of any personnel in the program," and "[i]n the exercise of discretion, the City may terminate the services of a Marshal under this S.O.P. for a conflict of interest or appearance of impropriety." (Scofflaw SOP, date effective Aug. 24, 2009 ("Scofflaw SOP"), Pl.'s Ex. 27 at 955.) Plaintiff has not pointed to a statute, rule, contractual agreement or policy providing for his continued appointment to the Scofflaw Program for a designated period of time. Accordingly, absent specific language or facts demonstrating a custom or practice providing for Plaintiff's continued employment with the Scofflaw Program, Plaintiff has

49

failed to establish that he held a property interest in this position, and as such his constitutional right to due process was not violated by his removal from the Scofflaw Program without notice or an opportunity to be heard. See Roth, 408 U.S. at 577 ("A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.").

Second, Plaintiff argues that as part of his position as City Marshal, he enjoyed an entitlement to the renewal of his five-year term, and that Schwam's unilateral decision not to rehire Plaintiff for another term violated Plaintiff's constitutional rights to notice and a meaningful opportunity to be heard. Specifically, Airday contends that he had a due process right based on the practice for all City Marshals to renew their terms. (Pl.'s Br. 20.) Defendants contend that "there is no statute, rule, or policy that guaranteed [Plaintiff] the right to remain in that office after the expiration of his stated term of appointment," and that, instead, the controlling statutes required that Plaintiff be appointed to an office with a fixed term of employment and that the office be deemed vacant at the time that the term expired.

50

(Defs.' Br. 15.) Defendants further argue that, pursuant to these statutes, Plaintiff's term expired on December 20, 2013, and Alvarez was appointed to succeed him on December 20, 2013 and was deemed qualified for that office on December 21, 2013, bringing Plaintiff's service as a City Marshal to an end at that time. (Id. at 16.)

While the presence of a written contract outlining a party's formal rights "would make the existence of the right much more apparent, its absence does not foreclose the possibility" that Airday possessed a property interest in a renewed term as City Marshal. Ezekwo v. New York City Health & Hosps. Corp., 940 F.2d 775, 782 (2d Cir. 1991). The parties through their course of dealing and practice can create additional rights and duties. Id. "In determining which interests are afforded such protection, a court must look to whether the interest involved would be protected under state law and must weigh 'the importance to the holder of the right.'" Id. at 783. A person has the required property interest for purposes of due process where rules or mutually explicit understandings support an expectation of continued employment. Perry v. Sindermann, 408 U.S. 593, 601 (1972). The law of contracts, including the rules governing implied contract, can establish the required property interest, based on a party's words,

conduct, the surrounding circumstances, and the meaning of the parties' conduct as found based on their past practices. Id.

For instance, in Ezekwo, 940 F.2d at 782, the Circuit held that a doctor had a property interest in being rotated into the Chief Resident position at the defendant hospital based on a long-standing practice of rotating all residents into the position and the resident's reasonable reliance on the practice. Moreover, in Perry, 408 U.S. at 603, the Supreme Court held that a professor who spoke out against educational authorities had a protected property interest in his position and was therefore entitled to "a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency."

Under New York law, a contract implied can be based upon the conduct of the parties, Parsa v. State of New York, 64 N.Y.2d 143, 148 (1984). Whether an implied contract was formed involves factual issues regarding the parties' intent and the surrounding circumstances, Jemzura v. Jemzura, 36 N.Y. 495, 503–04 (1974). The existence of an implied contract is ordinarily determined by an objective test; that is, whether a reasonable person would think the parties intended to make a new binding agreement. Martin v. Camanaro, 156 F.2d 127 (2d Cir. 1946).

Here, Plaintiff has demonstrated that a factual issue exists as to whether an implied contract was created as a result of the past practice of holding over City Marshals for reappointment following the expiration of their statutory term. The issue concerns the existence of a property interest in reappointment of Marshals after the expiration of their terms. In the September Opinion, it was concluded that there was a factual issue as to whether the parties had a mutual understanding of the renewal of the position after expiration, and the factual dispute remains. See Airday, 131 F. Supp. 3d at 183. The Plaintiff himself has held a City Marshal position by way of holdover status for over two decades since his initial appointment in 1984. (Pl.s' 56.1 ¶ 13.) Moreover, Plaintiff has established that several other City Marshals have also maintained their positions by way of holdover status. Schwam unilaterally without notice permanently removed Airday from his office in December 2013 and assigned Airday's badge to Alvarez. Accordingly, there remains a factual dispute as to whether Plaintiff was entitled to notice and a hearing. This dispute bars the Defendants' motion for summary judgment dismissing Airday's procedural due process claim.

b. Defendants' Motion for Summary Judgment Dismissing

Plaintiff's Selective Enforcement Claim is Denied


Plaintiff alleges that his suspension as City Marshal in January 2012 and his removal in December 2013 violated his constitutional right to equal protection because the evidence demonstrates that several other similarly situated City Marshals accused of assault, harassment, or other misconduct were not similarly deprived of their offices.


