```
                                                         ┌─────────────────────────────────┐
                                                         │ USDC SDNY                        │
                                                         │ DOCUMENT                         │
  UNITED STATES DISTRICT COURT                           │ ELECTRONICALLY FILED             │
  SOUTHERN DISTRICT OF NEW YORK                          │ DOC #:_____          │
                                                         │ DATE FILED:   7/16/2020          │
  ----------------------------------------------------- X└─────────────────────────────────┘
    GEORGE AIRDAY,                            :
                                              :
                            Plaintiff,        :
                                              :                14-CV-8065 (VEC)
                     -against-                :
                                              :           OPINION AND ORDER
    THE CITY OF NEW YORK and KEITH            :
    SCHWAM,                                   :
                                              :
                            Defendants.       :
  ----------------------------------------------------- X
```

VALERIE CAPRONI, United States District Judge:

      Plaintiff George Airday is a former city marshal.  He sued the City of New York and its officer Keith Schwam pursuant to 42 U.S.C. § 1983 because then-Mayor Michael Bloomberg decided not to renew his appointment.  The Court presumes familiarity with the facts, although minimal background knowledge is necessary for purposes of this Opinion.  On September 13, 2019, the Court granted Defendants judgment as a matter of law after holding a jury trial on Airday's procedural due process claim.  Post-Trial Op. & Order (Dkt. 183).  The primary issue in that trial was whether an implied contract existed between Airday and the City that he would either be reappointed or allowed to continue in holdover status as a city marshal when his term ended.  *Id.* at 5.  This Court held that Airday's evidence was insufficient as a matter of law to prove that any City official had bound the City to such a contract.  *Id.* at 5–10.  Airday's selective enforcement equal protection claim now remains, and on October 3, 2019, the Court granted Defendants leave to file a second motion for summary judgment on that claim.  Order (Dkt. 184).  Defendants' motion is DENIED.

      Airday asserts that Schwam violated his rights under the Equal Protection Clause of the Fourteenth Amendment by treating him worse than other city marshals who engaged in

misconduct during their term of office.  He argues that the City is liable under *Monell* because

Mayor Bloomberg made the ultimate decision to reassign Airday's city-marshal badge—bringing

an end to Airday's tenure—pursuant to the former mayor's final policy-making authority.

The Court understands Airday to be asserting three theories of unlawful "selective

enforcement."  Schwam ensured that Airday would not be reappointed: (a) out of malice and

spite; (b) to retaliate against Airday for Airday's having invoked certain procedural protections

to which city marshals are entitled prior to being disciplined during their terms of office; and (c)

to retaliate against Airday for the exercise of his Fifth Amendment right against self-

incrimination.  *See* Am. Compl. (Dkt. 34) ¶ 91; Opp. (Dkt. 192) at 20–27.  *Monell* liability exists

against the City, according to Airday, on a cat's paw theory that a recommendation from

Schwam was the prime force behind Mayor Bloomberg's decision.[1]  Opp. at 27–32.

## I.

As a threshold matter, Airday objects to the Court's decision to entertain a second motion

for summary judgment.  Opp. at 5–8.  The Court overruled this objection at a status conference

on October 3, 2019, and again reiterates that a second motion is proper.  The main (but not only)

impetus for a second motion was the concern that the Supreme Court's decision in *Engquist v.*

*Oregon Dep't of Agric.*, 553 U.S. 591 (2008), barred Airday's selective enforcement claim as a

matter of law.  That issue was never decided on Defendants' first motion for summary

judgment.[2]  Should Airday ultimately have no cognizable legal theory on which a jury could be

---

[1]     Airday also continues to advance the borderline frivolous argument that *Monell* liability exists because
Schwam, in addition to Mayor Bloomberg, acted with final policy-making authority.  *See* Opp. at 30.  The Court has
already held—based on the evidence presented at trial—that "Mayor Bloomberg was the only possible 'final
policymaking authority' whose conduct could have rendered the City liable to Plaintiff for any due-process
violation."  Post-Trial Op. & Order at 12 n.6 (quotation omitted).

