```
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
     ------------------------------------X
 4   GEORGE AIRDAY,
 5                  Plaintiff,
 6        - against -                  14-cv-8065 (RWS)
 7   THE CITY OF NEW YORK, KEITH SCHWAM
     and DAVID M. FRANKEL,
 8
 9                  Defendants.
     ------------------------------------X
10
11          DEPOSITION OF KEITH SCHWAM, taken by
12   Plaintiff, pursuant to Notice, at the Law Offices of
13   Nathaniel B. Smith, on Thursday, March 30, 2017,
14   commencing at 10:48 a.m., before Chandra D. Brown, a
15   Registered Professional Reporter and Notary Public
16   within and for the State of New York.
17
18
19
20
21
22
23
24
25   Job #25835
```

```
 1              K. Schwam - 3/30/17
 2   Q    How was this letter sent to Marshal
 3   Airday?
 4   A    I remember it was hand delivered to his
 5   office.  It may also have been mailed.  It
 6   probably was.
 7   Q    Did you obtain anybody's approval before
 8   sending this letter?
 9   A    No.
10   Q    Did you have any discussions with
11   Mr. Baxter about this letter before sending it?
12   A    No.
13   Q    Why did you send this letter to Marshal
14   Airday?
15   A    To inform him that a successor had been
16   appointed to his term -- excuse me, to the
17   office that he previously held, and that his
18   service as a marshal had ended, and that,
19   accordingly, he needed to surrender his badge
20   and identification card, and to ask him to
21   contact our office for additional information
22   regarding the wind-down procedure or
23   termination of office procedure.
24   Q    And why did you make this recommendation
25   or decision to have a successor appointed for
```

1        K. Schwam - 3/30/17
2   his office?
3   A    Well, first of all, that was a -- the
4   appointment of a successor was expressly
5   authorized by the law.
6        My reasons for recommending that that be
7   done had to do with Marshal Airday's conduct
8   and judgment that was exposed in the aftermath
9   of his two arrests in December 2011 and
10  January 2012.
11  Q    And what was that conduct that led you to
12  make this recommendation?
13  A    It involved several elements.  One, the
14  marshal was in possession unlawfully of two
15  firearms.  Two, that fact became known after
16  the marshal was arrested on a domestic violence
17  charge, and was under an obligation to
18  surrender all of his firearms.
19       The fact that he was arrested within four
20  weeks of the domestic violence arrest with
21  facts that indicated that he had not
22  surrendered all his firearms as directed by the
23  court, and that he had been in possession for
24  some period of time before his domestic
25  violence arrest of an unregistered firearm were

```
 1              K. Schwam - 3/30/17
 2    the principal acts that caused me to make the
 3    recommendation.
 4         Those acts, in turn, to me reflected
 5    judgment that fell far short of the standard
 6    that I believe was warranted for someone who
 7    is, Number 1, mayoral appointee; and Number 2,
 8    holding the position that involves the
 9    scrupulous attention to rules, court orders,
10    and adherence to the law in situations that
11    involve actions that -- the position involves
12    actions taken against members of the public.
13         So the position involves a mayoral
14    appointment, a delegation of very serious
15    authority to take away people's property, to
16    remove people's vehicles, to remove people from
17    their homes, to remove money from people's bank
18    accounts.  Those are very serious
19    responsibilities that call for uncompromised
20    integrity, mature judgment, adherence,
21    scrupulous adherence to rules, laws and court
22    orders and basic seriousness in how the person
23    goes about conducting their affairs, both
24    personal and official.
25         The conduct that I described and the fact
```

```
 1            K. Schwam - 3/30/17
 2   that the marshal having been arrested once
 3   failed to do the things that were required of
 4   him to stay well clear of being arrested again,
 5   and that he had not done those things and that,
 6   in fact, done the opposite, said to me that we
 7   need to replace Marshal Airday.
 8   Q    Are there any other reasons for why you
 9   made the recommendation to replace Marshal
10   Airday?
11   A    No.
12   Q    You mentioned that Marshal Airday was
13   arrested for a domestic violence incident; is
14   that correct?
15   A    Correct.
16   Q    When did you first learn about
17   Marshal Airday's arrest for a domestic violence
18   incident?
