```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

GEORGE AIRDAY,

            Plaintiff,

       v.                              14 CV 8065 (VEC)

THE CITY OF NEW YORK, et al.,

            Defendants.

------------------------------x
                                       New York, N.Y.
                                       May 6, 2019
                                       10:00 a.m.
Before:

               HON. VALERIE E. CAPRONI,

                                       District Judge
                                       -and a Jury-

                        APPEARANCES

NATHANIEL B. SMITH
     Attorney for Plaintiff

NEW YORK CITY LAW DEPARTMENT
     Attorneys for Defendants
BY:  WILLIAM A. GREY
     GARRETT KAMEN
```

1  Q.  In 2013 were you employed by anyone other than the New York
2  City marshals?
3  A.  No.
4  Q.  I'm going to show you what's been marked as page 20 from
5  Plaintiff's Exhibit 30A.  Do you see that on the screen?
6           MR. SMITH:  The whole thing is not in evidence.
7           MR. GREY:  I'm just asking if he can see it on the
8  screen.
9           MR. SMITH:  I think the jury can see it.
10          THE COURT:  The whole thing is in evidence.
11          MR. SMITH:  It is going to be subject to redactions.
12          THE COURT:  29B?
13          MR. GREY:  It's 30A, page 20 from 30A.
14          THE COURT:  That is not what you have on the screen.
15          MR. GREY:  Yes, page 20 from the application, from
16  30A.
17          THE COURT:  I'm sorry.  Question what from 30A are you
18  focused on?
19          MR. GREY:  Page 20 from 30A, your Honor.  What I have
20  on the screen is page 20.
21          THE COURT:  I got it.  What question?
22          MR. GREY:  Both of them I'm going to ask about.
23          THE COURT:  Which is what?
24  Q.  You were the owner of a --
25          THE COURT:  What is the question number?  What is the

```
 1  number of the question you're reading?
 2          MR. GREY:  29B is what I'm talking about, your Honor.
 3  I apologize.
 4          THE COURT:  That's the question number.
 5          MR. GREY:  Correct.
 6  Q.  Look at 29B, Mr. Airday.
 7  A.  All right.
 8  Q.  In 2013 you were the owner of a real estate group called
 9  the Star Group, correct?
10  A.  Yes.  It's a one-person LLC.
11  Q.  That owned your office that you worked out of, correct?
12  A.  That owned the building that was the location of my office.
13  Q.  Earlier when you told the jury that you had to pay rent for
14  your office, what you meant was you paid a company that you
15  owned rent for your office, correct?
16  A.  That's right.  I used that to pay off my mortgage.
17  Q.  You also owned 1 Main Street Associates LLC, correct?
18  A.  That's right.
19  Q.  When you no longer became a marshal, you sold the building
20  you owned, correct?
21  A.  I had to sell it.  I couldn't afford to not sell it.
22  Q.  You made money on that sale, correct?
23  A.  No, I did not.
24          MR. SMITH:  Objection.
25          THE COURT:  Overruled.
```

1   Q.   What was the sales price on that?
2              MR. SMITH:  Objection.
3              THE COURT:  Overruled.
4   Q.   What was the sales price of that building?
5   A.   Of which building?
6   Q.   The building that the Star Group owned.  Withdrawn.  Did
7   the Star Group own more than one building or just one building?
8   A.   You referred to two items, the 1 Main Street --
9              THE COURT:  Mr. Airday, don't argue.  Just answer the
10  question.
11  A.   What is the question?
12  Q.   Did the Star Group own more than one building or just that
13  one building?
14  A.   Just that one building.
15  Q.   You sold that building, correct?
16  A.   I did sell it.
17  Q.   How much did you sell that building for?
18  A.   I sold it for $1.4 million.
19  Q.   After you sold the building, you retained the right to keep
20  rent from persons in the building, correct?
21  A.   No, no.
22  Q.   Did the Star Group retain that right?
23  A.   No.
24  Q.   Just the one --
25  A.   I sold it.

1  Q.  What buildings did 1 Main Street Associates own?
2  A.  In Poughkeepsie, that was the building where I had somebody
3  basically handling the maintenance and cleaning.
4  Q.  That was your vacation home upstate, correct?
5  A.  No.
6  Q.  Was it your vacation home in Palm Beach that one Star
7  owned?
8  A.  No.
9  Q.  So neither of those owned your vacation homes in Palm Beach
10 or upstate New York?
11 A.  Neither what?
12 Q.  Neither of these organizations that you have created owned
13 your vacation home in Palm Beach or upstate New York?
14 A.  That's right.
15 Q.  Earlier you were testifying about a letter that you
16 received from Mr. Schwam requesting that you stop performing
17 the duties of a marshal.  Do you remember that?
18 A.  Yes.
19 Q.  That was in January of 2012, correct?
20 A.  Yes.
21 Q.  You told this jury that your lawyer told you not to comply
22 with that request, right?
23 A.  That's right.
24 Q.  I'm going to show you what's been marked as Defendants'
25 Exhibit H for identification.