To prevail on his equal protection claim, which is based on a theory of selective enforcement, Plaintiff must show both (1) that he was treated differently from other similarly situated individuals; and (2) that "such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 790 (2d Cir. 2007). As to the first prong, plaintiffs must show that they are similarly situated such that "(1) the persons to whom they compare themselves are similarly situated in all material respects and (2) the defendants knew there were similarly situated individuals and consciously applied a different standard to plaintiffs." Mosdos Chofetz Chaim, Inc. v.

Village of Wesley Hills, 815 F. Supp. 2d 679, 696 (S.D.N.Y. 2011). "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as the lawyer's art of distinguishing cases, the 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely or necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." Id. (citing T.S. Haulers, Inc. v. Town of Riverhead, 190 F. Supp. 2d 455, 463 (E.D.N.Y. 2002) (internal citation omitted)). "Generally, whether two entities are similarly situated is a factual issue that should be submitted to the jury . . . [but] this rule is not absolute and 'a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.'" Cine SK8, Inc., 507 F.3d at 790-91.

The facts as set forth above establish a factual conflict both as to whether Plaintiff is similarly situated to the other Marshals cited and whether Schwam's conduct amounted to malice and bad faith sufficient to satisfy the second prong of the inquiry. While Defendants argue that the City Marshals Plaintiff compares himself to are sufficiently dissimilar to

55

Plaintiff to warrant dismissal of this claim, the "relevant aspects" overlap enough to present a genuine issue of material fact to a jury. Each of the persons cited are City Marshals who engaged in similar behavior to Plaintiff, including harassment, assault, and misconduct of which DOI was aware. Unlike the other City Marshals, Airday was temporarily suspended and then permanently removed from his office, raising a genuine question as to why Plaintiff was treated differently than the other similarly situated individuals. Moreover, it remains an open factual question whether Plaintiff's grievances were the result of Defendants malice or bad faith. These factual disputes bar the Defendants' motion for summary judgment to dismiss Airday's equal protection claim.

## c. Defendants' Motion for Summary Judgment Dismissing Plaintiff's First Amendment Claim is Granted

Finally, Plaintiff contends that Schwam's actions against him constituted an act of retaliation in violation of his First Amendment right to free speech. While a similar claim concerning speech between Plaintiff and other City Marshals and the Marshals' Association of the City of New York was dismissed in Airday, 131 F. Supp. at 182, the AC has since been revised to assert that Defendants retaliated against Plaintiff after he

56

contacted elected officials in 2011 and 2012 to "oppose" the implementation of the Paylock Booting Program. (See AC ¶¶ 32-37; 56.1 ¶ 23.) Defendants seek dismissal of this claim on the grounds that Airday spoke as an employee rather than as a public citizen and because the communications alleged in the AC were not the cause of Schwam's actions. Because Plaintiff failed to establish either that his speech was protected or that a nexus existed between his speech and Schwam's actions, Defendants' motion for summary judgment as to this claim is granted.

The requirements to establish a violation of a First Amendment speech right were previously set forth in the September Opinion, and are summarized as follows. "A plaintiff asserting a First Amendment retaliation claim must establish that: '(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech.'" Matthews v. City of New York, 779 F.3d 167, 172 (2d Cir. 2015) (citing Cox v. Warwick Valley Cent. School Dist., 654 F.3d 267, 272 (2d Cir. 2011)). The issue of whether speech is protected by the First Amendment is a matter of law. See Connick v. Myers, 461 U.S. 138, 148 (1983).