[2]     Defendants' first motion was decided by Judge Sweet on May 10, 2018 (Dkt. 92) before the case was
reassigned to the undersigned.

instructed, both the parties and the Court would have wasted substantial time and resources.  In

addition, glaring evidentiary gaps surfaced during trial over Schwam's actual influence on

Mayor Bloomberg's decision not to reappoint Airday.  Airday's cat's paw theory requires

evidence that Schwam moved the cat's paw, but the Court has seen none.  The Court thus chose

to exercise its discretion to "entertain[] successive dispositive motions." *Sira v. Morton*, 380

F.3d 57, 68 (2d Cir. 2004).

Defendants, however, have squandered that opportunity by submitting papers which

flagrantly violate Local Rule 56.1.  They did not file a new Rule 56.1 statement, instead breezily

referring the Court to their 56.1 statement from early 2018 on their first motion for summary

judgment.  *See* Defs.' Mem. of Law (Dkt. 189) at 2.  That may have been excusable neglect, but

they have also not cited to that statement once in their papers.  Defendants treat this Court's post-

trial opinion as if it contained factual findings that the Court can properly rely upon now.  Even

if they could rely on that opinion for certain facts that were fully developed during trial, those

facts are insufficient to dispose of this motion.

"Failure to submit a [Rule 56.1] statement may constitute grounds for denial of the

motion."  S.D.N.Y. Local R. 56.1(a).  District courts have broad discretion to enforce local rules

and regularly deny motions for failing to comply.  *See Taylor v. Always Ready & Reliable Sec.,*

*Inc.*, No. 13-CV-8524, 2014 WL 5525745, at *1 (S.D.N.Y. Oct. 27, 2014) (collecting cases).

Although the Court continues to doubt that Airday can be successful at trial (for example, he has

not adduced any evidence supporting his cat's paw theory,[3] *see also infra* Part II.C), Defendants,

---

[3]      Airday's opposition brief attempts to catalogue such evidence, *see* Opp. at 33–36, but, in doing so, he
ignores the rules of evidence.  Schwam may very well have been on a crusade to end Airday's tenure as a city
marshal, but there is still no admissible evidence referenced in his brief (or presented during the first trial) showing
Mayor Bloomberg's rationale for making the decision he did.  That said, this Court will not do counsel's job.
Defendants have shirked their obligations as movant to "show[] that there is no genuine dispute as to any material

as the moving party, cannot just sit idly by and expect the Court to sort through the record on

their behalf.  The Court will nonetheless, in its discretion, address Defendants' argument that

*Engquist* bars Airday's selective enforcement claim, Defs.' Mem. of Law at 2–8, because a Rule

56.1 statement would not have aided in resolving that legal issue and doing so may be helpful in

focusing the parties' trial preparation.  For those reasons, and the reasons stated below,

Defendants' motion for summary judgment is denied.

## II.

*Engquist* does not bar Airday's selective enforcement claim.  *Engquist* holds that a public

employee cannot maintain an equal protection claim based on a class-of-one theory against his or

her employer.  553 U.S. at 605.  The *Engquist* Court reasoned that "some forms of state action

. . . by their very nature involve discretionary decisionmaking based on a vast array of subjective

individualized assessments."  *Id.* at 603.  Allowing a plaintiff to assert a claim based on a class-

of-one equal protection theory "based on the arbitrary singling out of a particular person would

undermine the very discretion that such state officials are entrusted to exercise."  *Id.*  Airday, by

contrast, does not allege that he was arbitrarily singled out; instead, he alleges that he was

terminated because Defendants harbored malice and ill will, and to retaliate against him for the

exercise of his state procedural and federal constitutional rights.  *Hu v. City of New York*, 927

F.3d 81, 92 (2d Cir. 2019).  His claim, in other words, does not rise or fall on the issue of

whether Defendants' actions were rationally related to a legitimate state policy, *id.*, and therefore

does not threaten the inherent discretion that *Engquist* reserved to states when making

employment decisions.