19   A    I believe it was shortly after the arrest.
20   Q    How were you informed?
21   A    That may have been the one that
22   Ken Litwack called me about.  We are
23   notified -- my office is notified when marshals
24   are arrested through several mechanisms.  So I
25   believe I had more than one report regarding
```

```
 1              K. Schwam - 3/30/17
 2   the marshal's arrest, and I believe that was
 3   the one that Ken Kelly called me about.
 4        Excuse me.  Not Ken Kelly.  Ken Litwack.
 5   Q    Ken Litwack.
 6        You believe Ken Litwack called you up
 7   about the domestic violence arrest?
 8   A    I believe so.
 9   Q    And you also were notified by the New York
10   State Criminal Justice Department, weren't you?
11   A    Correct.
12   Q    That's an automatic system that lets you
13   know that?
14   A    Yes.
15   Q    And you had been notified of other
16   marshals being arrested through that same
17   system, hadn't you?
18   A    From time to time.
19   Q    Who?
20   A    I can't remember specific means of
21   notification.  If your question goes to --
22   Q    Well, my question is:  Who else do you
23   remember getting notified, one way or the
24   other, that they were arrested who was a City
25   marshal who was under your supervision?
```

```
 1                  K. Schwam - 3/30/17
 2      A     I have no recollection of his being in the
 3      scofflaw program.
 4      Q     During your investigation, did you ask him
 5      to resign?
 6      A     Not that I recall.
 7            (THIS CONCLUDES CONFIDENTIAL PORTION.)
 8      Q     After you got the call from Litwack
 9      alerting you --
10            MR. SEACORD:  Are we done with Shapiro?
11            MR. SMITH:  Yes, we are.
12            MR. SEACORD:  Okay.  So we're no longer
13      confidential.
14            MR. SMITH:  Right.  Thank you.
15   BY MR. SMITH:
16      Q     After you got the call from Litwack
17      alerting you to Marshal Airday's arrest, what
18      did you do?
19      A     I can't be certain that the call from
20      Litwack was the first, you know, but --
21      Q     Okay.  So let me rephrase the question.
22      Fair enough.  I'll rephrase the question.
23            After you learned that Marshal Airday had
24      been arrested in December of 2011, what did you
25      do?
```

```
 1              K. Schwam - 3/30/17
 2   A     My recollection is that we opened a file
 3   on it.  Whether we made that a formal
 4   investigation, I'm not certain, but we
 5   certainly made a record in our system
 6   certainly.  I believe we obtained some of the
 7   records.  I don't recall whether we sent any
 8   correspondence to Mr. Litwack or the marshal
 9   concerning his obligations to inform DOI of the
10   disposition of the matter.
11         I don't have a specific recollection of
12   doing that, but we might have.  I'm sure I
13   would have at least told Ken Litwack to make
14   sure that was done.
15   Q     What records did you obtain regarding
16   Marshal Airday's arrest for the domestic
17   violence?
18   A     It would be standard.  I don't have a
19   specific recollection of the precise records
20   that we obtained, but it would be standard for
21   us to obtain a copy of the arrest report from
22   the police department, possibly the charging
23   instrument in the Criminal Court.
24         If there were other police reports on the
25   matter, we might have, but I don't have a
```

```
 1            K. Schwam - 3/30/17
 2   specific recollection of what particular
 3   records we obtained.
 4   Q    After you obtained those records, did you
 5   take any disciplinary action against Marshal
 6   Airday?
 7   A    Based on the December arrest?
 8   Q    Yes.
 9   A    Not at that time but upon his second
10   arrest.
11   Q    Okay.  We'll get to that.
12   A    Yeah.
13   Q    Okay.
14        So after the first arrest, you got your
15   records, you didn't take any steps.  You opened
16   up an investigation, formal or otherwise.
17        Is that fair to say?
18   A    I didn't say we didn't take any steps.
19   Q    You didn't take any steps.
20   A    We were gathering basic information.
21   Q    You were gathering information.
22   A    Yeah.  Yes.
23   Q    All right.
24        What happened next?
25        MR. SEACORD:  Objection.
```