1   A.  That's right.
2   Q.  Do you keep valuables in that safe?
3   A.  I keep some valuables, not that many.
4   Q.  You keep your children's birth certificates, right?
5   A.  That's right.
6   Q.  You keep your records that you have in there, right?
7   A.  I keep odds and ends, miscellaneous paraphernalia.
8   Q.  In fact, you bought that safe specifically because you had
9   a firearm stolen in 1975, correct?
10  A.  I didn't buy it specifically for that reason, but that was
11  among the reasons.
12  Q.  In 1975 a gun was stolen from your possession, right?
13  A.  Yes, it was stolen from my apartment.
14  Q.  You kept your gun in a back of a drawer covered with
15  things, right?
16          THE COURT:  That would be in 1974?
17          MR. GREY:  1974, your Honor.
18          MR. SMITH:  Your Honor, I'm going to object to this.
19          THE COURT:  We are getting very far afield, Mr. Grey.
20  Q.  I'm sorry.  '85.
21          THE COURT:  It's still far afield.
22  Q.  You got the safe in '85 because you had a gun problem, yes?
23          MR. SMITH:  Objection.
24          THE COURT:  Overruled.
25  A.  What is your question?

1   Q.   My question is, you bought the safe in 1985 amongst other
2   reasons because you had a gun stolen from your apartment,
3   correct?
4   A.   I didn't buy the safe in 1985.  I bought it before.
5   Q.   The licensing division revoked your license for a time
6   after this gun was stolen, right?
7   A.   I had to submit some paperwork and answer some questions in
8   order to have my license active.
9   Q.   One thing that you told them as one of the precautions that
10  you took is that you installed window gates in addition to
11  locks, changed apartment locks, and used a steel safe to store
12  guns, correct?
13  A.   Yes, I did.
14  Q.   This loss of a firearm, that was also exposed as a result
15  of your second arrest, correct?
16  A.   No.
17  Q.   No.  When did you first tell the department of
18  investigation about your lost firearm in 1985?
19  A.   The lost firearm was reported to the police department way
20  before I became a marshal.  They insisted at the licensing
21  division to continue listing that lost and reported stolen
22  firearm on my license.  But there was no other issue remaining
23  as far as I'm concerned.  The New York City Police Department
24  apparently lost their own records for this thing, but I kept a
25  copy of everything.

1      When I showed the police department and the courts
2 that that other gun was reported stolen, they resolved the
3 issue.  In fact, the New York City Police Department licensing
4 division gave me back my guns once that issue was resolved.
5 They had the police officer from the license division testify,
6 testify incorrectly, and the administrative judge had seen my
7 documentation and accepted it.
8 Q.  You didn't tell the department of investigation that you
9 had a stolen gun until 2013, correct?
10 A.  Yes.
11      THE COURT:  I'm sorry.  I don't understand.  Yes, that
12 was the first time you told DOI that you had a gun stolen from
13 you?
14      THE WITNESS:  Yes.  There was no question whether
15 something like this had happened, so there was no reason for me
16 to talk about old history.  That was a long time ago, before I
17 became a marshal.
18      THE COURT:  The gun was stolen before you were a
19 marshal?
20      THE WITNESS:  The gun was stolen sometime in the
21 1980's.  It had nothing to do with my work before 1980,
22 sometime during the time I was a probation officer.  It was
23 late '70s or early '80s.  I don't know the exact date.
24 Q.  Does looking at the letter you wrote to Leonard Kaplan,
25 commanding officer, license division of 1 Police Plaza, refresh

1  your recollection as to the date?
2           THE COURT:  Show it to Mr. Smith first.
3  Q.  Take a look and let me know if that refreshes your
4  recollection as to when the gun was stolen.
5  A.  Yes.
6  Q.  Now that your recollection is refreshed, when was the gun
7  stolen?
8  A.  The suspension is August 28, 1986.  But the date for the
9  gun being stolen is not cited.  I don't recall exactly when
10 that happened.
11 Q.  Your license got suspended in 1986, correct, your pistol
12 license?
13 A.  That's right.
14 Q.  You became a marshal in 1984, correct?
15 A.  Right.
16 Q.  After the letter you got identified in Plaintiff's
17 Exhibit 3, you did not resign, did you?
18 A.  Repeat your question.
19 Q.  Sure.  In the letter that Mr. Schwam sent you on January
20 19th of 2012, he suggested that you should resign your office
21 based on the discovery of all the facts in the first paragraph,
22 correct?
23 A.  That's what the letter says, yes.
24 Q.  You did not resign, correct?
25 A.  No, I did not.

1          Not only did he not tell you about the $100,000 in
2  cash, but how much did he sell it for?  1.4 million.  And how
3  did he set up the sale?  The buyer took a mortgage from him on
4  the rest other than the 100,000 cash.  What is that?  More
5  means of support.  He's getting paid back every month on a
6  15-year mortgage, he said.  That's a lot of means of support
7  that he didn't tell you about.

8          He didn't tell you about his Palm Beach vacation home.
9  He didn't tell you about his upstate vacation home.  He still
10 hasn't told you the partner in the company that he's in, how
11 many properties they own, what income he's making from it.

12         Remember, members of the jury, the position of a New
13 York City marshal involves dealing with members of the public.
14 It involves people that are in vulnerable positions who have
15 court orders against them.  The person who is authorized to
16 take their personal property in that situation at a bare
17 minimum must be trusted to maintain accurate information and
18 documentation.  He told you that's a main part of his job.  And
19 to be forthright and honest.

20         When he goes back to the court and he tells them I
21 followed the court order, what if someone says no, you didn't?
22 What do we have now?  We've got a problem for the City of New
23 York.  What's part of Marshal Airday's official record open to
24 the public and for everyone to see?  That he doesn't follow
25 court orders, he didn't follow the DOI directive to turn over