Courts follow a two-step inquiry for determining whether a government employee's speech is protected: First, it must determine "whether the employee spoke as a citizen on a matter of public concern," which in turn encompasses two subquestions: "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." Id. (citing Jackler v. Byrne, 658 F.3d 225, 235 (2d Cir. 2011) (internal citation omitted). If either question is answered negatively, then the relevant speech is not protected and the inquiry ends. Id. If both questions are answered affirmatively, the second determination is "whether the relevant government entity 'had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer.'" Id. (citing Lane v. Franks, 134 S.Ct. 2369, 2380 (2014)). "Only if the statements involved address a matter of public concern is it necessary for a court to balance the interests of the speaker against the state's interest in efficient government." Ezekwo, 940 F.2d at 781 (citing Rankin v. McPherson, 483 U.S. 378, 388 (1987)). "The Supreme Court has recognized a tension in public employment free speech cases between an employee's First Amendment rights and the 'common sense realization that government offices could not function if every employment decision became a constitutional

matter.'" Id. (citing Connick, 461 U.S. at 143). Accordingly,
"when public employees make statements pursuant to their
official duties, the employees are not speaking as citizens for
First Amendment purposes," and this speech does not enjoy
constitutional protection. Garcetti v. Ceballos, 547 U.S. 410,
421 (1951). The relevant question is whether the speech is
directed to the employee's "regular duties." Matthews, 779 F.3d
at 173.

The Plaintiff contends that he "disseminated his
criticisms of the Paylock program to other City Marshals, to the
Marshals' Association, to the [DOF], to local politicians and to
the NYC Comptroller's Office." (Pl.'s Br. 11, 29-30; see also
Pl.'s 56.1 ¶¶ 22-27.) The September Opinion determined that
"complaints . . . [that] were not expressed to anyone beyond his
own colleagues, the Marshals' Association, and unidentified
individuals . . . support a conclusion that Airday engaged in
speech as a public servant pursuant to his job duties, not as a
citizen." Airday, 131 F. Supp. 3d at 180-81.

Plaintiff has not established that he "spoke as a
citizen on a matter of public concern," in relaying his concerns
about the Paylock Program. See Jackler, 658 F.3d at 235.
Plaintiff noted an email sent to Kelly, Executive Director at

the Marshals' Association in March 2011, and "the other City
Marshals," in which he discussed his concerns about the
program's implementation and operation. (Pl.'s 56.1 ¶ 22.)
Specifically, Plaintiff communicated his concerns regarding the
following inquiries: (a) "how Paylock was chosen by the City and
whether a no-bid contract was appropriate and legal"; (b) "who
would be in charge under the proposal for tracking fines paid to
Paylock"; (c) "who would be responsible for supervising
Paylock"; (d) "what fees would be charged to the vehicle
owners"; (e) "what would be the City Marshal's law enforcement
and administrative roles, if any, in the booting process"; (f)
"what would . . . Paylock's fee be under the proposed system";
(g) "whether a vehicle could be legally 'un-booted' upon payment
of the outstanding fines and judgments and left operational on
City streets where the vehicle's registration status had expired
and the vehicle cannot under law be parked or operated on public
streets"; and (h) "whether it was appropriate to omit or
disregard necessary and legal guidelines from the Paylock
[B]ooting [P]rogram." (Id.) This email was principally concerned
with the impact of Paylock on the Plaintiff's business
operation, and there is no evidence that it was directed to the
Defendants or an elected official.

Plaintiff also contends that he contacted four elected officials in 2011 and 2012 to complain about the implementation and operation of the Paylock Booting Program. (Id. ¶ 23.) However, no details as to the time, method or substance of these communications are set forth other than a conclusory allegation. (See id.; see also Rankin, 483 U.S. at 388 (citing Connick, 461 U.S. at 146) ("Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.")).

Next, Plaintiff alleges that he spoke to City Councilmember Koppell in a "casual" manner when he saw him walking "on the street," at which point Plaintiff "told him that it would be a good idea if he and the City Council looked into this proposal that seems . . . to be way off the reservation." (Pl.'s 56.1 ¶ 24.) Plaintiff spoke in similarly cryptic terms when he allegedly telephoned an unknown person at the Office for the New York City Comptroller to ask in general terms "if they had any information about the [Paylock] contract; if they were aware of it, [a]nd that it seems as if there's a problem with this proposed contract." (Id. ¶ 25.) These allegations lack the evidentiary support needed to warrant a finding that the Plaintiff engaged in protected speech. Plaintiff has not

established any information regarding the speech that he alleged
was disseminated to City Councilmember Koppell and the New York
City Comptroller's Office, except to say that it may have
occurred in 2011 or 2012. (See id. ¶¶ 24-25.) Plaintiff adds
only that his "objections and concerns about Paylock were not
limited to concerns about how his job would be performed and his
first concern was the means whereby Paylock was selected and the
procurement process." (Id. ¶ 89.) However he provides no further
detail as to the content of his concerns. The conclusory nature
of Plaintiff's allegations fall short of stating a matter of
public concern.