---

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## A.

The Supreme Court previously recognized the class-of-one theory in *Village of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000) (per curiam).  The plaintiff in *Olech* had sued her local government for imposing conditions on her access to the municipal water supply that it had not imposed on others.  *Id.* at 563.  The issue presented in *Engquist* was whether a public employee could also sustain an *Olech* claim against the government.

The *Engquist* Court distinguished the public employment context from the legislative and regulatory context; only in the latter does the Constitution set a minimum rationality requirement for governmental classifications.  Engquist, formerly an employee of a state agency, sued over an allegedly "arbitrary" decision to terminate her.  553 U.S. at 595.  The Supreme Court reasoned that "[t]o treat employees differently . . . is simply to exercise the broad discretion that typically characterizes the employer-employee relationship."  *Id.* at 605.  Consequently, a public entity's employment decisions are not bound by the Fourteenth Amendment's requirement that legislation and regulation treat all persons alike under like circumstances and conditions.  *Id.* at 602–03 (quoting *Hayes v. Missouri*, 120 U.S. 68, 71–72 (1887)).  The Court thus declined to recognize the petitioner's *Olech* claim because such a claim requires a "rational basis for the difference in treatment."  *Id.* at 601, 603.

In doing so, the Supreme Court established a "jurisdiction-limiting" rule meant to prevent a flood of *Olech* claims over public employment decisions.  *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010).  The Court was careful to note that "all" it decided was that "the class-of-one theory of equal protection has no application in the public employment context," being "guided, as in the past, by the 'common-sense realization that government offices could not function if every employment decision became a constitutional matter.'"  *Engquist*, 553 U.S. at 607 (quoting *Connick v. Myers*, 461 U.S. 138, 143 (1983)).

Defendants' motion for summary judgment presents the novel legal issue whether *Engquist* also prevents public employees from asserting a selective enforcement theory of equal protection against their government employers.  That theory dates to the Second Circuit's decision in *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980).  Although it belongs to a "murky corner" of equal protection law, the Second Circuit has continued to recognize such claims after *Engquist*, albeit typically in the zoning context.  *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005).  To prevail on a *LeClair* claim, a plaintiff must prove both that "(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person."  *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995) (quoting *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir. 1992)).

The Second Circuit in *Hu* expressly reserved decision on the *Engquist* issue while still clarifying the differences between selective enforcement equal protection claims and class-of-one equal protection claims.  927 F.3d at 100 n.5.  The Circuit noted that "[w]e have not decided whether the Supreme Court's decision in *Engquist* to bar *Olech* claims in the employment context also applies to malice-based *LeClair* claims."  *Id.*  The *Hu* case, unlike Airday's claim here, involved a sovereign acting as a regulator bound to the discretion-limiting standards of a regulatory framework, not as an employer.  Under the former circumstances, *Engquist* bars neither *Olech* nor *LeClair* claims.  *Id.*

District courts in this Circuit have circled the issue.  *See, e.g.*, *Mancuso v. Vill. of Pelham*, No. 15-CV-7895, 2016 WL 5660273, at *14 n.16 (S.D.N.Y. Sept. 29, 2016) (noting that "the law in this Circuit is unsettled as to whether public employees' claims asserted under the 'selective enforcement' theory can survive in light of *Engquist*" and addressing the merits of the plaintiff's

selective enforcement claim (quotation omitted)); *Vlahadamis v. Kiernan*, 837 F. Supp. 2d 131,
144 (E.D.N.Y. 2011) (collecting cases and noting the court "is not inclined to take such a broad
reading of *Engquist* to eliminate selective enforcement claims altogether").  Others have held
that *Engquist* does prevent selective enforcement claims,[4] relying on non-precedential Second
Circuit decisions that summarized *Engquist*'s holding as barring all non-class-based equal
protection claims in the public employment context.[5]  The Second Circuit has since articulated
*Engquist*'s holding in far narrower terms.  *See Hu*, 927 F.3d at 95 ("[T]he Supreme Court in
[*Engquist*] barred public employees from bringing *Olech* claims against their government
employers."); *Analytical Diagnostic*, 626 F.3d at 140 ("The Supreme Court's decision in
[*Engquist*] eliminated class-of-one claims for government employees.").[6]