In addition, Plaintiff's speech "focused primarily on
private motives related to employment grievances." See Reuland
v. Hynes, 460 F.3d 409, 417 (2d Cir. 2006); Ezekwo, 940 F.2d at
781 (holding that the speech at issue was not a matter of public
concern because both the motive of the speaker and the content
of the speech were related to personal grievances). Plaintiff's
criticisms focused on how the Paylock Booting Program would
impact his business operation: (i) "who would be in charge under
the proposal for tracking fines paid to Paylock"; (ii) "who
would be responsible for supervising Paylock"; and (iii) "what
would be the City Marshal's law enforcement and administrative
roles, if any, in the booting process." (Pl.'s 56.1. ¶ 22). As

the Circuit has noted, "[s]peech that, although touching on a topic of general importance, primarily concerns an issue that is 'personal in nature and generally related to [the speaker's] own situation,' such as his or her assignment, promotion, or salary, does not address matters of public concern." Jackler, 658 F.3d at 236 (citation omitted); see also Connick, 461 U.S. at 149 ("To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case.").

Finally, no evidence has been submitted that DOI, DOF, Schwam, or Frankel were aware of the Plaintiff's purported speech described in the AC. Accordingly, Plaintiff is unable to establish the requisite nexus to support his claim of retaliation. See Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2003) (holding "that a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link," and "[i]nstead, he must produce some tangible proof to demonstrate that his version of what occurred was not imaginary.") (quotation, citation, and alteration omitted). The Plaintiff contends that a jury could find that Schwam knew of Plaintiff's "objections and is simply feigning lack of knowledge." (Pl.'s

Br. 30-31.) However, this unsupported speculation is belied by
the Plaintiff's acknowledgement that he "did not communicate
with Schwam or anyone else at DOI about his concerns as to
Paylock," as set forth in paragraph 26 of the Plaintiff's 56.1
Statement of Facts. (Pl.'s 56.1 ¶ 26.)

Because the Plaintiff has not established protected
speech as a citizen, and in the absence of a nexus between that
speech and the actions taken by Schwam in January 2012 and
December 2013, the Defendants' motion for summary judgment as to
Airday's First Amendment claim is granted.

d. The Defendants' Motion for Summary Judgment Dismissing
   the AC Against Schwam on the Grounds of Qualified
   Immunity is Denied

"Qualified immunity shields federal and state
officials from money damages unless a plaintiff pleads facts
showing (1) that the official violated a statutory or
constitutional right, and (2) that the right was 'clearly
established' at the time of the challenged conduct." Ashcroft v.
al-Kidd, 563 U.S. 731, 735 (2011). This doctrine "balances two
important interests—the need to hold public officials
accountable when they exercise power irresponsibly and the need

to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009).

In determining whether the relevant law is "clearly established," courts "consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." <u>Terebesi v. Torreso</u>, 764 F.3d 217, 231 (2d Cir. 2014). A clearly established right "is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" <u>Mullenix v. Luna</u>, 136 S.Ct. 305, 308 (2015) (citing <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012); <u>see also</u> <u>Terebesi</u>, 764 F.3d at 230 (internal citations and quotations omitted) ("Official conduct violates clearly established law 'when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every 'reasonable official would have understood that what he is doing violates that right.'")). As such, "existing precedent must have placed the statutory or constitutional question beyond debate." <u>Aschroft v. al-Kidd</u>, 563 U.S. 731 (2011).

First, as to the due process claim, the Defendants argue that they are entitled to qualified immunity because there is no support for the theory that they should have known that removing Plaintiff from the Scofflaw Program in February 2012, recommending his suspension to the Appellate Division in 2012, and appointing a successor at the expiration of Plaintiff's term in 2013 violated a constitutional right. (Defs.' Br. 22.) However, United States and Circuit case law cited above demonstrate that the constitutional law regarding property interests and the rights that attach to such interests is a clearly established area of the law. Moreover, Schwam, an attorney, has acknowledged that notice is a fundamental aspect of due process, (see Schwam Dep. 109:21-24), demonstrating his knowledge of this area of law. Schwam also prepared the submission to the First and Second Departments, which sets forth the law on how the Appellate division, rather than DOI or Schwam, makes the decision to temporarily suspend a City Marshal. (Pl.'s Ex. 5 at 234.) Moreover, "[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." Kerman v. City of New York, 261 F.3d 229, 240 (2d Cir. 2001). Thus, to the extent that there remains a factual dispute as to the due process claim regarding whether an implied contract existed as a result of the City's alleged practice of

holding over City Marshals for reappointment following the expiration of their statutory term, and as to the selective enforcement claim, Defendants are not entitled to qualified immunity.

## V. **Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is granted in part, and denied in part.

It is so ordered.

**New York, NY**
**May /0, 2018**

**ROBERT W. SWEET**

**U.S.D.J.**