---

[4]        *See, e.g.*, *Heusser v. Hale*, 777 F. Supp. 2d 366, 387 (D. Conn. 2011); *Gusler v. City of Long Beach*, 823 F.
Supp. 2d 98, 135 (E.D.N.Y. 2011); *Terry v. Gary*, No. 08-CV-8127, 2010 WL 4273302, at *3 (S.D.N.Y. Oct. 27,
2010); *Jarrach v. Sanger*, No. 08-CV-2807, 2010 WL 2400110, at *9 (E.D.N.Y. June 9, 2010).

[5]        *See Massi v. Flynn*, 353 F. App'x 658, 660 (2d Cir. 2009) (summary order), *cert. denied*, 559 U.S. 1107
(2010); *Porr v. Daman*, 299 F. App'x 84, 86 (2d Cir. 2008) (summary order).

[6]        The Court assumes *arguendo* that Airday should be treated as a public employee for these purposes.
Airday takes issue with the exact nature of his prior relationship with the City—arguing that he was an independent
contractor entitled to certain contractual and statutory rights.  Opp. at 14–20.  But the Court need not decide this
issue because the Court finds that *Engquist* does not bar his claim under either scenario.  In any event, whether
Airday is an employee or government contractor likely does not matter.  Several courts in this district have applied
*Engquist* to claims by government contractors, including Judge Sweet in this action before it was reassigned to the
undersigned.  *See Airday v. City of New York*, 131 F. Supp. 3d 174, 185 (S.D.N.Y. 2015) (stating that "[c]ourts
within this Circuit also bar 'class of one' equal protection claims brought by government contractors" and collecting
cases); *see also Preschools of Am. (USA), Inc. v. New York City Dep't of Educ.*, No. 17-CV-5027, 2018 WL
4265886, at *7 (S.D.N.Y. Sept. 6, 2018), *appeal pending*, 18-2964 (2d Cir.) (holding that "the reasoning of *Engquist*
fits government contracting nearly as well as it does government employment"); *cf. Douglas Asphalt Co. v. Qore,
Inc.*, 541 F.3d 1269, 1274 (11th Cir. 2008) (extending *Engquist* to decisions involving government contractors).
Indeed, even assuming that Airday had certain contractual and statutory protections as an independent contractor
that typical employees did not, the *Engquist* Court recognized that "Congress and all the States have, for the most
part, replaced at-will employment with various statutory schemes protecting public employees from discharge for
impermissible reasons," and that did not alter the Supreme Court's decision.  553 U.S. at 606–07 (citation omitted).
This case—where it is undisputed that then-Mayor Bloomberg terminated Airday as a city marshal and reassigned
his office—falls squarely within the "public employment context" envisioned in *Engquist*.  *Id.* at 600; *see* Post-Trial
Op. & Order at 11–12.

**B.**

The rationale animating *Engquist* does not apply to a *LeClair* claim.  *Engquist* begins

with the principle that the Equal Protection Clause's core concern is to "shield against arbitrary

classifications."  553 U.S. at 598.  The Court then considered the differences between the

government acting "as employer as opposed to sovereign."  *Id.*  It found that treating employees

differently is an inherently discretionary act, elaborating that government employment

historically is at-will; employees "may be terminated for a good reason, bad reason, or no reason

at all."  *Id.* at 605–06 (quotation and citation omitted).  The Court also recognized that it had

never found that the Equal Protection Clause was implicated when "government employers are

alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or

irrational manner."  *Id.* at 605.  Because the class-of-one theory "presupposes that like

individuals should be treated alike, and that to treat them differently is to classify them in a way

that must survive at least rationality review," the Court held that it was a "poor fit in the public

employment context."  *Id.* at 605.

The *LeClair* theory, in contrast, rests on a different set of core assumptions than *Olech*'s

class-of-one theory.  It presupposes that the government may not act with an "impermissible

motivation," such as discrimination on the basis of race, suppressing a constitutionally protected

activity, or personal malice.  *Hu*, 927 F.3d at 91.  The Second Circuit recently recognized that

*Olech* and *LeClair* "offer distinct pathways for proving a non-class-based Equal Protection

violation."  *Id.* at 93.  The court aptly summarized:

> While both types of Equal Protection claims require a showing that the plaintiff was
> treated differently from another similarly situated comparator, they differ in at least
> two key respects.  First, unlike a malice-based *LeClair* claim, an *Olech* claim does
> not require proof of a defendant's subjective ill will towards a plaintiff.  Instead, a
> plaintiff can prevail on an *Olech* claim on the basis of similarity alone.  However,
> the similarity standard for an *Olech* claim is more stringent than the standard for a
> *LeClair* claim.  While *Olech* requires an "extremely high" degree of similarity

between a plaintiff and comparator, *LeClair* merely requires a "reasonably close resemblance" between a plaintiff's and comparator's circumstances.

*Id.*  That is to say, the selective enforcement theory does not share the class-of-one theory's basic tension with the discretionary nature of at-will employment.  A *LeClair* claim requires not only proof of differential treatment, but also malice.  Unlike an *Olech* claim, it does not impose a rationality requirement on government decisions that are historically marked by discretion free of any minimum rationality requirement.

*Engquist*'s traffic-ticket hypothetical illustrates how that difference is crucial. The Supreme Court posited a traffic officer on a busy highway where cars frequently drive above the speed limit.  553 U.S. at 603.  The officer cannot, of course, stop every speeder, so he or she must pick and choose essentially at random, creating a class of persons who did not get a ticket and a class of one who did.  *Id.* at 603–04.  The officer's decision—although apparently "discriminatory" and lacking any rationale—does not "implicate basic equal protection concerns."  *Id.* at 604.

Now consider instead a vengeful officer who follows his neighbor every day until he catches the neighbor speeding.  That officer's actions are no longer immune from constitutional scrutiny; they might give rise to a selective enforcement claim.  *LeClair*'s improper-motive prong implicates basic equal protection concerns even when *Olech* claims do not.  *LeClair*, 627 F.2d at 609; *cf. Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012) (reversing dismissal of a class-of-one claim in part because "[a]lthough the police are necessarily afforded wide discretion in performing their duties, that discretion does not extend to discriminating against or harassing people").  A plaintiff asserting a *LeClair* claim cannot "merely rest on a demonstration of different treatment from persons similarly situated . . . *LeClair* protects against both discrimination

on the basis of a plaintiff's protected status (*e.g.*, race or a constitutionally protected activity) and discrimination on the basis of a defendant's personal malice or ill will towards a plaintiff." *Hu*, 927 F.3d at 91 (quotation omitted).

Defendants argue that the *Engquist* decision was driven by the distinction between government as employer and government as sovereign. Defs.' Mem. of Law at 6–7. Defendants rely on language in *Engquist* emphasizing that the government's interest "in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." 553 U.S. at 598 (quotation omitted). But that elevated interest does not automatically relieve the state of all its constitutional obligations. *Engquist*'s own discussion of a public employee's First Amendment rights recognizes as much, *see id.* at 599–600, as does the vast body of due process law protecting public employees, *see, e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985); *Locurto v. Safir*, 264 F.3d 154, 174 (2d Cir. 2001).

To be sure, *Engquist* does contain dictum implying that the Court meant to bar all non-class-based equal protection theories: it warned against the heavy burdens the state would have to bear should plaintiffs not have to "claim discrimination on the basis of membership in some class or group" in the public employment context.[7] 553 U.S. at 607. But *Engquist* does not stand for the principle that the Equal Protection Clause protects persons only from discrimination on the basis of class membership. The Court limited the scope of its holding in no uncertain terms: "all we decide [is] that the class-of-one

---

[7]      This language appears to be the basis for the Second Circuit's applications of *Engquist* in its summary orders in *Massi* and *Porr*. *See supra*, note 5.

theory of equal protection has no application in the public employment context." *Id.*; *see also Hu*, 927 F.3d at 95; *Analytical Diagnostic*, 626 F.3d at 140.

Finally, *Hu* implies that allowing plaintiffs to bring *LeClair* claims presents less risk of excessive litigation than if they were allowed to bring *Olech* claims. The *Engquist* Court was concerned that a contrary ruling would constitutionalize routine employment decisions, displacing statutory employment schemes under the guise of equal protection. 553 U.S. at 607–08. But the Second Circuit's view was that a *LeClair* claim's impermissible-considerations requirement—which includes traditional categories of equal protection such as race—acts as a mitigating roadblock.[8]  *See Hu*, 927 F.3d at 95 (explaining why the court would require a lower showing of similarity for *LeClair* claims than for *Olech* claims (citing *Neilson v. D'Angelis*, 409 F.3d 100 (2d Cir. 2005)). The Circuit highlighted Justice Breyer's concurrence in *Olech* which noted that "illegitimate animus" or "ill will" is an "added factor . . . sufficient to minimize any concern about transforming run-of-the-mill zoning cases into cases of constitutional right."[9]  *Id.* at 93 (quoting *Olech*, 528 U.S. at 566). To put a fine point on it, malice, obviously, is not an essential feature of employment-related decision-making.

---

[8]     A reasonable argument can be made that this case runs counter to that expectation. Based on the evidence at the first trial, Airday has conjured up malice and ill will as the reason for his termination, which flowed from his unlawful possession of unregistered firearms and his unwillingness to cooperate with Schwam, who was responsible for supervising city marshals, after his arrest. While there is evidence that Schwam was frustrated with Airday, frustration is not the same as malice or ill will.

[9]     Indeed, that the Second Circuit has not had to resolve this issue—and very few district courts have—in the twelve years since *Engquist* was decided is testament to that fact.

## C.

Although summary judgment is denied for the reasons discussed above, it is worth noting that Plaintiff may well not be able to satisfy his *prima facie* case at trial. To prevail on his *LeClair* claim, he must show that the persons he seeks to compare himself to were similarly situated in all material respects. *Hu*, 927 F.3d at 96 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). Based on the evidence adduced at the first trial (which clearly could be different than what will be adduced at the equal protection trial), that may be a very difficult row for Airday to hoe, as there are numerous differences between Airday and other city marshals who engaged in misconduct while in office. In addition, he must prove that former-Mayor Bloomberg's decision not to reappoint him was motivated by malice, ill will, or some other improper consideration. *Id.* at 91 (quoting *Zahra*, 48 F.3d at 683). That will also prove difficult as there appears to be no evidence that Schwam's motive (even assuming he was improperly motivated) was shared by, or moved, the decision-maker. Nevertheless, Defendants did not marshal the evidence into a Rule 56.1 statement to show that there is no question of fact on those critical issues, and the Court is not going to do their work for them.

## CONCLUSION

For the foregoing reasons, Defendants' motion is DENIED. Not later than two weeks from this Order, the parties must submit a joint status letter via ECF addressing the following issues:

(i)     whether both parties would like a referral to Magistrate Judge Aaron for a settlement conference;

(ii)    whether both parties are willing to waive a jury trial; and

(iii)　　whether both parties consent to all further proceedings before the

Magistrate Judge.

If the parties do not agree, they are directed not to inform the Court of either

party's position; they should only state whether there is agreement or not on the issue.

The parties are warned that the Court cannot predict when it will be practicable to hold

jury trials and that, when it is, criminal trials will have priority over civil trials.  Whether

the parties consent to a bench trial or wish to proceed with a jury trial, the Court will give

them at least one-month warning of their trial date.


**SO ORDERED.**

Date:  **July 16, 2020**
　　　  **New York, NY**

　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　**VALERIE CAPRONI**
　　　　　　　　　　　　　　　　　　　　　　**United States District Judge**